**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LISA ALCORN, as Plenary Guardian | ) | |
| of the Estate and Person of TYLER LUMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 5859 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| THE CITY OF CHICAGO, et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Alcorn, as Plenary Guardian of the Estate and Person of Tyler Lumar, sued the City of Chicago, the Chicago Police Department (CPD), CPD Chief of the Bureau of Patrol Wayne Gulliford in his official capacity, CPD Lieutenant Kevin Hannigan in his official capacity, and several officers and employees of the Chicago Police Department ("Individual CPD Defendants")[1] in their individual and official capacities (collectively "City Defendants") and Cook County, Cook County Sheriff Thomas Dart, Executive Director of Cook County Department of Corrections Dr. Nneka Jones Tapia (Dr. Jones) in her official capacity, and several officers and employees of the Cook County Sheriff's Office ("Individual County Defendants")[2] in their individual and official capacities (collectively "County Defendants"). (Dkt. 69). Plaintiff brings

---

[1] The Individual CPD Defendants include Officer Daniel Warren, Officer Carlos Vega, Officer Corrina Esteban, Officer Justin Conner, Detention Aide Kimoni Peals, Officer Justin Conner, Lieutenant Dany Masters Helwink, Lieutenant Frederick Ulleweit, Officer Peter Vinson, Officer Dietrice Ellens-Alexander, Detention Aide Charles Barry, Detention Aide Jonathan Errum, District Commander James Jones ("J. Jones"), Sergeant Alan Lasch, Sergeant Kevin Geyer, Station Supervisor Weslene O'Donnell, and Station Supervisor John Gartner. (Dkt. 69 at ¶¶ 9-23).

[2] The Individual County Defendants include Correctional Officer T. Wlodarski, Correctional Officer Crawford, Correctional Officer Garmon, Correctional Officer Leon, Lieutenant Angela Lewis, and Lieutenant Chaunte Latham. (Dkt. 69 at ¶¶ 27-28).

several claims under 18 U.S.C. § 1983 alleging violations of Tyler Lumar's constitutional rights during a series of events occurring over a two-day period related to his arrests and detentions by CPD and the Cook County Jail and eventual attempted suicide in the CPD lockup. (Dkt. 69). The Individual CPD Defendants, the City of Chicago, and the County Defendants filed separate Motions to Dismiss certain claims in Plaintiff's Amended Complaint. (Dkts. 87, 88, 92). The Motions to Dismiss are granted in part and denied in part for the following reasons.

## BACKGROUND

The facts set forth in Plaintiff's Amended Complaint are accepted as true for the purpose of reviewing Defendants' Motions to Dismiss. *Heyde v. Pittenger*, 633 F.3d 512, 516 (7th Cir. 2011). The Court also considers the General Administrative Order No. 2015-06 ("the Order") attached to the parties' pleadings. Generally, matters outside the pleadings may not be considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(b). However, the Court can examine concededly authentic documents attached to a party's motion to dismiss if the documents are referred to in the plaintiff's complaint and are central to his claim. *See Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993). GAO 2015-06 is central to Plaintiff's Complaint because Count II is based entirely on the alleged selective enforcement of the Order at the time Lumar was arrested. Therefore, the Court takes judicial notice of the fact that Chief Judge Evans issued GAO 2015-06 on June 17, 2015 and the Order states what it does. (*See* Dkt. 87-1). Plaintiff attaches a CPD General Order, a CPD Special Order, and two police reports to pleadings in response to the Motions to Dismiss. (*See* Dkts. 101, 102). The Court will not consider them as they are not referenced in Plaintiff's Complaint.

## I.  Arrest and Detention on Out-of-County Traffic Warrant

At approximately 3:00 p.m. on August 18, 2016, Chicago Police Officers Daniel Warren and Carlos Vega responded to a call at Madison Family Health Center after receiving a complaint from certain medical personnel there that Tyler Lumar was yelling and refusing to leave the medical grounds.  (Dkt. 69 at ¶ 32).[3]  When the Officers arrived, the medical staff asked the Officers to issue a verbal notice informing Lumar that he was banned from the property but advised that they did not wish to pursue criminal charges.  (*Id.* at ¶¶ 33-34).  Accordingly, at approximately 3:15 p.m., Officers Warren and Vega issued the verbal warning.  (*Id.* at ¶ 35).  No charges were brought and Lumar left the Health Center and walked peacefully down the street.  (*Id.*).

Approximately 35 minutes later at 3:50 p.m., Officers Warren and Vega stopped Lumar as he was walking down the street and arrested him on a traffic warrant for his arrest issued by Lee County.  (*Id.* at ¶ 36).  Officers Warren and Vega searched Lumar and found that he was not in possession of any contraband or narcotics and did not appear to be under the influence of drugs or alcohol.  (*Id.* at ¶ 37).  Lumar informed the Officers that the information was incorrect and that he had no outstanding traffic warrant but they proceeded to transport him to the 11th District Station.  (*Id.* at ¶¶ 38-39).  Upon arrival, he was searched by Officer Corrina Esteban who found again that he was not in possession of any narcotics and did not appear to be under the influence of any drugs or alcohol.  (*Id.* at ¶ 40).

Detention Aide Kimoni Peals and other officers at the 11th District Station then booked and processed Lumar.  (*Id.* at ¶ 41).  The booking officers also searched Lumar, finding only $130.00 and a necklace on his person and, once again, that he was not in possession of any

---

[3] The numbering of paragraphs changes on several pages of the Amended Complaint, for example, on page 43 such that ¶ 147 follows ¶ 201.  The Court cites to each paragraph as numbered in the Amended Complaint.  Therefore, there may be more than one set of facts attributed to the same paragraph number.

narcotics and did not appear to be under the influence of drugs or alcohol. (*Id.* at ¶¶ 41-42). During booking, Lumar informed Officer Peals and the other officers that he was taking prescription medication for asthma. (*Id.* at ¶ 42). Finally, Officer Conner took Lumar's mugshot and searched him, finding also that he was not in possession of any narcotics or under the influence of drugs or alcohol. (*Id.* at ¶ 43).

Lumar was received in the 11th District lockup at around 4:26 p.m. that day. (*Id.* at ¶ 44). At 4:43 p.m., Officer Vega or some other officer contacted Lee County through the Law Enforcement Agencies Data System (LEADS) and at 4:48 p.m., an officer from Lee County responded to inform CPD that the warrant was valid and had been issued on June 9, 2016 for failure to pay a fine after Lumar pleaded guilty on May 15, 2015 to driving on a suspended license. (*Id.* at ¶¶ 45-46, 49). Lee County advised CPD that Lumar could pay $50.00 (10% of $500.00) to bond himself out and, if he were unable to pay the $50.00, that CPD should place a hold on him so that Lee County could pick him up and extradite him. (*Id.* at ¶ 46).

The CPD Officers failed to advise Lumar that he could bond himself out by paying $50.00. (*Id.* at ¶ 47). Instead, they reported "Bond Information Not Available" on his arrest report, charged him with a "Class Z" (nonbondable) offense under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z, even though they knew the traffic warrant arose out of a Class A Misdemeanor bondable offense, and issued a hold for him under #Z14221. (*Id.* at ¶¶ 47-48). District Commander James Jones and Station Supervisors Sergeant Alan Lasch and Sergeant Kevin Geyer approved the issuance of the Z charge and the concealment of the fact that Lumar could have posted bail for $50.00 and leave the 11th District station. (*Id.* at ¶ 95). Lumar made several phone calls to his mother Lisa Alcorn and fiancé Casey Tencate on August 18, 2016. (*Id.* at ¶ 90). Had he known

he could have posted bail for $50.00, he would have used the money on him to do so or asked his mother or fiancé to post that amount. (*Id.* at ¶¶ 89-90).

According to the Complaint, as part of his May 2015 guilty plea in Lee County, Lumar agreed to pay $673.00 in fines and court costs in monthly installment payments of $25.00 due on the first of each month and Lumar timely made these payments from May 2015 through May 2016. (*Id.* at ¶ 51). Lumar claims that Lee County issued the traffic warrant on June 3, 2016, after he made his June 2016 payment a few days late. (*Id.*). Lumar made the July 2016 and August 2016 payments on time and at the time of his arrest on August 18, 2016, the last and final payment was not due until September 1, 2016. (*Id.*). Plaintiff alleges that at some point, CPD Officers including Officers Warren, Vega and Esteban spoke with his fiancé Tencate, who informed them that Lumar had made the outstanding June 2016 payment which served as the basis of the Lee County warrant. (*Id.* at ¶ 82).

Before Lumar's arrest, on June 17, 2015, Chief Judge Evans of the Circuit Court of Cook County issued General Administrative Order No. 2015-06 Procedures for Arrests on Illinois Intrastate Warrants Issued Outside of Cook County. (*Id.* at ¶ 109). GAO No. 2015-06 required that any defendant who, like Lumar, is taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County, "shall be required to appear in bond court." (*Id.* at ¶ 110; Dkt. 87-1). Plaintiff alleges CPD selectively enforced this policy only against non-white arrestees like Lumar and allowed similarly situated white arrestees who were able to bond themselves out instead directly from the CPD lockup. (Dkt. 69 at ¶¶ 109-11, 113).

After being told he could not bail himself out, Lumar became extremely agitated and anxious and advised CPD Officers that he needed medical treatment. (*Id.* at ¶ 204). At

approximately 11:30 p.m., Lumar had an emergent asthma attack and CPD Officers including Officer Walter Delgado transported him to the Mount Sinai Hospital emergency room for treatment. (*Id.* at ¶ 51). Lumar was discharged from the emergency room the following morning on August 19, 2016 at approximately 6:30 a.m., transported back to the 11th District station by Officer Walter Delgado and other officers and received at the station by Officer John Granat. (*Id.* at ¶¶ 53-54). Officers searched Lumar before he was transported to the hospital, before he was transported back to the station and upon receipt at the station and, each time, did not find any narcotics on him. (*Id.* at ¶¶ 52, 54-55).

## II.   Arrest and Detention on Possession of Narcotics

At approximately 8:40 a.m. that same morning, CPD Officers Peter Vinson and Dietrice Ellens-Alexander and other Central Prisoner Transport personnel transported Lumar to the Cook County Jail and upon arrival at the Jail placed Lumar in Bullpen 23, a group lockup with 25 other pretrial detainees. (*Id.* at ¶¶ 56-57). Before transporting him, the Officers searched Lumar and did not find any narcotics on his person. (*Id.* at ¶ 56). In Bullpen 23, the pretrial detainees including Lumar were seated together on a bench. (*Id.* at ¶ 57). At some point, Cook County Correctional Officers T. Wlodarski, Crawford, Leon and Garmon conducted a search of the pretrial detainees in Bullpen 23, during which an unknown African American male sitting next to Lumar removed a package from his shoe and dropped it behind the bench that he and Lumar were seated on. (*Id.* at ¶¶ 57-78). Correctional Officer Wlodarski recovered the package, which was later determined to contain narcotics in the form of 12 white rocks. (*Id.* at ¶ 59). Correctional Officer Wlodarski then pulled Lumar out of Bullpen 23 and, thereafter, Correctional Officers Wlodarski and Crawford restrained Lumar outside of the bullpen while CPD Officer Vinson and other CPD

officers handcuffed and arrested Lumar. (*Id.* at ¶¶ 59-60). Lumar told the Officers that the narcotics were not his and were dropped by another detainee. (*Id.* at ¶ 145).

The Cook County Jail maintains video footage of the bullpen lockup areas and video surveillance of Bullpen 23 shows that the detainee sitting next to Lumar dropped the narcotics on the floor immediately before Officer Wlodarski discovered it. (*Id.* at ¶ 146). Officer Wlodarski never reviewed the video. (*Id.*). In the Incident Report, Officer Wlodarski falsely claimed he found the narcotics on Lumar and falsely indicated that the incident was not captured on video surveillance. (*Id.* at ¶¶ 61, 151). Officer Wlodarski turned the narcotics over to Cook County Department of Corrections Lieutenant Angela Lewis.

At approximately 9:25 a.m., CPD Officers Vinson and Alexander and others transported Lumar and the narcotics from the Cook County Jail back to the 11th District station lockup. (*Id.* at ¶ 62). Officer Wlodarski told the CPD Officers that he found the narcotics on Lumar's person while conducting a custodial search of the arrestees in Bullpen 23. (*Id.* at ¶ 182). Neither Officer Wlodarski nor anyone else from the Cook County Sheriff's Office provided the CPD Officers with any paperwork, including paperwork documenting that the narcotics were found on Lumar, when turning Lumar over. (*Id.* at ¶ 149). No CPD Officer watched the video surveillance of the bullpen. (*Id.* at ¶ 147).

### III.    Attempted Suicide in 11th District Lockup

Lumar arrived at the 11th District station, which is approximately 2.5 miles or 10 minutes away from the Cook County Jail, sometime between 10:15 and 10:45 that morning. (*Id.* at ¶¶ 62, 150). Upon arrival, Officer Vinson turned the narcotics over to Station Supervisor Officer John Gartner and Detention Aide Jonathan Errum placed Lumar into cell #E2. (*Id.*). Lumar told Errum that he was being wrongfully detained, that he had been framed for having the drugs and that he

was suicidal and hopeless. (*Id.* at ¶ 227). CPD records provide conflicting information as to what time Lumar was placed in his cell; however, at least some CPD reports state that he was placed into cell #E2 at 11:04 a.m. (*Id.* at ¶ 62). When Lumar arrived, CPD Lieutenants Dany Helwink and Frederick Ulleweit were responsible for watch command of the inmates in the 11th District station lockup. (*Id.* at ¶¶ 63-64).

Eric Spann, the inmate housed in cell #E1 next to Lumar, witnessed Detention Aide Errum place Lumar into cell #E2. (*Id.* at ¶¶ 65-66). More than ten minutes after Lumar was placed in cell #E2, Spann heard Lumar praying to God and asking for forgiveness. (*Id.* at ¶ 67). Several minutes after that, Spann heard loud banging noises on Lumar's cell; the officers in the station could hear the noises but none came to investigate. (*Id.* at ¶ 68). More than five minutes after the banging, Spann called for a guard because he needed some tissue. (*Id.* at ¶ 69). Detention Aide Charles Barry responded and, as he came down Cell Block E, discovered Lumar hanging from his cell. (*Id.* at ¶ 70). Barry cut Lumar down and called for assistance, and Officer Menoni performed CPR on Lumar. (*Id.* at ¶ 71).

Chicago Police Department Special Orders and policy require that lockup personnel complete a visual check of each arrestee every 15 minutes and create an Inspection Log which records the time of each inspection, a concise statement of conditions found, notable occurrences, actions taken, and the initials and employee identification number. (*Id.* at ¶¶ 246, 256). Plaintiffs allege that Barry falsified the watch log at the end of his shift by initialing next to each 15-minute interval for the hours of his shift indicating that he had visually checked on each inmate when in fact he had not. (*Id.* at ¶ 248).

CPD reports state that Lumar was found at 11:15 a.m. (*Id.* at ¶ 71). Paramedics were dispatched to the station at 11:17 a.m., arrived at 11:44 a.m. and then transported Lumar to Mount

Sinai Hospital. (*Id.* at ¶ 72). Lumar remained at Mount Sinai until September 11, 2016, when he was transferred to Kindred North for long term care. (*Id.* at ¶ 73). Lumar was subsequently transferred to Ballard Respiratory and Rehabilitation Center in Des Plaines, Illinois where he resides now. (*Id.*).

On August 19, 2016, CPD Officer Joseph Trivoli contacted Lee County's Sheriff's Office and requested that they reissue a traffic warrant for Lumar, and the Lee County's Sheriff's Office refused. (*Id.* at ¶¶ 75-76). Neither the Chicago Police Department nor the County Sheriff's Office ever charged Lumar with possession of a controlled substance of for any other crime related to the narcotics recovered by Officer Wlodarski. (*Id.* at ¶¶ 77-78).

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). The factual allegations "must be enough to raise a right to relief above the speculative level." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). At the 12(b)(6) stage, the Court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in his favor. *Heyde*, 633 F.3d at 516. However, "[l]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley*, 671 F.3d at 616 (citing *Iqbal*, 566 U.S. at 678).

## DISCUSSION

Plaintiff's Amended Complaint alleges eight counts against the named Defendants. Counts I, V and VII allege claims against all City Defendants under 42 U.S.C. § 1983 for violations of Lumar's constitutional rights related to his first arrest and pretrial detention on the Lee County warrant, his second arrest and detention for possession of narcotics, and the conditions of his confinement in the 11th District station lockup, respectively. Counts II, VI, and VIII allege corresponding claims for municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) against the City regarding policies and practices Plaintiff claims were the moving force behind those violations of Lumar's constitutional rights.[4]

Similarly, Count III alleges a claim against all County Defendants under 42 U.S.C. § 1983 for violations of Lumar's constitutional rights related to the second arrest and detention for possession of narcotics and Count IV alleges a corresponding *Monell* claim for municipal liability against all County Defendants regarding policies and practices Plaintiff claims were the moving force behind that violation of Lumar's constitutional rights.

The Individual CPD Defendants moved to dismiss Counts I, V, and VII (Dkt. 87), the City moved to dismiss Counts I, II, V, VI, VII and VIII (Dkt. 99), and the Cook County Defendants collectively moved to dismiss Count IV (Dkt. 92).

## I.     Counts I, V and VII against Individual CPD Defendants

In Counts I, V and VII, Plaintiff alleges violations of Lumar's constitutional rights under 42 U.S.C. § 1983 against the City, the Chicago Police Department, Chief Gulliford and Lieutenant Hannigan in their official capacities, and all Individual CPD Defendants in their individual and

---

[4] In the Amended Complaint, Plaintiff alleges Count VI against "Chicago Police Department," which Plaintiff defines to include all City Defendants. (Dkt 69 at ¶ 31). However, in Plaintiff's Response to Individual CPD Defendants' Motion to Dismiss, Plaintiff acknowledged that only the City of Chicago—and not the Individual CPD Defendants—can be held liable for municipal liability under Count VI. (Dkt. 101 at 3 n.1).

official capacities. The Individual CPD Defendants moved to dismiss the claims in Counts I, V and VII against them in their individual capacities. The City separately moved to dismiss these claims against the City, the Chicago Police Department, and all other City Defendants in their official capacities.

### A. Count I § 1983 Claim for Unlawful Detention in Violation of the Fourth Amendment against the Individual CPD Defendants in their Individual Capacities

In Count I, Plaintiff alleges that following Lumar's arrest on the Lee County warrant, the Individual CPD Defendants unlawfully detained Lumar without probable cause and based on fabricated evidence in violation of his rights under the Fourth Amendment. Specifically, Plaintiff alleges that following Lumar's initial arrest, Officers Warren, Vega and Esteban verified with Lee County that the traffic warrant arose out of a Class A Misdemeanor bondable offense and that Lumar could bail himself out by paying $50.00 and, therefore, had no probable cause to continue to detain Lumar and charge him with a nonbondable offense and did so only based on the falsified arrest report stating incorrectly "Bond Information Not Available." The Individual CPD Defendants argue that the Officers had probable cause to make the initial arrest of Lumar on the facially valid Lee County warrant and that Lumar's continued detention based on that arrest was lawful. They argue in the alternative that Officers Warren, Vega and Esteban are protected under qualified immunity.

The Officers lawfully arrested Lumar on the basis of a facially valid arrest warrant issued by a Lee County court. "A police officer who receives a facially valid arrest warrant is ordinarily expected to act upon it, not to second-guess the court's decision to issue it." *Brunson v. Murray*, 843 F.3d 698, 709 (7th Cir. 2016) (dismissing false arrest claim where arrest was made on the basis of a valid arrest warrant). "The officer does not personally violate the Constitution by making the arrest the court has authorized." *Id.* There are two exceptions to this rule: "where a reasonable

officer would have known that the evidence provided to support the warrant failed to establish probable cause," *id.* (citing *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013)), and where the officer "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [if] the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests." *Id.* (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742–43 (7th Cir. 2003)). Neither exception applies here. Plaintiff alleges no facts suggesting that Officers Warren, Vega and Esteban were involved in any way in obtaining the Lee County warrant or had any knowledge of the evidence provided to support the out-of-county warrant. Officers Warren, Vega and Esteban had probable cause to arrest Lumar based on the facially valid warrant.

Plaintiff does not dispute that the Officers had probable cause to arrest Lumar but argues that the subsequent act of fabricating evidence to charge Lumar with a nonbondable offense without probable cause, instead of allowing Lumar to bail himself out, constituted a wrongful detention after his arrest because "[i]f Defendants had not unlawfully detained Lumar, concealing from him his right to bond out, Lumar would have used the cash on his person to post bail." (*See* Dkt. 101 at 3-4). Plaintiff relies on *Manuel v. City of Joliet*, in which the Supreme Court recently held that pretrial detention absent probable cause can violate the Fourth Amendment "not only when it precedes, but also when it follows, the start of the legal process," for example, when a court issues an arrest warrant. 137 S. Ct. 911, 911 (2017). Essentially, Plaintiff argues that after learning from Lee County that Lumar could post $50.00 in bail to be released, the Officers had no probable cause to charge him with a nonbondable offense and continue detaining him based on that charge.

In *Manuel v. City of Joliet*, the Joliet police stopped a car for failing to use a turn signal, searched the car's passenger Elijah Manuel and found a vitamin bottle containing pills. 137 S. Ct. 911, 915 (2017). The field test of the bottle's contents came back negative but the officers arrested Manuel anyway. *Id.* At the station, an evidence technician tested the pills and got the same negative result but lied in his report, claiming one of the pills tested positive for ecstasy. *Id.* One of the arresting officers also lied in his report, stating that he knew the pills to be ecstasy. *Id.* Based on the falsified reports, another officer wrote out a criminal complaint charging Manuel with unlawful possession of a controlled substance and a county judge, relying exclusively on the criminal complaint, determined there was probable cause for the charge. *Id.* As a result, Manuel was detained for seven weeks before the charges were ultimately dropped. *Id.* at 915-16.

Manuel filed a § 1983 action alleging the City violated his Fourth Amendment rights in two ways: first by arresting him at a roadside without any reason and second by detaining him in police custody based on fabricated evidence. *Id.* at 916. The Seventh Circuit upheld the district court's denial of Manuel's unlawful detention claim, citing circuit precedent holding that once a person is detained pursuant to legal process, *e.g.,* a finding of probable cause by a magistrate judge, "the Fourth Amendment falls out of the picture and the detainee's claim that the detention is improper becomes [one of] due process." *Manuel v. City of Joliet*, 590 F. App'x 641, 643 (7th Cir. 2015) (internal citations omitted). The Supreme Court reversed, explaining:

> The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement.

*Manuel*, 137 S. Ct. at 918–19.  In other words, where the government had no probable cause for the arrest in the first place, legal process that fails to cure that lack of probable cause does not extinguish the detainee's Fourth Amendment claim.  The Court held, therefore, that Manuel stated a claim when he sought relief for his post-legal-process pretrial detention.  *Id.* at 919.

Plaintiff's case is distinguishable from *Manuel* in that the Officers had probable cause to make the initial arrest of Lumar based on the facially valid out-of-county warrant.  However, that warrant did not provide probable cause to *continue* detaining Lumar after the Officers learned that the warrant was for a bondable offense and Lumar could secure his release by paying $50.  While an officer may end her investigation once she has established probable cause and the Fourth Amendment imposes no duty to investigate whether a defense is valid, an officer "may not ignore conclusively established evidence of an affirmative defense." *McBridge*, 576 F.3d at 707 (7th Cir. 2009).  Here, the Officers did not end their investigation and instead inquired further with Lee County, learning that the arrest warrant had been issued for a bondable offense.  Despite conclusive evidence to the contrary, according to the facts alleged Complaint which the Court accepts as true, the Officers falsified the arrest report to show that Lumar's bond information was not available and continued to detain him for a nonbondable offense.  Therefore, Plaintiff has sufficiently alleged the Officers detained Lumar without probable cause in violation of the Fourth Amendment.

*Frobe v. Village of Lindenhurst*, decided before *Manuel*, is also instructive here.  No. 11 C 1722, 2014 WL 902878 (N.D. Ill. Mar. 7, 2014).  In *Frobe*, police officers pulled the plaintiff, Louis Frobe, over for speeding and Frobe video recorded his conversation with the officers during the stop.  *Id.* at *2.  The officers arrested Frobe on a felony charge for eavesdropping on a police officer in violation of the Illinois Eavesdropping Act (IEA), searched Frobe and placed him in the police car, and then searched Frobe's vehicle.  *Id.*  The officers confiscated Frobe's prescription

medications but left the paper prescriptions on the floor of the car before having the vehicle towed. *Id.* Once at the police station, the officers contacted the prosecutor's office and were informed that any decision on the felony eavesdropping charge would have to wait until the following day. *Id.* Meanwhile, the officers decided to pretend as though they had never seen the paper prescriptions for the medication confiscated from Frobe and charged him with felony possession of a controlled substance. *Id.* Frobe spent the night in jail and the following day, posted bond and was released from custody. *Id.* at *3. The prosecutor's office ultimately declined to charge Frobe with eavesdropping and eventually dropped the controlled substance charge. *Id.* Frobe filed a lawsuit alleging a claim for false arrest against the officers and challenging three distinct points of the encounter: the traffic stop, the arrest for eavesdropping, and the detention on the controlled substance charge. *Id.* With regard to the first two arguments, the court held that Frobe sufficiently alleged the officers lacked probable cause for the initial stop but that the officers had probable cause to arrest Frobe for eavesdropping. *Id.* at *4-6.

With regard to the third argument that the officers unlawfully detained Frobe on the controlled substance charge, the defendants argued that under *Devenpeck v. Alford*, 543 U.S. 145 (2004), probable cause on the eavesdropping arrest extended to provide a legal basis for Frobe's continued detention on the controlled substances charge. *Id.* at *6. Frobe alleged that it was only after the prosecutor's office refused to immediately authorize a charge of eavesdropping that the officers decided to pretend they had not seen the prescriptions and falsely charge him with the controlled substance offense. *Id.* at *8. The Court held that, taken in the light most favorable to the plaintiff, the allegations in the complaint suggested a scenario that "involves two separate detention decisions by law enforcement" because "although the authorities . . . did not release Frobe at any point, they are alleged to have conspired to manufacture an alternative means of

detainment (i.e., the controlled substance charge) only after the prosecutor's initial decision not to charge Plaintiff under the IEA." *Id.* The Court held that the facts as alleged were sufficient to survive a motion to dismiss. *Id.*

Here, as in *Frobe*, the officers had probable cause to arrest Lumar on the out-of-county warrant. However, also as in *Frobe*, Plaintiff alleges that after learning that the out-of-county warrant had been issued for a bondable offense and that Lumar could secure his own release by posting $50.00, the officers "manufactured an alternative means of detainment" by charging Lumar with a nonbondable offense based on falsified reports stating that his bond information was unavailable and continued to detain him on that basis. In other words, the allegations suggest a scenario that involves two separate detention decisions and adequately alleges the officers lacked probable cause for the second detention based on the charge for a nonbondable offense.

The Individual CPD Defendants argue that Plaintiff's claim fails because the Officers were required by court order to detain Lumar until he appeared in bond court pursuant to GAO 2015-06, regardless of whether the Officers charged him for a nonbondable offense. Contrary to the Individual CPD Defendant's assertion, the GAO is not equivalent to a court order and violation of the GAO is not punishable by contempt of court. *See Murneigh v. Gainer*, 177 Ill. 2d 287, 310 (1997) ("Indeed, this court has held that the violation of an administrative order is *not* punishable by contempt of court.") (emphasis in original). Clearly, to the extent GAO 2015-06 was in effect at the time of Lumar's arrest, the Officers felt they had some discretion in enforcing it because, based on the facts alleged, the Officers did not base their decision to continue detaining Lumar on GAO 2015-06. For example, GAO 2015-06 requires that "[a] properly executed Intrastate Hold Affidavit shall accompany the defendant" to bond court. (Dkt. 87-1). An Intrastate Hold Affidavit sets forth the information in the out-of-county warrant, including the amount of bond set in the

warrant. *See, e.g., Brinson v. Syas*, 735 F. Supp. 2d 844, 855 (N.D. Ill. 2010); *Hargarten v. Dart*, No. 05 C 6006, 2009 WL 103153, at *2 (N.D. Ill. Jan. 15, 2009). The Officers never completed such affidavit; rather, they completed an arrest form indicating (falsely) that Lumar's bond information was unavailable and continued to hold Lumar under a z-warrant, not pursuant to any Intrastate Hold Affidavit. Had they relied on GAO 2015-06, the Officers would have had no need for the falsified report, nonbondable offense charge, or z-warrant.

The Individual CPD Defendants next argue that the Officers are entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Locke v. Haessig*, 788 F.3d 662, 666–67 (7th Cir. 2015) (internal citations omitted). It is "an affirmative defense which may be raised in a motion to dismiss, but the Court considers only the facts alleged in the complaint, which are accepted as true." *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). Qualified immunity shields government officials from liability "unless [a] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir.2009). Here, it has been clearly established that it was unconstitutional for the Officers to continue to detain Lumar without probable cause and based on a falsified arrest report. The Individual CPD Defendants again rely on GAO 2015-06, but such reliance is improper for the reasons already stated: GAO 2015-06 does not have the force of a court order and, regardless, the Offices did not rely on it as a basis for Lumar's detention. Therefore, Officers Warren, Vega and Esteban are not entitled to qualified immunity for Count I.

Finally, the Independent Defendants seek dismissal of Count I against all other Officers—other than Officers Warren, Vega and Esteban—in their individual capacities on the grounds that Plaintiff failed to allege their personal involvement in the wrongful detention. To succeed on an individual-capacity claim under § 1983, Plaintiff must establish that the government employee was personally responsible for a deprivation of his rights. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 469 (7th Cir. 2016) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)); *see also Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003) ("[Section] 1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim."). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id.* (quoting *Gentry*, 65 F.3d at 561)). Direct participation is not necessary, but a plaintiff must at least show that the defendant acquiesced in some way in the constitutional violation. *Palmer*, 327 F.3d at 594.

The Complaint alleges Defendants J. Jones, Lasch, and Geyer approved the issuance of a Class Z charge and of the concealment of the fact that Lumar could have posted bail and left station despite knowing the bond information was readily available from Lee County. (Dkt. 69 at ¶ 95). Therefore, Plaintiff sufficiently alleges at least acquiescence on the part of Defendants J. Jones, Lasch and Geyer. However, Plaintiff fails to allege that any other officers were personally involved in, had knowledge of or consented or acquiesced in any way to the unlawful detention alleged in Count I. Accordingly, Plaintiff may proceed on Count I against Defendants Warren, Vega, Esteban, J. Jones, Lasch and Geyer in their individual capacities; Count I is dismissed as to all other Individual CPD Defendants in their individual capacities.

**B.    Count V § 1983 Claim for Unlawful Arrest and Detention in Violation of the Fourth Amendment against the Individual CPD Defendants in their Individual Capacities**

In Count V, Plaintiff alleges that Officer Vinson, Officer Alexander and other CPD officers unlawfully seized and detained Lumar for possession of narcotics without probable cause while he was in Cook County Jail.  Specifically, Plaintiff alleges that Officers Vinson and Alexander did not have probable cause to arrest and detain Lumar because they did not witness Correctional Officer Wlodarski recover the package of narcotics, did not receive any paperwork from Cook County documenting Wlodarski's claim that Lumar had the alleged narcotics on his person, and knew Wlodarski's claim was false because they knew Lumar had been searched eight times before he was transferred to the Cook County Jail and never found to have narcotics or contraband on him.  In further support of their claim, Plaintiff alleges that Officers Vinson and Alexander knew Cook County maintained live footage of the bullpen but did not view the footage before arresting and detaining Lumar knowing it would show that Lumar never had any narcotics on him.

Plaintiff's claim against Officers Vinson and Alexander fails for two reasons.  First, Lumar cannot be "seized" while already in police custody.  A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The Officers' arrest and transport of Lumar did "not curtail [his] freedom of action' because he ha[d] 'already lost that freedom.'" *Swanigan v. City of Chicago*, 881 F.3d 577, 584 (7th Cir. 2018) (quoting *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989)).  "A person can't be seized while seized any more than he can jump while jumping. He's either seized or not; he isn't extra seized when forced to sit in a police car or stand in a lineup." *Id.* at 584.

Regardless, Officers Vinson and Alexander had probable cause to arrest Lumar for possession of narcotics.  "Probable cause to arrest exists if the totality of the circumstances known

to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013) (citing *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir.2013)). "If the test is satisfied 'the arrest is lawful even if the belief would have been mistaken.'" *Urbanski v. City of Chicago*, No. 09-CV-280, 2011 WL 1103886, at *4 (N.D. Ill. Mar. 25, 2011) (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir.1998)). Here, Officer Wlodarski informed Officers Vinson and Alexander that he found the narcotics on Lumar while conducting a custodial search of the arrestees in Bullpen 23. Officer Wlodarski's statement is sufficient basis for probable cause and Officers Vinson and Alexander were entitled to rely on it to arrest Lumar. *See Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) ("Probable cause can be based on a single identification from a credible eyewitness."); *see also Rebolar ex rel. Rebolar v. City of Chicago, Ill.*, 897 F. Supp. 2d 723, 735 (N.D. Ill. 2012) ("[T]he defendant police officer received information from a fellow police officer on which, without question, the defendant officers were entitled to reasonably rely, and therefore, the defendant officers objectively had probable cause to effectuate an arrest."); *Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir. 1998) ("[A]n officer can lawfully act solely on the basis of fellow officers' statements if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of probable cause."). It matters not whether Wlodarski was lying if the Officers had no knowledge or any reason to believe that he was being dishonest. *See Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) ("Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters."). The fact that Lumar had been searched repeatedly before arriving at the Cook County Jail without any finding of narcotics on him did not automatically render Wlodarski's information false. Officers

Vinson and Alexander had no knowledge of Lumar's activity once at the Jail or in the bullpen. Based on Wlodarski's statement, reasonable officers in their position could have believed, for example, that Lumar obtained narcotics from another individual in the bullpen.

Once probable cause was established, the Officers had no duty to investigate further. While "exculpatory evidence is also relevant" to the probable cause analysis, *Cervantes v. Jones*, 188 F.3d 805, 813 (7th Cir.1999), *overruled on other ground Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), "[w]hen probable cause has been gained from a reasonably credible victim or eyewitness, there is no constitutional duty to investigate further." *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001); *see also Matthews v. City of East St. Louis*, 675 F.3d 703, 707 (7th Cir.2012) ("Once an officer has probable cause to arrest an individual, he need not continue to investigate or seek out exculpatory evidence."); *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 625 (7th Cir.2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation.") (citing *McBride*, 576 F.3d at 707-08). Given the statement by a fellow law enforcement officer, Officers Vinson and Alexander were not required to review Wlodarski's report (which would have falsely corroborated his verbal account anyway) or to view the bullpen tape. They were entitled to rely on the witnessing officer's information and that information provided probable cause.

Therefore, Count V against Officers Vinson and Alexander in their individual capacities fails. Count V also fails as to all other Individual CPD Defendants in their individual capacities because the Complaint fails to allege that any other Chicago police officers were personally involved in, had knowledge of or consented or acquiesced in any way to the unlawful arrest and detention alleged in Count V. *See Wilson*, 830 F.3d at 469; *Palmer*, 327 F.3d at 594.

**C.    Count VII § 1983 Claim for Denial of Proper Medical Care and Conditions of Confinement in Violation of the Fourth Amendment against the Individual CPD Defendants in their Individual Capacities**

In Count VII, Plaintiff alleges that the Individual CPD Defendants knew Lumar would become emotionally unstable and a suicide risk because he demonstrated a propensity to suffer severe emotional distress from continued unlawful detention based upon his prior emotional and physical reactions, for example, when he had an asthma attack, exhibited extreme stress after being told he told he could not be bonded out, became hopeless and suicidal after being wrongfully arrested for possession of narcotics, and made suicidal statements to Defendant Errum.  (Dkt. 69 at ¶¶ 241-42).  Plaintiff alleges also that the Individual CPD Defendants knew that inmates who are wrongfully detained or framed for a crime they did not commit pose a substantial risk of suicide and that the risk of suicide increases as the length of the wrongful detention increases.  (*Id.* at ¶ 244).  Plaintiff alleges further that knowing this risk, the Individual CPD Defendants acted objectively unreasonable and deliberately indifferent to Lumar's medical health and safety in violation of the Fourth Amendment by failing to take appropriate steps to protect him and failing to adequately provide conditions of confinement that did not pose a serious risk of harm, for example, by closely observing Lumar, removing all harmful materials from his person, promptly investigating the banging noises from his cell, and performing the required 15-minute inmate checks on him.  (*Id.* at ¶¶ 243, 249).  The Individual CPD Defendants seek to dismiss this claim against all Individual CPD Defendants in their individual capacities except for Defendant Jonathan Errum.

The "objective reasonableness" standard applies to Plaintiff's claims for denial of proper medical care and for unlawful conditions of confinement under the Fourth Amendment.  *See Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) (The Seventh Circuit has "applied the Fourth Amendment's 'objectively unreasonable' standard to both 'conditions of confinement' and

'medical care' claims brought by arrestees . . . .").  The "objective reasonableness" standard is less

burdensome than the "deliberate indifference" standard applied under the Fourteenth Amendment.

*See Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006).  Plaintiff appears to allege both

a "medical care" claim and "conditions of confinement" claim in Count VII.  (*See* Dkt. 69 at 45

("Count VII . . . (Denial of Proper Medical Care and Conditions of Confinement) Violation of 4th

Amendment")).  The set of facts Plaintiff must allege to succeed on each is different.

To evaluate the medical care claim, the Court considers four factors: "(1) 'notice of the

arrestee's medical need . . . whether by word . . . or through observation of the arrestee's physical

symptoms'; (2) 'the seriousness of the medical need'; (3) 'the scope of the requested treatment,'

which is balanced against the seriousness of the medical need; and (4) police interests, a factor

which 'is wide-ranging in scope and can include administrative, penological, and investigatory

concerns.'" *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011) (quoting *Williams

v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)).  Importantly, notice is required to establish

liability for a medical care claim.  *See, e.g., Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL

3643417, at *4 (N.D. Ill. June 11, 2015) ("Without notice of Saucedo's suicidal ideations, Plaintiff

cannot show that Defendant Detectives' conduct was objectively unreasonable in failing to

respond to Saucedo's medical need."); *Buford v. City of Chicago, Ill.*, 2009 WL 4639747, at *3

(N.D. Ill. Dec. 3, 2009) ("[O]fficers must receive some form of notice of suicide risk before their

failure to prevent an arrestee's suicide can be considered objectively unreasonable.").  The

Individual CPD Defendants argue that Plaintiff fails to allege that any Individual CPD Defendant

other than Defendant Officer Errum had notice that Lumar was suicidal.

Based on the allegations in the Complaint, Defendant Officer Errum is the only Individual

CPD Defendant that could have been on notice of Lumar's suicidal ideations.  Plaintiff alleges that

as Officer Errum transferred Lumar to cellblock #E2, Lumar "was visibly upset, anxious and appeared hopeless about his situation," "advised Errum that he was being wrongfully detained [and] that he had been framed for having the drugs," and explicitly "advised Errum that he was suicidal and hopeless." (Dkt. 69 at ¶ 227). There is no doubt that, according to the facts as alleged, Officer Errum was on notice that Lumar was suicidal.

However, Plaintiff fails to allege the same notice with regard to any other Individual CPD Defendant. For example, Plaintiff's allegation that Lumar informed Defendant Officer Peals during booking that he was taking prescription medication for asthma does not suggest that Peals would be on notice that Lumar's detention would cause him to become suicidal. Plaintiff also alleges that Defendant Officer Delgado transported Lumar to Mount Sinai for emergency treatment for his asthma attack after Lumar advised other, unidentified officers that he was agitated and anxious and needed medical treatment. Even assuming Delgado was aware that Lumar's anxiety caused the asthma attack, which Plaintiff does not allege in the Complaint, these allegations at most suggests that Delgado was on notice that Lumar's anxiety could trigger an asthma attack; they suggest nothing about Lumar's susceptibility to suicidal ideations, which is the basis of Plaintiff's claim in Count VII.

Similarly, allegations that Lumar told Warren, Vega, and Esteban that he had no outstanding traffic warrant, or that he advised unidentified Defendants—presumably Defendant Officers Vinson and Alexander, although the Complaint fails to specify—that he had been framed by Officer Wlodarski, or that Defendant Officers Warren, Vega, Esteban, Peals, Conner, Delgado, Granat, and Alexander each searched Lumar without finding any contraband on his person all fail to establish that any of Individual CPD Defendant was on notice of Lumar's medical needs generally, much less that he was a suicide risk. Plaintiff's claim that "Defendants knew that

inmates who are wrongfully detained and inmates who are framed for crimes of which they did not commit, such as [Lumar], pose a substantial risk of suicide and that the risk of suicide increases as the length of wrongful detention progresses" is merely a conclusory statement lacking any factual support in the Complaint. Such statements are not entitled to s presumption of truth at this stage. *Iqbal*, 556 U.S. at 681 (2009).

It is not the Court's intention to minimize Lumar's traumatic experience while in custody or to suggest that his mental state was not in fact gravely affected by his detention. In order to assess Plaintiff's allegations at this stage, the Court must focus on what each Individual CPD Defendant is alleged to have known, by way of word or observation, about Lumar's mental state. The Complaint as currently alleged simply fails to allege sufficient notice as to several of the Individual CPD Defendants to bring the medical care claim alleged under the Fourth Amendment in Count VII.[5]

To succeed on the claim of unconstitutional conditions of confinement alleged in Count VII, Plaintiff need only show that "the totality of the defendant's conduct in detaining the arrestee was 'objectively unreasonable' under the circumstances." *Saucedo*, 2015 WL 3643417, at *5 (quoting *Flores v. Lackage*, 938 F.Supp.2d 759, 775 (N.D. Ill. 2013)); *see also, e.g., Lovett v. Herbert*, No. 2:15-CV-63-WTL-MJD, 2017 WL 819716, at *3 (S.D. Ind. Mar. 2, 2017) (looking to the "totality of the circumstances" in determining whether conditions of confinement were objectively reasonable). "In assessing the totality of a defendant's conduct, courts consider several

---

[5] In the response to the Individual CPD Defendants' Motion to Dismiss, Plaintiff relies on and attaches a Chicago Police Department Case Incident Report dated December 26, 2014, more than one year and a half before the incidents alleged in the Complaint, when Lumar was transported by ambulance to the hospital after a suicide attempt at his home. (Dkt. 101, Ex. C). Plaintiff argues in the Response that Defendants accessed this report when they ran Lumar's name in their database and, therefore, knew of his suicidal propensities. (*Id.* at 23). However, as previously stated, the Court will not consider this argument or the attached Case Incident Report in deciding the Individual CPD Defendants' Motion to Dismiss because Plaintiff alleges these facts for the first time in the Response. Plaintiff fails to mention the prior suicide attempt or allege that any Defendant had knowledge of the prior suicide attempt or related Report anywhere in the Complaint.

factors, including the duration of confinement, the nature and seriousness of the alleged constitutional violation, and the police rationale for the alleged deprivation of an arrestee's rights." *Id.*; *see also Lopez*, 464 F.3d at 720 (considering evidence that arrestee was deprived of food, drink, and sleep and was shackled to the wall of an interrogation room for four days and nights and forced to yell for an extended period of time before being permitted to use the bathroom). Therefore, "unlike a Fourth Amendment claim for inadequate medical care, a finding of objectively unreasonable conditions of confinement does not require that a defendant had notice of the detainee's medical need"; "such notice is merely one, non-conclusive factor considered amongst several other[s]." *Id.*, 2015 WL 3643417, at *6.

Plaintiff alleges that the Individual CPD Defendants failed to adequately provide Lumar with conditions of confinement that did not pose a serious risk of harm to him by failing to closely observe him, failing to remove all harmful materials from his person including his shirt and shoes, failing to promptly investigate the banging noises from his cell, and failing to perform 15-minute inmate checks on him as required under CPD policy. (Dkt. 69 at ¶¶ 243, 249). Although lack of notice is not dispositive, it is difficult to see how failure to closely observe Lumar or failure to remove items like his shirt or shoes from his person would be "objectively unreasonable" unless the Defendants were on notice that Lumar had a medical condition for which unmonitored time alone or access to own clothing could pose a risk to his safety.

The same is true of the loud banging and 15-minute checks. A violation of a Chicago Police Department special order does not in itself constitute a constitutional violation for purposes of a § 1983 claim and is irrelevant to the determination of whether an officer's actions are "objectively reasonably" under the Fourth Amendment. *See Thompson v. City of Chicago*, 472 F.3d 444, 454-55 (7th Cir. 2006). Plaintiff must also allege some fact showing that it is plausible

Defendant Barry's failure to check on Lumar every fifteen minutes—and, relatedly, Defendants Helwink's and Ulleweit's consent or acquiescence in that failure—was objectively unreasonable under the circumstances. *See, e.g., Saucedo*, 2015 WL 3643417, at *6 ("While an internal standard may illustrate a custom of officers to undertake certain obligations for the safety and welfare of prisoners, the reasonableness of an officer's conduct must be evaluated under a particular set of facts and circumstances.") (citing *Thompson*, 472 F.3d at 455). Here, Plaintiff relies only on the CPD policy and fails to allege any facts suggesting Barry, Helwink or Ulleweit were on notice of Lumar's suicidal ideations or of other circumstances meriting frequent monitoring of Lumar.

Therefore, Plaintiff fails to allege that any Individual CPD Defendants other than Defendant Officer Errum were personally involved in, had knowledge of or consented or acquiesced in any way to the unlawful detention alleged in Count VII. *See Wilson*, 830 F.3d at 469; *Palmer*, 327 F.3d at 594. Accordingly, Plaintiff may proceed on Count VII against Defendant Errum in his individual capacity; Count VII is dismissed as to all other Individual CPD Defendants in their individual capacities.

### D. Counts I, V, and VII against the City, Chicago Police Department, and all other City Defendants in their Official Capacities

Counts I, V and VII are alleged against the "Chicago Police Department," which the City defines collectively to include "the City of Chicago, the Chicago Police Department, and the individual City of Chicago Police Officer Defendants." (Dkt. 69 at ¶ 30). Therefore, these Counts as alleged in the Complaint are against not only the Individual CPD Defendants in their individual capacities but also the City, the Chicago Police Department, Chief Gulliford and Lieutenant Kevin in their official capacities, and all Individual CPD Defendants in their official capacities. The City moves to dismiss Counts I, V, and VII against the City, the Chicago Police Department, and all individuals sued in their official capacities. (Dkt. 88 at 11-13).

First, the Chicago Police Department is not a suable entity; any complaint filed against the Chicago Police Department is improper and properly filed only against the City of Chicago. *See Courtney v. City of Chicago*, 439 F. App'x 557, 558 (7th Cir. 2011) ("[A] police department is not a suable entity in Illinois."); *Best v. City of Portland*, 554 F.3d 698, 698 (7th Cir. 2009) ("[A] police department is not a suable entity under § 1983."); *see also, e.g. Sattler v. Chicago Police Dep't*, No. 09 C 7018, 2010 WL 3189710, at *2 (N.D. Ill. Aug. 9, 2010) ("Any complaint filed listing the Chicago Police Department as a defendant is improper and is properly filed naming the City of Chicago."); *Moseley v. City of Chicago*, No. 91 C 940, 1991 WL 53765, at *3 (N.D. Ill. Apr. 4, 1991) ("The Chicago Police Department does not enjoy a legal existence that is independent of the City of Chicago, and therefore may not be sued as a separate entity."). Therefore, Counts I, V and VII are dismissed as to the Chicago Police Department.

Second, "[i]t is well settled that the City cannot be liable for [§ 1983] actions through a theory of *respondeat superior*." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citing *Monell*, 436 U.S. at 691). Plaintiff must show the City's officers acted pursuant to: "(1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012); *Monell*, 436 U.S. at 690. Counts I, V and VII do not allege any facts related to an official policy, a widespread practice or custom, or instructions from a City official with final policy-making authority that caused the alleged harm. Therefore, Counts I, V and VII are dismissed as to the City.

Finally, a claim against a government employee in his or her official capacity is treated as a claim against the government entity for which he or she works. *See Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). Therefore, the claims against all individuals in their official

capacities are construed as claims against the City and fail for the same reasons articulated above.[6] Accordingly, Counts I, V and VII are also dismissed as to all individuals in their official capacities.

## II.     Counts II, VI and VIII *Monell* Claims against the City

Counts II, VI and VIII of the Amended Complaint allege § 1983 claims for municipal liability under *Monell* against the City. A municipality may be liable for damages under § 1983 only if the unconstitutional act is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). "The critical question under *Monell* . . . is whether a municipal [] policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dept of Corr.*, 849 F.3d 372, 379 (7th Cir.), *cert. denied sub nom. Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017). "To demonstrate that the [City] is liable for a harmful custom or practice, the plaintiff must show that [City] policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Thomas*, 604 F.3d at 303 (quoting *Gable*,

---

[6] The City also argues that all claims against individuals sued in their official capacities should be dismissed as impermissible under § 1983 because the "Eleventh Amendment 'bars federal courts from ordering the state to disburse funds to a private party for retroactive damages,'" and "Plaintiff seeks only monetary damages and fees, not injunctive relief, from each Defendant." (Dkt. 88 at 12 (quoting *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1051 (7th Cir. 2013)). "The jurisdictional bar of the Eleventh Amendment protects the state and its agencies; it does not shield political subdivisions." *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987) (quoting *Mount Healthy School District v. Doyle*, 429 U.S. 274, 280 (1977)). "The question here, then, is whether the [entity] 'is more like a county or city than it is like an arm of the State.'" *Id.* Therefore, while it is true Plaintiff has not sought injunctive relief in this case, Defendant's argument is misplaced as the Eleventh Amendment applies only to state entities and, therefore, not to the City of Chicago. *See, e.g., N. M. Paterson & Sons, Ltd. v. City of Chicago*, 176 F. Supp. 323, 324 (N.D. Ill. 1959) (The City of Chicago is "completely separate entity from the State of Illinois with power to levy and collect taxes, borrow money, hire its own employees and in general to conduct its own affairs" and, therefore, not protected by the Eleventh Amendment.). Regardless, the City Defendants sued in their official capacities in Claims I, V and VII are dismissed for the reasons already stated.

296 F.3d at 537). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.*

Plaintiff brings each of the *Monell* claims in Counts II, VI, and VIII under both an "express policy" and a "widespread practice" theory of liability. There are two varieties of "express policy" claims under *Monell*. The first applies, "as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (citing *Monell*, 436 U.S. at 658). To prevail on this first variation, Plaintiff must identify specific language in the policy that explicitly violates a person's constitutional rights. *Id.* at 381. "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id.* at 379–80 (citing *City of Okla. v. Tuttle*, 471 U.S. 808, 822 (1985)). The second variation of an "express policy" claim applies where the plaintiff "object[s] to omissions in the policy," *i.e.*, that the policy fails to address certain issues. *Id.* at 380. Such claims "require more evidence than a single incident to establish liability." *Id.*

To prevail on a "widespread practices" claim, Plaintiff must show that the City engaged in a practice "so permanent and well settled as to constitute a custom or usage with the force of law." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010); *see also Moore v. City of Chicago*, 126 F. App'x 745, 747 (7th Cir. 2005) (Plaintiff must show the police department "engaged in a widespread practice so well-settled that it had the effect of a custom."). Like the second variation of "express policy" theory, a "widespread practice" is "not tethered to a particular written policy" and "requires more evidence than a single incident to establish liability." *Calhoun*, 408 F.3d at 380. Plaintiff must provide "evidence that there is a true municipal policy at issue, not a random event." *Id.* The Seventh Circuit has declined to adopt bright-line rules defining a "widespread practice, recognizing that "there is no clear consensus as to how frequently such conduct must

occur to impose *Monell* liability, except that it must be more than one instance . . . or even three." *Thomas*, 604 F.3d at 303 (internal quotations omitted).

### A. Count II § 1983 *Monell* Claim against the City for Selective Enforcement of GAO No. 2015-06 in Violation of the Fourteenth Amendment

In Count II, Plaintiff alleges a *Monell* claim related to the enforcement of GAO No. 2015-06 under an "express policy" theory and "widespread practice" theory of liability. First, Plaintiff claims the City "had an express policy in which it selectively enforced [GAO] No. 2015-06 almost exclusively on non-white arrestees . . . which was motivated by the intent to discriminate on the basis of race" and "deprived detainees of equal protection." (*Id.* at ¶ 109). Second, Plaintiff alleges there existed "a widespread practice within the Chicago Police Department under with the Chicago Police Officers, within all 25 Districts, would selectively enforce GAO No. 2015-06 by almost exclusively enforcing it against non-white arrestees/pretrial detainees, including but not limited to African Americans and Hispanics," which was "motivated by the intent to discriminate on the basis of race, depriving non-white arrestees/pretrial detainees of equal protection of the laws." (*Id.* at ¶ 113).

The City moves to dismiss only the "express policy" allegation. Plaintiff's "express policy" claim fails because the Complaint fails to identify any specific language in GAO No. 2015-06 that is unconstitutional when applied. *See Calhoun*, 408 F.3d at 381; *Duff v. Grandberry*, No. 14 C 8967, 2017 WL 2424236, at *3 (N.D. Ill. June 5, 2017) ("Duff must 'point to [] language in the [Village's] policy that is constitutionally suspect.'") (quoting *Calhoun*, 408 F.3d at 381); *Lopez v. Vidljinovic*, No. 1:12-CV-5751, 2016 WL 4429637, at *3 (N.D. Ill. Aug. 22, 2016) (first variation of "express policy" claim failed where plaintiff "never identifie[d] specific language in any of the[] polices which is 'explicitly' violative of a person's constitutional rights when applied"). In fact, Plaintiff does not allege the policy itself is unconstitutional at all. Plaintiff

alleges only that the "selective enforcement" of the policy against minorities is unconstitutional but identifies no language in GAO No. 2015-06 directing officers to enforce the policy against detainees according to race.

Plaintiff does not dispute this. Instead, Plaintiff argues for the first time in the Response that Count II is based on an "implicit" policy whereby CPD's "emphasis on speed" in the booking process resulted in white detainees being released on bond immediately while minority detainees were charged. (Dkt. 102 at 8). In support of this theory, Plaintiff cites to CPD Special Order S06-01 because it "places the requirement that the charging process be complete 'without necessary delay' immediately after the section concerning the possibility of release without charges." (*Id.*; Dkt. 102-2).

As an initial matter, an "implicit policy" claim is not another variation of an "express policy" claim but rather is another name for a claim brought under a "widespread practice" theory. *See Calhoun*, 408 F.3d at 381 (describing plaintiff's claim as alleging an "implicit theory reflected in an alleged widespread practice"); *see also Johnson v. Frain*, No. 17 C 2000, 2018 WL 2087448, at *3 (N.D. Ill. May 4, 2018) ("Where the alleged constitutional deprivation resulted from an implicit policy, a plaintiff must present evidence of a widespread practice."). Therefore, re-labeling the claim as such does not allow Plaintiff's "express policy" claim in Count II to survive. Additionally, nothing about the language Plaintiff identifies in S06-01 requiring that the charging process occur "without necessary delay" is constitutionally suspect. More importantly, however, Count II as alleged in the Complaint is based on the selective enforcement of GAO No. 2015-06 according to detainee's race; it states no factual allegations whatsoever related to the speed of the CPD booking process or to Special Order S06-01. Plaintiff alleges these new facts for the first time in the Response and, therefore, they are not properly before the Court at this stage. *See e.g.*,

*Gold v. Wolpert*, No. 84 C 4344, 1987 WL 10585, at *6 (N.D. Ill. May 1, 1987) ("[F]actual allegations contained in the briefs which are not alleged in the body of the complaint are not properly before the court on a motion to dismiss.").

Plaintiff fails to state a claim under an "express policy" theory. Therefore, only Plaintiff's "widespread practice" claim in Count II may proceed.

**B.     Count VI § 1983 *Monell* Claim against the City for Arrest and Detention of Pretrial Detainees Turned Over by Cook County Jail without Probable Cause in Violation of the Fourth Amendment**

In Count VI, Plaintiff alleges a *Monell* claim related to arrests of Cook County Jail detainees allegedly without probable cause under both an "express policy" theory and "widespread practice" theory of liability.   The City moves to dismiss both theories.

**1.     "Express policy" claim**

The "express policy" claim alleges that the City "had an express policy to accept and arrest detainees at Cook County Jail, even when the facts and circumstances of the arrest failed to establish the necessary probable cause for arrest" and that this express policy served as the moving force behind Lumar's attempted suicide. (*Id.* at ¶¶ 150, 157). Plaintiff's "express policy" claim fails because the Complaint fails to identify any City or CPD policy, much less specific language in that policy, that violates a constitutional right when applied. *See Calhoun*, 408 F.3d at 381; *see also, e.g., Duff*, 2017 WL 2424236, at *3; *Lopez*, 2016 WL 4429637, at *3. Again, Plaintiff does not dispute this but argues instead that the alleged policy is "implicit": "whenever City police officers pick up a detainee from a bullpen, they are to subordinate any knowledge they may possess of the detainee and take him into custody without further investigation." (Dkt. 102 at 3). This argument fails to save Plaintiff's "express policy" claim from the same reasons discussed with regard to Count II. An "implicit policy" claim is another form of "widespread practice" claim, not an "express policy" claim. *See Calhoun*, 408 F.3d at 381; *Johnson*, WL 2087448, at *3.

Plaintiff next points to CPD General Order G06-01 and Special Order S06-01 to support this claim, explaining that these policies prioritize booking speed over a detainee's constitutional rights. (Dkts. 102 at 3, 102-1, 102-2). Specifically, Plaintiff cites to two short phrases from the Orders: "delay[ing] the booking process" (Dkt. 102-1) and "without unnecessary delay" (Dkt 102-2). These phrases are not constitutionally suspect on their own, much less in the context of G06-1 and S06-01 in their entirety. Regardless, as with Count II, Plaintiff's entire argument based on G06-1 and S06-01 is improper because it relies on facts not alleged in the Complaint and documents not central to or even referenced in Plaintiff's claim. *See e.g.*, *Gold*, 1987 WL 10585, at *6. Therefore, Plaintiff fails to state any plausible claim under an "express policy" theory.

### 2. "Widespread policy" claim

Plaintiff's "widespread practice" claim alleges that "Chicago Police Department's records show a widespread practice [of] arresting detainees without probable cause, that are seized while being detained at Cook County Jail, and turned over to CPD by Cook County" and that this widespread practice served as the moving force behind Lumar's attempted suicide. (*Id.* at ¶¶ 153, 157). To successfully plead a "widespread practice" claim, Plaintiff must allege facts showing that at least more than one instance of the alleged conduct occurred to establish that a practice in fact exists and that Lumar's allegedly unconstitutional arrest was not merely a random event. *See Calhoun*, 408 F.3d at 380. Plaintiff may rely on incidents relating only to him, *see White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), but he still must allege multiple such incidents such that the Court can draw the reasonable inference that the alleged practice was "so permanent and well settled" as to constitute custom with the force of law. Plaintiff fails to identify a single other instance in which CPD arrested him or any other detainee at Cook County Jail without probable cause. Additionally, Plaintiff provides no details about the "records" that allegedly reveal such a

widespread practice, for example, what the records report or even what kind of records they are. Without more, Plaintiff's statement about what the records purportedly show is merely conclusory and an insufficient basis for the "widespread policy" claim. *See McCauley*, 671 F.3d at 616 ("conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth" when assessing a motion to dismiss); *see also, e.g., Annan v. Vill. of Romeoville*, No. 12 C 3577, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013) (dismissing *Monell* claim for failing to allege more than conclusory assertions to show a policy or widespread practice caused the alleged constitutional injuries). The Complaint contains no other allegations that would support the existence of the alleged "widespread practice."

Therefore, the Court dismisses the *Monell* claim in Count VI under both the "express policy" theory and "widespread practice" theory.

### C. Count VIII § 1983 *Monell* Claim against the City for Failure to Conduct 15-Minute Checks and Falsification of Related Records in Violation of the Fourth Amendment

In Count VII, Plaintiff alleges a *Monell* claim related to the alleged falsification of watch logs under both an "express policy" theory and "widespread practice" theory of liability. The City moves to dismiss both theories.

#### 1. "Express policy" claim

First, Plaintiff alleges the City "had an express policy at all 25 Chicago Police District stations . . . under which the Chicago Police Detention Aides would falsify watch logs and other records by falsely claiming to perform 15-minute visual checks on inmates, which were necessary to protect inmates' health, medical needs, and safety; a constitutional right guaranteed to pretrial detainees under the 4th Amendment." (Dkt. 69 at ¶ 258). Once again, Plaintiff's "express policy" claim fails for failure to identify language in a specific policy that is unconstitutional when applied. *See Calhoun*, 408 F.3d at 381. In response, Plaintiff argues only that at the motion to dismiss stage

Plaintiff "need only allege a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists." (Dkt. 102 at 6 (quoting *Santos v. Curran*, No. 17 C 2761, 2018 WL 888758, at *5 (N.D. Ill. Feb. 14, 2018)). While that is correct, the case law is clear that to sufficiently allege an "express policy" claim, Plaintiff must at minimum identify language in a policy that is constitutionally suspect or, under the gap-in-policy variation of the claim, allege several incidents demonstrating that an unconstitutional lack in policy is at issue and not merely a random event. *See Thomas*, 604 F.3d at 303; *Calhoun*, 408 F.3d at 380-81. Plaintiff has done neither here. Therefore, Plaintiff fails to sufficiently allege an "express policy" claim in Count VIII.

### 2. "Widespread policy" claim

Plaintiff also alleges a "widespread policy" claim related to CPD's falsification of watch logs. Specifically, Plaintiff alleges that at the time of Lumar's attempted suicide, the City "had a widespread practice within the Chicago Police Department under which employees, including Chicago Police Detention Aides and Watch Commanders, commonly created an Inspection Log which falsely stated that the employee was performing the required visual inmate checks every 15 minutes" and "providing these Inspection Logs to their supervisors, who also knew them to be false." (Dkt. 60 at ¶ 260). As with Count VI, Plaintiff fails to allege facts related to any other incident where a CPD officer falsified an Inspection Log to show that she conducted the required 15-minute check when in fact she had not. Therefore, the "widespread policy" claim in Count VIII fails for the same reasons. It simply lacks factual support to infer that Detention Aide Barry's alleged failure to conduct the 15-minute check and false reporting on the log on August 19, 2016 were not random events.

Plaintiff alleges also that the City encouraged or approved this widespread practice by "failing to adequately train, supervise, and control police officers and personnel" and "failing to adequately punish and discipline prior instances of similar misconduct." (*Id.* at ¶ 261). To the extent Plaintiff intends to allege a failure-to-train clam in Count VIII, that claim is dismissed as well. A municipality's decision not to train its employees about their legal to duty to avoid violating citizens' rights may rise to the level of an official policy for purposes of § 1983 only "in limited circumstances." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (internal citations omitted). To rise to a violation of § 1983, the failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of 'deliberate indifference' on the part of the local government.") Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *Canton*, 489 U.S. at 389).

"Deliberate indifference" is a "stringent standard" and requires proof that the municipal actor disregarded or knew of [sic] obvious consequence of his actions." *Id.* Generally, Plaintiff must show a pattern of similar constitutional violations to demonstrate deliberate indifference for purpose of a failure-to-train claim. *Id.* at 62. Here, as already discussed, Plaintiff identifies just one violation: Detention Aide Barry's alleged failure to conduct the 15-minute check and false reporting on the log on August 19, 2016. Otherwise, the failure-to-train claim consists only of conclusory language that the "fail[ure] to adequately train, supervise, and control police officers .

. . [and] punish and discipline prior instances of misconduct" was the moving force behind Lumar's injuries. (*Id.* at ¶ 261). The claim contains no specifics and is pure boilerplate. *See, e.g., Macaluso v. City of Chicago*, No. 15 CV 1739, 2015 WL 7008140, at *5 (N.D. Ill. Nov. 12, 2015) (dismissing failure-to-train claim that "contain[ed] no specifics" and was "pure boilerplate"). Therefore, Plaintiff fails to sufficiently allege any failure to train that amounted to deliberate indifference as required under § 1983. *See, e.g., Maglaya v. Kumiga*, No. 14-CV-3619, 2015 WL 4624884, at *5 (N.D. Ill. Aug. 3, 2015) ("Plaintiffs' claim of improper police training is a factually-unsupported, boilerplate allegation that cannot survive a motion to dismiss."); *Kowalski v. Cty. of Dupage, Ill.*, No. 2013 CV 526, 2013 WL 4027049, at *2 (N.D. Ill. Aug. 7, 2013) (dismissing failure-to-train claim where plaintiff relied only on the pleaded incident in which he was involved and boilerplate allegations).

The Court dismisses the *Monell* claim in Count VIII under both the "express policy" theory and "widespread practice" theory.

III.     **Count IV against the County Defendants**

Counts IV of the Complaint alleges a *Monell* claim against "the Sherriff of Cook County" related to Lumar's arrest while in the Cook County Jail. Plaintiff defines "Sheriff of Cook County" collectively to include the Cook County, the Cook County Sheriff, Dr. Jones Tapia in her official capacity and Officer Wlodarski, Officer Crawford, Officer Garmon, Officer Leon, Lieutenant Lewis, and Lieutenant Latham in their individual and official capacities. (Dkt. 69 at ¶ 31). The County Defendants move to dismiss the *Monell* claim in Count IV against Sheriff Dart, Dr. Jones and all individual defendants in their official capacities. (Dkt. 92).

A claim against a County employee in his or her official capacity is treated as a claim against the County. *See Grieveson*, 538 F.3d at 771 (7th Cir. 2008). The County cannot be liable

under § 1983 through a theory of *respondeat superior*. *Gable*, 296 F.3d at 537. Plaintiff must show the County employees acted pursuant to an express policy, widespread practice or instructions from a County official with final policy-making authority. *Gonzalez*, 671 F.3d at 664. Therefore, the *Monell* claim against the Individual County Defendants in their official capacities is dismissed as duplicative of the same claim against the County.

In the Motion to Dismiss, the County Defendants also argue: "[I]ndividual Defendants cannot be held liable for a policy or practice of the municipality. Only the municipality can be held liable under this theory. Since Defendants are not individuals, not a municipality, Plaintiff's Count IV must be dismissed against them." (Dkt. 92 at ¶¶ 6-7). Although not explicit stated as such, the Court construes this argument as a motion to dismiss the *Monell* claim against the individual defendants in their individual capacities, as well. The Court dismiss the claims in Count IV against Officers Wlodarski, Crawford, Garmon, and Leon and Lieutenants Lewis and Latham in their individual capacities because the argument is correct.

Finally, the County Defendants also argue that Plaintiff failed to sufficiently allege the *Monell* claim in Count IV. Plaintiff alleges the *Monell* claim on both an "express policy" theory and "widespread practice" theory. Both fail for the same or similar reasons as Plaintiff's *Monell* claims against the City. With regard to the "express policy" theory, Plaintiff alleges only that the County Officers acted "on an express policy to arbitrarily restrain and/or arrest pretrial detainees housed inside Cook County's bullpen for contraband discovered by Cook County which was unknown to belong to any specific pretrial detainee, depriving detainees of due process and the right to be free from unlawful arrest." (*Id.* at ¶ 130). Plaintiff fails to identify any specific language in any County policy that is unconstitutional when applied. *See Calhoun*, 408 F.3d at 381. In the Response to the County Defendants' Motion to Dismiss, Plaintiff admits that it does not have "any County policies on point about situations where contraband is found in a bullpen" and characterizes the

claim in Count IV as alleging a "gap in policy" on this issue exist. (Dkt. 103 at 3-4). This "gap in policy" theory appears nowhere in Count IV of the Complaint. Regardless, to sufficiently allege a gap-in-policy claim, Plaintiff must allege facts showing more than a single incident occurred. *Calhoun*, 408 F.3d at 380. Plaintiff fails to allege any facts related to any other incident in which the he or another detainee was arbitrarily detained for contraband found in the Cook County Jail bullpen.

The same is true for a "widespread practice" claim. Plaintiff must allege facts showing more than a single incident occurred such that the Court can draw the reasonable inference that the alleged practice was "so permanent and well settled" as to constitute custom with the force of law. *Id.*; *Wragg*, 604 F.3d at 467. In the Complaint, Plaintiff alleges only that "records of CCDOC show [that] the practice of Defendant Cook County Correctional Officers . . . is to arbitrarily detain and/or arrest pretrial detainees where contraband is found which was unknown to belong to any specific pretrial detainee." (Dkt. 69 at ¶ 136). Again, Plaintiff relies only on the one incident he experienced. As with Count VI, Plaintiff provides little detail about the records that purportedly show the alleged widespread practice exists. The Complaint states only the "records of CCDOC" show that when contraband is found in the bullpen but not on the person of any particular detainee, officers arbitrarily arrest the nearest person to the contraband and fail to consult arrest record or search results for that person. (Dkt. 69 at ¶ 139). Plaintiff does not attach the records or describe on what types of records it relies. Without more, these allegations are conclusory and do not state facts from which the Court can infer other incidents similar to the one Plaintiff experienced have occurred.

Therefore, the *Monell* claim in Count IV fails under both the "express policy" and "widespread practice" theories. Count IV is dismissed with prejudice as to the Sheriff and Dr.

Jones in their official capacities and against the Individual County Defendants in their individual and official capacities because it is duplicative of the claim against the County. Count IV is dismissed against the County without prejudice.

## CONCLUSION

For the reasons stated above, the Individual CPD Defendants' Motion to Dismiss (Dkt. 87) is granted in part and denied in part. Plaintiff may proceed on Count I against Defendants Warren, Vega, Esteban, J. Jones, Lasch and Geyer in their individual capacities. Count I is dismissed without prejudice as to all other Individual CPD Defendants in their individual capacities. Counts V is dismissed without prejudice as to all Individual CPD Defendants in their individual capacities. Plaintiff may proceed on Count VII against Defendant Errum in his individual capacity. Count VII is dismissed as to all other Individual CPD Defendants in their individual capacities

The City of Chicago's Motion to Dismiss (Dkt. 88) is granted. Plaintiff's *Monell* claim in Count II based on an "express policy" theory is dismissed without prejudice. Plaintiff's *Monell* claim in Counts VI and VIII are dismissed without prejudice in their entirety. Additionally, Counts I, V and VII are dismissed with prejudice against the City, the Chicago Police Department, Chief Gulliford and Lieutenant Kevin in their official capacities, and all Individual CPD Defendants in their official capacities.

The County's Motion to Dismiss (Dkt. 92) is granted. Plaintiff's *Monell* claim in Count IV is dismissed with prejudice as to the Sheriff and Dr. Jones in their official capacities and against the Individual County Defendants in their individual and official capacities and is dismissed without prejudice as to the County.

Absent, the filling of an amended pleading, only the following claims may proceed: Count I against Defendants Warren, Vega, Esteban, J. Jones, Lasch and Geyer in their individual capacities; the "widespread practice" *Monell* claim against the City in Count II; Count III; and Count VII against Defendant Errum in his individual capacity.

Hon. Virginia M. Kendall
United States District Judge

Date: July 27, 2018