**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA ALCORN, as Independent Administrator** | ) | |
| **Of the Estate of TYLER LUMAR** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **THE CITY OF CHICAGO, a Municipal** | ) | |
| **Corporation; OFFICER DANIEL** | ) | |
| **WARREN (#17444), OFFICER CARLOS** | ) | |
| **VEGA (#17477), OFFICER CORRINA** | ) | **No. 17 CV 5859** |
| **ESTEBAN (#17617); COMMANDER JAMES** | ) | |
| **JONES (#73), SERGEANT KEVIN GEYER** | ) | |
| **(#1679), SERGEANT ALAN LASCH (#1434),** | ) | |
| **JONATHAN ERRUM (#117727), Individually** | ) | |
| **and as employees and/or agents of the** | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **COOK COUNTY, OFFICER T. WLODARSKI,** | ) | |
| **OFFICER CRAWFORD, OFFICER GARMON,** | ) | |
| **OFFICER LEON, CORRECTIONAL** | ) | |
| **LIEUTENANT CHAUNTE LATHAM, and** | ) | |
| **LIEUTENANT ANGELA T. LEWIS,** | ) | |
| **Individually and as employees and/or agents of** | ) | |
| **the COOK COUNTY SHERIFF'S OFFICE, and** | ) | |
| **COOK COUNTY SHERIFF THOMAS J. DART** | ) | |

**Defendants.**

<u>**PLAINTIFF'S CORRRECTED SECOND AMENDED COMPLAINT AT LAW AND
JURY DEMAND**</u>

NOW COMES Plaintiff LISA ALCORN, as Independent Administrator of the Estate of

TYLER LUMAR, by her attorneys, O'CONNOR LAW GROUP, LLC, and for her First Amended

Complaint at Law against Defendants, THE CITY OF CHICAGO, a Municipal Corporation,

OFFICER DANIEL WARREN (#17444), OFFICER CARLOS VEGA (#17477), OFFICER

CORRINA ESTEBAN (#17617); COMMANDER JAMES JONES (#73), SERGEANT ALAN

LASCH (#1434), SERGEANT KEVIN GEYER (#1679), (#2167), JONATHAN ERRUM

1

(#117727), Individually and as employees/agents of the CITY OF CHICAGO, COOK COUNTY,

OFFICER T. WLODARSKI, OFFICER CRAWFORD, OFFICER GARMON, OFFICER LEON,

CORRECTIONAL LIEUTENANT CHAUNTE LATHAM, and LIEUTENANT ANGELA T.

LEWIS, Individually and as agents/employees of the COOK COUNTY SHERIFF'S OFFICE, and

COOK COUNTY SHERIFF THOMAS J. DART, allege and state as follows:

<u>JURISDICTION</u>

1.     This action is brought pursuant to 42 USC § 1983 to redress the Defendants'

tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

2.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §1331

and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. §1367.

3.     Venue is proper under 28 U.S.C. §1391(b).  Plaintiff resides in this judicial district,

the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's

claims occurred within this judicial district.

<u>PARTIES</u>

4.     Plaintiff LISA ALCORN is a resident of Chicago, Cook County, Illinois.

ALCORN currently resides at 430 N. Waller Avenue, Unit 2W, Chicago, IL 60644.

5.     Plaintiff LISA ALCORN was appointed as Independent Administrator of TYLER

LUMAR's person and estate on November 7, 2016 by the Probate Division of the Circuit Court

of Cook County.

6.      Defendant CITY OF CHICAGO is an Illinois municipal corporation that is or was

the employer of the individual police officers named as defendants herein.  Each of the

aforementioned officers acted as an agent of the City of Chicago while conducting the arrest,

search, interrogation, and detention of TYLER LUMAR.  Defendant CITY OF CHICAGO is

additionally responsible for the policies and practices of the Chicago Police Department.

7. Defendants OFFICER DANIEL WARREN (#17444) and OFFICER CARLOS VEGA (#17477) are employees and/or duly authorized agents of the City of Chicago Police Department and/or the CITY OF CHICAGO and were acting in the course and scope of their employment, as well as under color of law. They were the acting Chicago Police Officers who arrested TYLER LUMAR on August 18, 2016. Defendant OFFICER DANIEL WARREN (#17444) was the Chicago Police Officer who arrested Tyler Lumar at Cook County Jail on August 19, 2016.

8. DEFENDANT OFFICER CORRINA ESTEBAN (#17617) is an employee and/or duly authorized agent of the City of Chicago Police Department and/or the CITY OF CHICAGO and was acting in the course and scope of his employment, as well as under color of law. He was the Chicago Police Officer who received and verified the Lee County Traffic Warrant for TYLER LUMAR and issued hold #Z14221 for TYLER LUMAR on August 18, 2016. OFFICER ESTEBAN (#17617) searched TYLER LUMAR on August 18, 2016.

9. Defendant JONATHAN ERRUM (#117727) is an employee and/or duly authorized agent of the City of Chicago Police Department and/or the CITY OF CHICAGO and was acting in the course and scope of his employment, as well as under color of law. He was a Chicago Police Detention Aide who was responsible for the watch command for Cellblock E on August 19, 2016.

10. Defendant JAMES JONES (#73) is an employee and/or duly authorized agent of the City of Chicago Police Department and/or the CITY OF CHICAGO and was acting in the course and scope of his employment, as well as under color of law. He was the District Commander for the 11th District on August 18, 2016 and August 19, 2016.

11.     Defendant SERGEANT ALAN LASCH (#1434) is an employee and/or duly authorized agent of the City of Chicago Police Department and/or the CITY OF CHICAGO and was acting in the course and scope of his employment, as well as under color of law.  He was the acting Station Supervisor of the 11th District Station during the 2nd watch on August 18, 2016.

12.     Defendant SERGEANT KEVIN GEYER (#1679) is an employee and/or duly authorized agent of the City of Chicago Police Department and/or the CITY OF CHICAGO and was acting in the course and scope of his employment, as well as under color of law.  He was the acting Station Supervisor of the 11th District Station during the 3rd watch on August 18, 2016. Defendant GEYER was the Chicago Police Officer who acted as the Approving Supervisor, who approved the arrest and finding of probable cause to arrest TYLER LUMAR on August 18, 2016.

13.     Cook County is a duly incorporated government entity in Illinois and the Sheriff runs the services for its detainees housed at Cook County Department of Corrections, located at 26th and California.  Cook County, through the Cook County of Board of Commissioners, is responsible for all jail facilities operated by the Sheriff and/or Cook County, including the Cook County Department of Corrections. Cook County is liable for any judgments related of its agents and employees arising out of an in the course and scope of their employment.  Cook County is additionally responsible for the policies and practices of Cook County and the Cook County Department of Corrections.  These same facts were true during the relevant facts alleged herein. The Sheriff is an independently elected Cook County Officer and a governmental entity.  The Sheriff is liable for any judgments related to its agents and employees arising out of and in the course and scope of their employment.

14.     Defendants Correctional Officers T. WLODARSKI ("15733"), CRAWFORD, GARMON, and LEON are employees and/or duly authorized agents of the SHERIFF OF COOK

4

COUNTY and/or COOK COUNTY and were acting in the course and scope of their employment, as well as under color of law.

15.     Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM are employees and/or duly authorized agents of the SHERIFF OF COOK COUNTY and/or COOK COUNTY and were acting in the course and scope of their employment, as well as under color of law.

16.     Each of the individual Defendants acted under color of law (state action) and within the scope of his employment.

## FACTS

17.     At approximately 3:00 p.m. on August 18, 2016, Chicago Police Officer DANIEL WARREN (#17444) and CARLOS VEGA (#17477) were called to respond to Madison Family Health Center, located at 3800 W. Madison, in Chicago, Illinois, after receiving a complaint from certain medical personal at Madison Family Health Clinic that TYLER LUMAR was yelling at the scene and refusing to leave the medical grounds.

18.     Upon their arrival, the Madison Family Health Center medical staff requested that Chicago Police Officer DANIEL WARREN (#17444) and CARLOS VEGA (#17477) give TYLER LUMAR a verbal notice to inform him that he was banned from the property.

19.     The Madison Family Health Center advised Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) that they did not wish to pursue any criminal charges against TYLER LUMAR.

20.     At approximately 3:15 p.m. on August 18, 2016, Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) advised TYLER LUMAR that he was banned from returning to the Madison Family Health Center in the future but that he was free to leave; no

charges were brought. TYLER LUMAR thereafter left Madison Family Health Center and proceeded to walk peacefully down on Madison Street.

21. Then, on August 18, 2016, at approximately 3:50 p.m., Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) stopped TYLER LUMAR, who was peacefully walking down Madison Street, and placed him under arrest after advising TYLER LUMAR that there was a traffic warrant for his arrest issued by Lee County.

22. On August 18, 2016, at approximately 3:50 p.m. Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) searched TYLER LUMAR's person after placing him under arrest. The Chicago Police Officers who searched TYLER LUMAR found that he was not in possession of any contraband or narcotics. He did not appear to be under the influence of drugs or alcohol at the time of his arrest.

23. TYLER LUMAR informed the Chicago Police Department, including but not limited to Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) that the information they had was incorrect; that there was no outstanding traffic warrant for his arrest.

24. Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) transported TYLER LUMAR to the 11th District Station, located at 3151 W. Harrison St. Chicago, IL 60612.

25. Upon arrival, Chicago Police Officers, including but not limited to Officer ESTEBAN (#17617), again searched TYLER LUMAR. Officer ESTEBAN (#17617) and the other Chicago Police Officers who searched TYLER LUMAR found that he was not in possession of any narcotics. He did not appear to be under the influence of drugs or alcohol at the time of his arrest.

26. TYLER LUMAR was booked, processed, and searched by KIMONI PEALS and/or other Chicago Police Officers.

27.     At the time TYLER LUMAR was searched, the booking Chicago Police Officers, including KIMONI PEALS, found that he had $130.00 on his person and a necklace. The Chicago Police Officers who searched TYLER LUMAR found that he was not in possession of any narcotics. He did not appear to be under the influence of drugs or alcohol at the time of his arrest. TYLER LUMAR reported that he was presently taking prescription medication for asthma.

28.     Officer JUSTIN CONNER (#18863) took TYLER LUMAR's mugshot for his arrest and also searched TYLER LUMAR, once again, on August 18, 2016. Officer JUSTIN CONNER found that TYLER LUMAR was not in possession of any narcotics. He did not appear to be under the influence of drugs or alcohol at the time of his arrest.

29.     TYLER LUMAR was received in lockup at District 011, 3151 W. Harrison St. Chicago, IL 60612, on August 18, 2016 at or about 18:26 hours.

30.     Either Officer CARLOS VEGA (#17477) or some other Chicago Police Officer contacted Lee County through the Law Enforcement Agencies Data System (LEADS) at approximately 4:43 p.m. on August 18, 2016.

31.     At approximately 4:48 p.m., Lee County CO Stewart relayed to the Chicago Police Department that traffic warrant 15TR1515 was valid and that it was issued for failure to make a payment on a fine which was issued after LUMAR plead guilty to driving on a suspended license, that the bond was $500.00, with 10% to apply, so that TYLER LUMAR could pay $50.00 to bond himself out of jail. Lee County further advised the Chicago Police Department that if TYLER LUMAR was unable to bond himself out, to place a hold on LUMAR for Lee County to pick up and extradite TYLER LUMAR.

32.     After receiving Lee County's response, Defendant Chicago Police Officers refused and/or failed to advise TYLER LUMAR that he could bond out by simply paying $50.00 and

instead Officer ESTEBAN (#17617) issued a hold for TYLER LUMAR, under hold #z14221.

33.     Defendant Chicago Police Officers then charged TYLER LUMAR under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z.  Chicago Police Officers falsely reported on TYLER LUMAR's Arrest Report that "Bond Information Not Available" even though the Bond Information was provided by Lee County/LEADS at 4:48 p.m. on August 18, 2016.

34.     The Lee County Traffic Warrant, 15TR1515, was issued on June 9, 2016 after TYLER LUMAR failed to timely make a payment on an outstanding balance of court costs. TYLER LUMAR owed such costs after pleading guilty to the charge of Driving on a Suspended License, a Class A Misdemeanor, on May 15, 2015.  He was charged with this offense on April 10, 2015.

35.     On May 15, 2015, as part of his guilty plea in the Lee County case, TYLER LUMAR was assessed and agreed to pay fines and court costs totaling $673.00.  On November 6, 2015, TYLER LUMAR entered into an installment agreement with Lee County in which TYLER LUMAR agreed to make payments of $25.00 per month, with each payment due on the 1st of the month until all fees and costs were paid in full.  TYLER LUMAR timely made payments from May of 2015 through May of 2016.  TYLER LUMAR made his June 2016 $25.00 payment a few days late, which was received by Lee County on June 6, 2016.  Unbeknownst to TYLER LUMAR, Lee County had issued traffic warrant 15TR1515 on June 3, 2016 after his payment had not been received on the 1st of June.  The traffic warrant was never vacated or canceled after Lee County received TYLER LUMAR's June installment payment on June 6, 2016.  TYLER LUMAR thereafter timely made his July and August 2016 payments.  On August 18, 2016, at the time Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) arrested TYLER LUMAR, the outstanding balance owed by TYLER LUMAR to Lee County was $24.00.

The last and final payment of $24.00 was not due until September 1, 2016.

36.     On or about 11:30 p.m. on August 18, 2016, while still in police custody, TYLER LUMAR experienced an emergent asthma attack and was transferred to Mount Sinai Hospital for evaluation and treatment.

37.     Prior to his transfer, Chicago Police Officers searched TYLER LUMAR's person. The Chicago Police Officers did not find any narcotics or contraband on TYLER LUMAR.

38.     TYLER LUMAR was treated in the emergency room at Mount Sinai Hospital for complaints of shortness of breath and an asthma attack.  He was discharged from Mount Sinai's emergency room at approximately 6:30 a.m. on August 19, 2016.

39.     Upon discharge from the emergency room on August 19, 2016, Officer WALTER DELGADO and/or other Chicago Police Officers transported TYLER LUMAR back to the 11th District station where Officer WALTER DELGADO or some other Chicago Police Officer again searched TYLER LUMAR prior to transporting him back to the 11th District.  Officer DELGADO and/or other searching Chicago Police Officer did not find any narcotics on TYLER LUMAR. LUMAR was received by Officer John P. Granat at approximately 7:00 a.m. on August 19, 2016.

40.     TYLER LUMAR was searched, again, by Officer GRANAT and/or other Chicago Police Officers upon his return to the 11th District Station on August 19, 2016.  He was not found to have any narcotics on his person.

41.     At approximately 8:40 a.m. on August 19, 2016, TYLER LUMAR was transported to Cook County Department of Corrections, located at 26th and California by Central Detention Prisoner Transport Personnel, including Officers VINSON and ALEXANDER (#7662).  Central Detention personnel, including Officer VINSON and/or ALEXANDER again searched TYLER LUMAR prior to transporting him to Cook County.  The searching officers, including Officers

9

VINSON and ALEXANDER (#7662), did not find any narcotics on TYLER LUMAR's person.

42.     At approximately 9:00 a.m. on August 19, 2016, TYLER LUMAR arrived at Cook County Jail and was placed into a group lockup, Bullpen 23, at Cook County Jail, with 25 other detainees. TYLER LUMAR was seated next to several other detainees on a bench inside Bullpen 23. While TYLER LUMAR was sitting in Bullpen 23, an unknown African American male, seated to the right of LUMAR, removed contraband from his shoe and dropped it behind the bench that both he and LUMAR were seated on.

43.     The unknown African American dropped the contraband behind the bench while the Cook County Sheriff Officers T. WLODARSKI, CRAWFORD, GARMON, and LEON were searching the pretrial detainees who were inside group lockup, Bullpen 23.

44.     Cook County Sheriff Officer T. WLODARSKI recovered a package from the floor which sometime later was determined to contain 12 individually packaged small white rocks from behind the bench in Bullpen 23 on which TYLER LUMAR was seated. Cook County Sheriff Officer T. WLODARSKI then took LUMAR out of Bullpen 23 and restrained him outside bullpen 20.

45.     Cook County Sheriff T. WLODARSKI and CRAWFORD restrained LUMAR while a Chicago Police Officer, believed to be Officer VINSON (#17066) handcuffed, arresting LUMAR.

46.     Officer WLODARSKI wrongfully and knowingly claimed that he found the narcotics on TYLER LUMAR's person. Officer WLODARSKI detained TYLER LUMAR and subsequently turned over the narcotics to Cook County Department of Corrections Lieutenant ANGELA T. LEWIS.

47.     Chicago Police Central Detention 5 Transport, including but not limited to Police

Officers VINSON (#17066) and ALEXANDER (#7662) transported TYLER LUMAR back to the 11th District Lockup, along with the contraband found by WLODARSKI. The Chicago Police Officers left with LUMAR from Cook County Jail at approximately 9:25 a.m. and transported LUMAR directly from Cook County Jail to the 11th District station. LUMAR arrived back at the 11th District sometime between 10:15 – 10:45. Chicago Police Department reports are conflicting as to what time LUMAR arrived back at the 11th District. Some CPD reports state that LUMAR was rejected by Cook County at 11:04 a.m. (indicating he was still at Cook County at 11:04) and on other reports, CPD states that LUMAR was placed into cell #E2 at 11:04. Upon arrival, Officer VINSON (#17066) turned over the narcotics to Station Supervisor Officer JOHN GARTNER (#2523).

48.    Officer DANY MASTER HELWINK (#261) was responsible for watch command of the inmates on August 18, 2016 and August 19, 2016.

49.    Defendant FREDERICK ULLEWEIT (#582) was responsible for watch command of the inmates on August 18, 2016 and/or August 19, 2016.

50.    ERIC SPANN was an inmate at the 11th District who was located/housed in the cell next to LUMAR, (Cell #E1) before, during, and after LUMAR allegedly attempted suicide.

51.    Chicago Police Department Detention Aid ERRUM placed LUMAR into cell #E1. SPANN witnessed this.

52.    More than 10 minutes after ERRUM placed LUMAR in cellblock #E2, Inmate ERIC SPANN heard LUMAR praying to God and asking for forgiveness.

53.    Several minutes thereafter, SPANN heard loud banging noises on LUMAR's cell, which were audible to the Chicago Police Officers and civilians working inside the 11th District. No CPD officer or civilian came to LUMAR'S cell #E2 to investigate the banging noises.

11

54.     More than 5 minutes after hearing the banging, SPANN yelled for a guard because he needed some tissue.

55.     In response to SPANN's yelling, Detention Aide CHARLES BARRY (#49970) came down Cell Block E and discovered LUMAR hanging from his cell. He cut LUMAR down from the cell and called for assisted. Officer MENONI performed CPR on LUMAR.

56.     CPD reports state that TYLER LUMAR was found hanging from his cell by Chicago Police Detention Aide CHARLES BARRY (#49970) at 11:15 a.m.

57.     Paramedics were dispatched at 11:17 a.m. and arrived at the 11th District at 11:44 a.m. The paramedics transported TYLER LUMAR from the 11th District to Mount Sinai Hospital.

58.     TYLER LUMAR remained as a patient at Mount Sinai Hospital until September 11, 2016. He was transferred to Kindred North for long term acute care. He was subsequently transferred to Ballard Respiratory and Rehabilitation Center in Des Plaines, Illinois. Tyler Lumar passed away on April 18, 2018.

59.     On August 19, 2016, TYLER LUMAR was released from custody without charging him with any crime.

60.     On August 19, 2016, Chicago Police Department Officer Joseph Tripoli contacted the Lee County Sheriff's Office and requested that they reissue a traffic warrant for TYLER LUMAR.

61.     Lee County refused to reissue a traffic warrant for TYLER LUMAR.

62.     The Chicago Police Department never charged TYLER LUMAR with possession of a controlled substance or for any other crime related the narcotics/contraband recovered by Officer T. WLODARSKI (#15733).

63.     The Cook County Sheriff's office never charged TYLER LUMAR with possession

of a controlled substance or for any other crime related the narcotics/contraband recovered by Officer T. WLODARSKI (#15733).

**COUNT I**
**LUMAR v. WARREN, VEGA, ESTEBAN, JONES, LASCH, & GEYER**
**in their Individual Capacities**
**42 U.S.C. § 1983 – WRONGFUL/UNLAWFUL DETENTION**
**VIOLATION OF 4TH AMENDMENT**
*(Dismissed without prejudice as to all other Individual CPD Defendants in their Individual Capacities on July 27, 2018)*

64.    Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 64 of Count I.

65.    At all times relevant, Tyler Lumar was a pretrial detainee within the custody of the Chicago Police Department.

66.    At the time of his arrest and after transfer to the 11th District station, on August 18, 2016 TYLER LUMAR advised Defendant Chicago Police Officers, including Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617), that he had made the outstanding payment which served as the basis for the Lee County traffic warrant.

67.    Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) also spoke with Casey Tencate, Tyler's fiancé and mother of Tyler's child, who advised them that TYLER LUMAR had made the outstanding payment which served as the basis for the Lee County traffic warrant.

68.    Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) contacted Lee County through the Law Enforcement Agencies Data System (LEADS) at approximately 4:43 p.m. on August 18, 2016.

13

69.     On or about August 18, 2016 at 16:48 hours, Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) received verification from the Lee County Sheriff's Office that TYLER LUMAR could be released by simply positing $50.00 to bond himself out.  The Lee County Sheriff also advised Defendants that the traffic warrant issued for TYLER LUMAR was for LUMAR's failure to make a payment of court costs after he had plead guilty to a Class A misdemeanor, for driving on a suspended license.

70.     Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) intentionally failed to advise and concealed from TYLER LUMAR that he could be released by simply positing $50.00 to bond himself out.

71.     Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) falsely advised TYLER LUMAR that Lee County's traffic warrant was a nonbondable offense and that he would have to remain detained at the 11th District station.

72.     At no time did any Chicago Police Officer issue an Intrastate Hold Affidavit for LUMAR.

73.     Defendant Chicago Police Officers, including Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) knowingly and intentionally concealed the fact that the arresting charge was a bondable offense with the purpose of restraining TYLER LUMAR without against his will, without due process.

74.     TYLER LUMAR had more than $50.00 on his person which he would have used to bond himself out if Defendant Chicago Police Officers, including but not limited to WARREN

14

(#17444), VEGA (#17477) and ESTEBAN (#17617) would have advised TYLER LUMAR of his right to bond himself out of jail.

75.     TYLER LUMAR made several phone calls to his mother Lisa Alcorn and his fiancé Casey Tencate on August 18, 2016.  If Defendant Chicago Police Officers, including but not limited to WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) had not concealed from TYLER LUMAR that he had the right to bond himself out of jail, TYLER LUMAR would have requested that his mother Lisa Alcorn and/or his fiancé Casey Tencate post the $50.00 necessary to bond TYLER LUMAR out of jail.

76.     Instead of offering bail to TYLER LUMAR, the Defendant Chicago Police Officers, including Officer ESTEBAN (#17617), issued an unauthorized hold for TYLER LUMAR, under hold #z14221.

77.     Defendant Chicago Police Officers then wrongfully charged TYLER LUMAR under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z.  Chicago Police Officers falsely stated on TYLER LUMAR's Arrest Report that the "Bond Information Not Available" even though the Bond Information was provided by Lee County/LEADS at 4:48 p.m. on August 18, 2016.

78.     Defendant Chicago Police Officers charged TYLER LUMAR with a "z warrant" (nonbondable offense) even though Chicago Police Department policy prohibited the use of "z warrants."  The Defendant Chicago Police Officers intentionally charged TYLER LUMAR with a "Class Z" (nonbondable) offense even though Defendants knew that the Lee County traffic warrant arose out of a Class A Misdemeanor charge.  The Chicago Police Officers did so with the intent to wrongfully detain TYLER LUMAR.

79.     Defendants lacked probable cause to arrest TYLER LUMAR under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z, as Defendants knew from their direct contact with Lee

15

County, that the underlying charge was for a Class A Misdemeanor bondable offense and not a Class Z nonbondable offense based upon TYLER LUMAR's failure to make payment on an outstanding balance of court costs.

80.     Defendant District Commander JAMES JONES (#73), and Station Supervisors SERGEANT ALAN LASCH (#1434) and SERGEANT KEVIN GEYER (#1679) approved of the charges, approved of the issuance of a Class Z charge, instead of a Class A charge, and approved of the Chicago Police Officers, including but not limited to WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617)'s concealment of the fact that TYLER LUMAR could have posted bail and left the 11th District station.  Defendants also knew that bond information was readily available after Lee County had contacted the Chicago Police Department to confirm the issuance of the traffic warrant.

81.     As a result of Defendants' unconstitutional conduct, TYLER LUMAR was unlawfully seized and detained.  As a result of his unlawful seizure and detainment, based upon fabricated evidence, TYLER LUMAR attempted to commit suicide, suffering pain, permanent injury, and emotional distress.

82.     The conduct of Defendants violated the 4th Amendment to the U.S. Constitution because it resulted in an unlawful seizure, detention and restraint of TYLER LUMAR's freedom of movement in that Defendants unreasonably detained TYLER LUMAR using information known to be false in order to unlawfully charge TYLER LUMAR with a Class Z nonbondable offense and in order to unlawfully detain LUMAR instead of allowing him to bond himself out at the 11th District.

83.     TYLER LUMAR was deprived of the rights, privileges, and immunities secured to him by the Fourteenth Amendments to the United States Constitution and law enacted thereunder.

16

Therefore, Defendants are liable to Plaintiff TYLER LUMAR pursuant to 42 U.S.C. §1983.

84.     The Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR's rights.

85.     Defendants' conduct proximately caused the injuries suffered by TYLER LUMAR and TYLER LUMAR's de

86.     As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT II**
**LUMAR V. CITY OF CHICAGO**
**42 U.S.C. § 1983 – MUNICIPAL LIABILITY/MONELL CLAIM**
**14TH AMENDMENT CONSTITUTIONAL VIOLATION**

87.     Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 87 of Count II.

88.     This count is brought pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

89.     At all times relevant, TYLER LUMAR was a pretrial detainee within the custody of the Chicago Police Department.

90.     At the time of his arrest and after transfer to the 11th District station, on August 18, 2016 TYLER LUMAR advised Defendant Chicago Police Officers, including Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617), that he had made the outstanding

17

payment which served as the basis for the Lee County traffic warrant.

91.     Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) also spoke with Casey Tencate, Tyler's fiancé' and mother of Tyler's child, who advised them that TYLER LUMAR had made the outstanding payment which served as the basis for the old Lee County traffic warrant.

92.     Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) contacted Lee County through the Law Enforcement Agencies Data System (LEADS) at approximately 4:43 p.m. on August 18, 2016.

93.     On or about August 18, 2016 at 16:48 hours, Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) received verification from the Lee County Sheriff's Office that TYLER LUMAR could be released by simply positing $50.00 to bond himself out.  The Lee County Sheriff also advised Defendants that the traffic warrant issued for TYLER LUMAR was for LUMAR's failure to make a payment of court costs after he had plead guilty to a Class A misdemeanor for driving on a suspended license.

94.     In processing persons arrested on Illinois warrants issued outside of Cook County, Defendant had an implicit policy in which it selectively enforced General Administrative Order No. 2015-06 Procedures for Arrests on Illinois Intrastate Warrants Issued Outside of Cook County ("GAO No. 2015-06"), entered by Judge Evans on June 17, 2015, which was motivated by the intent to discriminate on the basis of race.  Specifically, Defendant had an implicit policy to selectively enforce GAO No. 2015-06, thereby subjecting arrestees to invidious racial discrimination and depriving arrestees of equal protection. The City, through the Chicago Police

18

Department, selectively enforced GAO No. 2015-06 almost exclusively on non-white arrestees.

95. GAO No. 2015-06 facially states that defendants taken into custody by an arresting agency located within Cook County, including the City of Chicago, on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court. The City of Chicago, through the Chicago Police Department, did not consistently enforce GAO No. 2015-06 in that it did not require all detainees arrested on out of county warrants to appear in bond court. Instead, Defendant City of Chicago would selectively enforce GAO No. 2015-06 with the intent to discriminate on the basis of race.

96. Similarly situated white arrestees (those arrested in Cook County on out of county warrants) were not required to appear in bond court. Instead, similarly situated white arrestees who had the means to bond themselves out (either because they had the requisite monies on their persons or if another person provided the monies to bond themselves out) were allowed to bond themselves out directly from the Chicago Police Department lockups, including but not limited to the 11th District.

97. GAO No. 2015-06 facially requires that the Chicago Police Department must execute an Intrastate Hold Affidavit for a defendant held without bail under GAO No. 2015-06. The Chicago Police Department did not execute an Intrastate Hold Affidavit for TYLER LUMAR.

98. There existed, around and before the time of LUMAR's attempted suicide, a widespread practice within the Chicago Police Department under which the Chicago Police Officers, within all 25 Districts, would selectively enforce GAO No. 2015-06 by almost exclusively enforcing it against non-white arrestees/pretrial detainees, including but not limited to African Americans and Hispanics. This practice was motivated by the intent to discriminate on the basis of race, depriving non-white arrestees/pretrial detainees of equal protection of the laws,

19

guaranteed by the 14th Amendment to the U.S. Constitution. Approximately 18,000 individuals are arrested on warrants annually by the Chicago Police Department, of which 4% are arrested on warrants issued outside of Cook County from a state court in Illinois, which accounts for approximately 788 individuals. Of those approximately 788 individuals, more than 300 non-white arrestees/pretrial detainees, in 2015-2018, were subjected to the City of Chicago's widespread unlawful practice of selectively enforcing GAO No. 2015-06 on them on account of their race. Specifically, these more than 300 non-white arrestees/pretrial detainees, in 2015-2018, were wrongfully detained when they were not allowed to bond themselves out when they otherwise could have, as their similarly situated white counterparts were allowed to do.

99.     This widespread practice was and is allowed to flourish because the City of Chicago, through the Chicago Police Department, directly encouraged or approved and was thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control police officer and personnel and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging futures abuses such as those that caused LUMAR's injuries.

100.    The above described widespread practice, so well-settled as to constitute the de facto policy of the City of Chicago and the Chicago Police Department was able to exist and thrive because governmental policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

101.    Wayne M. Gulliford, acting Chief of Bureau of Patrol was a decision maker with final policy making authority for the enforcement of GAO No. 2015-06. He ratified the Chicago Police Officer's practice in selectively enforcing GAO No. 2015-06 on a discriminatory basis, in violation of the 14th Amendment to the US Constitution.

102. The District Commanders of all 25 Districts, including but not limited to the District Commander for the 11th District, JAMES JONES and KEVIN JOHNSON were decision makers with final policy making authority for the enforcement of GAO No. 2015-06. They ratified the Chicago Police Officer's practice in selectively enforcing GAO No. 2015-06 on a discriminatory basis, in violation of the 14ht Amendment to the US Constitution.

103. The watch commanders of all 25 Districts, including but not to limited to FREDERICK ULLEWEIT (#582) was a decision maker with final policy making authority for the enforcement of GAO No. 2015-06. As the watch commander for the 11th District on August 18, 2016, FREDERICK ULLEWEIT (#582) selectively enforced GAO No. 2015-06 on LUMAR.

104. Defendants violated LUMAR's rights by establishing and maintaining an implicit policy/widespread practice, ratified by specific persons with policy making authority, that was the moving force for the constitutional violations LUMAR suffered; specifically, by depriving him of due process by engaging in unlawful discrimination in violation of the 14th Amendment, which ultimately resulted in his wrongful detention, in violation of the 4th Amendment.

105. Defendant Chicago Police Officers, including but not limited to Defendants WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617) intentionally failed to advise and concealed from TYLER LUMAR that he could be released by simply positing $50.00 to bond himself out. They falsely advised TYLER LUMAR that Lee County's traffic warrant was a nonbondable offense and that he would have to remain wrongfully detained at the 11th District station, based in part on GAO No. 2015-06. Instead of offering bail to TYLER LUMAR, the Defendant Chicago Police Officers, including Officer ESTEBAN (#17617), issued an unauthorized hold for TYLER LUMAR, under hold #z14221. This was done with the purpose of restraining TYLER LUMAR without against his will, without due process.

106.     TYLER LUMAR had more than $50.00 on his person.  TYLER LUMAR made several phone calls to his mother Lisa Alcorn and his fiancé Casey Tencate on August 18, 2016. If the Chicago Police Officers had not discriminatorily applied GAO No. 2015-06, claiming that TYLER LUMAR could not bond himself out of jail, TYLER LUMAR would have used the $50.00 on his person or had his mother Lisa Alcorn and/or his fiancé Casey Tencate post the $50.00 necessary to bond TYLER LUMAR out of jail.

107.     Further, Defendant Chicago Police Officers wrongfully charged TYLER LUMAR under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z.  Chicago Police Officers falsely stated on TYLER LUMAR's Arrest Report that the "Bond Information Not Available" even though the Bond Information was provided by Lee County/LEADS at 4:48 p.m. on August 18, 2016.

108.     Defendant Chicago Police Officers charged TYLER LUMAR with a "z warrant" (nonbondable offense) even though Chicago Police Department policy prohibited the use of "z warrants."  The Defendant Chicago Police Officers intentionally charged TYLER LUMAR with a "Class Z" (nonbondable) offense even though Defendants knew that the Lee County traffic warrant arose out of a Class A Misdemeanor charge.  The Chicago Police Officers did so with the intent to wrongfully detain TYLER LUMAR.

109.     Defendants lacked probable cause to arrest TYLER LUMAR under 725 ILCS 5.01/110-3, Issuance of Warrant, Class Z, as Defendants knew from their direct contact with Lee County, that the underlying charge was for a Class A Misdemeanor bondable offense and not a Class Z nonbondable offense based upon TYLER LUMAR's failure to make payment on an outstanding balance of court costs.

110.     Defendant District Commander JAMES JONES (#73), and Station Supervisors SERGEANT ALAN LASCH (#1434) and SERGEANT KEVIN GEYER (#1679) approved of the

Officers' selective enforcement of GAO No. 2015-06 as to LUMAR, approved of the issuance of a Class Z charge, instead of a Class A charge, and approved of the Chicago Police Officers, including but not limited to WARREN (#17444), VEGA (#17477) and ESTEBAN (#17617)'s concealment of the fact that TYLER LUMAR could have posted bail and left the 11th District station.

111.    As a result of Defendant's unconstitutional conduct, in establishing and maintaining an implicit policy/widespread practice, ratified by specific persons with policy making authority, LUMAR was deprived of the rights, privileges, and immunities secured to him by the Fourteenth Amendment to the United States Constitution and laws enacted thereunder. Therefore, Defendants are liable to Plaintiff TYLER LUMAR pursuant to 42 U.S.C. §1983.

112.    Further, the conduct of Defendants violated the 4th Amendment to the U.S. Constitution because it resulted in an unlawful seizure, detention and restraint of TYLER LUMAR's freedom of movement in that Defendants unreasonably detained TYLER LUMAR using information known to be false in order to unlawfully charge TYLER LUMAR with a Class Z nonbondable offense. Therefore, Defendants are liable to Plaintiff TYLER LUMAR pursuant to 42 U.S.C. §1983.

113.    As a result of these constitutional deprivations, unlawful discrimination and unlawful seizure and detainment, TYLER LUMAR attempted to commit suicide, suffering pain, permanent injury, and emotional distress.

114.    The Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR'S rights.

115.    TYLER LUMAR's injuries were proximately caused by employees/agents of the Chicago Police Department of the CITY OF CHICAGO, including but not limited to the

individually named Defendants who acted pursuant to the Chicago Police Department and/or the CITY OF CHICAGO and their policies and practices in engaging in misconduct described in this count.

116. The Chicago Police Department of the CITY OF CHICAGO is therefore directly liable for TYLER LUMAR's injuries and death.

117. As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE AND PERSON OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendant CITY OF CHICAGO and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT III**
**LUMAR v. Wlodarski, Crawford, Garmon, Leon, Latham, Lewis**
**in their individual capacities**
**42 U.S.C. § 1983 – UNLAWFUL ARREST AND DETENTION**
**VIOLATION OF 4TH AMENDMENT**

118. Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 118 of Count III.

119. At all times relevant, TYLER LUMAR was a pretrial detainee within the custody of the Cook County Sheriff.

120. At no time did TYLER LUMAR bring in or carry in any narcotics or other contraband to Cook County Jail, either on his person or otherwise.

121. At all times while TYLER LUMAR remained at Cook County Jail, TYLER LUMAR did not obtain and/or possess any contraband and/or narcotics on his person.

24

122.     Sometime after 9:00 a.m. on August 19, 2016, TYLER LUMAR was placed into Cook County Jail, Bullpen 23 with 25 other detainees.  At 9:11 a.m., while TYLER LUMAR was sitting in Bullpen 23, an unknown African American male, seated one detainee to the right of LUMAR, removed contraband from his shoe and dropped it behind the bench where both he and LUMAR were seated.

123.     Cook County Sheriff Officers T. WLODARSKI, CRAWFORD, GARMON, and LEON were conducting a custodial search searched the pretrial detainees who were inside group lockup, Bullpen 23.

124.     During his custodial search of all 26 arrestees, Cook County Sheriff Officer THOMAS WLODARSKI recovered a package which contained 12 individually packaged small white rocks from the floor behind the bench where LUMAR and several other inmates were seated.

125.     Officer WLODARSKI then detained TYLER LUMAR.

126.     Cook County Sheriff Officer T. WLODARSKI then removed LUMAR from Bullpen 23 and restrained him outside bullpen 20.

127.     Thereafter, Cook County Sheriff CRAWFORD, LEON, GARMON, and T. WLODARSKI restrained LUMAR while Chicago Police Officers, including but not limited to Officer VINSON (#17066) handcuffed LUMAR.

128.     Cook County Sheriff CRAWFORD, LEON, GARMON, and T. WLODARSKI never tested the recovered contraband.

129.     Defendants had no probable cause to arrest and/or restrain TYLER LUMAR for possession of narcotics as the narcotics were identified on the floor, behind a bench, in a room with 25 other detainees.  Defendants' seizure/arrest was without probable cause and was unnecessary and unreasonable and was therefore in violation of Plaintiff's Fourth and Fourteenth

Amendment Rights.

130.    At no time did Cook County Officer T. WLODARSKI, CRAWFORD, GARMON, or LEON locate the contraband on TYLER LUMAR's person.

131.    TYLER LUMAR continuously advised the Cook County Defendants that the contraband discovered by Cook County Officer T. WLODARSKI was not in his possession, was not found on his person and was dropped by another detainee.

132.    The Cook County Department of Corrections maintains video footage of the bullpen lockup areas for pretrial detainees.  Video footage of TYLER LUMAR shows that another detainee sitting one detainee to the right of TYLER LUMAR dropped the contraband on the floor immediately before Cook County Officer THOMAS WLODARSKI discovered the contraband on the floor of the bullpen.  Officer WLODARSKI never reviewed the video footage of Bullpen 23.

133.    The Cook County Correctional Officers, including WLODARSKI, CRAWFORD, GARMON, and LEON, knew that the Cook County Jail maintained live footage of the bullpen/holding cells.  Defendants never viewed the footage of Bullpen 23 at any time during or after their arrest and restrain of LUMAR.

134.    Officer WLODARSKI or some other Cook County official then contacted the Chicago Police Department to return TYLER LUMAR to 11th District Lockup.

135.    Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) arrested LUMAR at COOK COUNTY.  COOK COUNTY provided no paperwork to the Chicago Police Officers at the time they turned LUMAR over.

136.    At approximately 9:30 a.m., Chicago Police Central Detention 5 Transport, Police Officers PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662)

transported TYLER LUMAR immediately back to the 11th District Lockup.  The distance from Cook County Jail to the 11th District is approximately 2.5 miles; it took Chicago Police Officers approximately 10 minutes via car to travel from Cook County Jail to the 11th District.  LUMAR arrived at the 11th District sometime between 10:15 and 10:45, along with the contraband found by WLODARSKI at the Cook County Jail.  Officer Vinson turned over the narcotics to the Station Supervisor Officer John Gartner (#2523).

137.    Officer WLODARSKI and LEWIS wrongfully and knowingly falsified an Incident Report with the Cook County Sheriff's Office claiming that he recovered the contraband and/or narcotics from TYLER LUMAR's person while processing new pretrial detainees.   Officer WLODARSKI wrongfully and knowingly indicated on the report that the incident was not captured on video surveillance when Cook County surveillance footage clearly depicts the incident.    Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM knowingly approved the falsified Incident Report as they knew that Bullpen 23 was at all times under video surveillance.

138.    As such, LUMAR's wrongful arrest and detainment were based on fabricated evidence.

139.    Officer WLODARSKI, Officer CRAWFORD, Officer GARMON, Officer LEON, and Officer LEWIS acted with the intent to wrongfully arrest and detain TYLER LUMAR.

140.    Cook County never filed charges against TYLER LUMAR for possession or any other crime related to the contraband/narcotics.

141.    The Chicago Police Department never filed charges against TYLER LUMAR for possession or any other crime related to the contraband/narcotics.

142.    As a proximate result of Defendants' unconstitutional conduct, TYLER LUMAR

was unlawfully restrained, seized, and arrested and was also unlawfully detained. As a proximate result of his unlawful arrest, seizure, and detainment, TYLER LUMAR was deprived of the rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution. As a proximate result of his unlawful arrest and detention, he became emotionally and medically unstable, and attempted to commit suicide. He suffered pain, permanent injury, and emotional distress. Therefore, Defendants are liable to Plaintiff TYLER LUMAR pursuant to 42 U.S.C. §1983.

143. The Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR'S rights.

144. Defendants' conduct proximately caused the injuries suffered by and the death of TYLER LUMAR.

145. As a result of Defendants' conduct, LISA ALCORN, Independent Administrator ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

## COUNT IV
## LUMAR V. COOK COUNTY / COOK COUNTY SHERIFF
## 42 U.S.C. § 1983 – MUNICIPAL LIABILITY/MONELL CLAIM
## 4TH AMENDMENT CONSTITUTIONAL VIOLATION
### *(Dismissed without prejudice per Court Order on July 27, 2018)*

146. Plaintiff realleges and incorporates fact Paragraphs 18 through 64 as Paragraph 146 of Count IV.

147.    This count is brought pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

148.    At all times relevant, TYLER LUMAR was a pretrial detainee in the bullpens and general detention areas of Cook County Jail.

126    While the bullpen area was being searched, Cook County Sheriff Officer THOMAS WLODARSKI recovered a package later determined to contain 12 individually packaged small white rocks from the floor behind the bench where LUMAR and several other inmates were seated.

127    On or about 9:15 a.m., Defendant Cook County Correctional Officers including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON participated in LUMAR's detention.

128    At no time between WLODARSKI's visual recognition of the contraband and the Defendant Cook County Correctional Officers' detaining LUMAR and transferring him to CPD did any officer review the video footage of the bullpen.

129    Officer WLODARSKI, LEWIS, and LATHAM wrongfully and knowingly completed an Incident Report with the Cook County Sheriff's Office claiming that they recovered the contraband and/or narcotics from TYLER LUMAR's person while processing new pretrial detainees.  The Officers wrongfully and knowingly indicated on the report that the incident was not captured on video surveillance when Cook County surveillance footage clearly depicts the incident and when it was well known to the Officers that Bullpen 23 is under constant surveillance. Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM knowingly approved the falsified Incident Report as they also knew that Bullpen 23 was at all times under video surveillance.

130     Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, acted on an implicit policy to arbitrarily restrain and/or arrest pretrial detainees housed inside Cook County's bullpen for contraband discovered by Cook County which was unknown to belong to any specific pretrial detainee, depriving detainees of due process and the right to be free from unlawful arrest.

131     Plaintiff LUMAR possessed sufficient funds to pay the $50.00 bond and would have been released on bond after an appearance in bond court.

132     As a result of LUMAR's unlawful arrest after contraband was discovered in Bullpen 23, he was deprived of the bond hearing he would have otherwise had.

133     Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, by honoring an express policy to detain similarly situated persons to LUMAR and thereby making an unlawful arrest, were the moving force behind LUMAR's suicide attempt.

134     Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, acting as municipal government workers, deprived TYLER LUMAR of his right to be free from unlawful arrest, thereby infringing on his Fourth Amendment rights; indeed, this deprivation was the moving force of the unconstitutional conditions leading to LUMAR's suicide attempt.

135     The tendency to detain similarly situated persons to LUMAR was part of a widespread practice on the part of Defendant Cook County Correctional Officers.

136     As the records of CCDOC show, the practice of Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, is to arbitrarily detain and/or arrest pretrial detainees where contraband is found which

was unknown to belong to any specific pretrial detainee.

137     The records of CCDOC show that before being held in a bullpen, any arrestee is subjected to at least two full-body searches for contraband.

138     The records of CCDOC show that before being arrested, a person is charged with a particular crime or multiple crimes, which is immediately entered into the County's records.

139     When contraband was found in an area of the bullpen and not on the person of any particular detainee, records of CCDOC show that officers have failed to consult either the arrest record or the results of searches and instead arbitrarily detain and/or arrest the nearest person to the contraband. This custom results in the unlawful arrest of a detainee without probable cause.

140     Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, by following this widespread custom to detain similarly situated persons to LUMAR and thereby making an unlawful arrest without probable cause, were the moving force behind LUMAR's suicide attempt. Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, infringed upon Plaintiff LUMAR's Fourth Amendment rights and thereby set in motion a chain of events directly leading to LUMAR's attempted suicide.

141     The widespread practice of arbitrarily selecting the nearest detainee with contraband found in an open bullpen deprives arrestees of due process and the right to be free from unlawful detention and arrest, and in the case of Plaintiff LUMAR, this 4th amendment deprivation was the moving force of the unconstitutional conditions leading to LUMAR's suicide attempt.

142     The decision to ratify the practice of detaining similarly situated persons to LUMAR was made by final policymakers at the Cook County Sheriff's Office.

143     The practice of Defendant Cook County Correctional Officers, including but not

31

limited to WLODARSKI, CRAWFORD, LEON, and GARMON, is to arbitrarily detain and/or arrest pretrial detainees where contraband is found which was unknown to belong to any specific pretrial detainee.

144    When contraband was found in an area of the bullpen and not on the person of any particular detainee, Defendant Cook County Correctional Officers, including but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON, failed to consult either the arrest record or the video surveillance before detaining and/or arresting the nearest person to the contraband.

145    Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM are decision makers with final policy making authority; they ratified and approved WLODARSKI's falsified Incident Report for the arrest, demonstrating their power to act without review from superiors.

146    NNEKA JONES TAPIA, as the Executive Director of the Cook County Department of Corrections, is a decision maker with final policy making authority who ratified and approved the express policy and widespread practice of arbitrarily detaining and/or arresting pretrial detainees where contraband is found which was unknown to belong to any specific pretrial detainee, including LUMAR.

126    Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM, by ratifying LUMAR's unlawful arrest and unlawful detention, created the moving force behind LUMAR's suicide attempt. Defendant Cook County Correctional Lieutenant ANGELA T. LEWIS and Cook County Correctional Lieutenant CHAUNTE LATHAM allowed their lower-ranking Correctional Officers to infringe Plaintiff LUMAR's Fourth Amendment rights and thereby set in motion a chain of events directly leading to LUMAR's attempted suicide.

127     As a result of these constitutional deprivations, unlawful discrimination and unlawful seizure and detainment, TYLER LUMAR attempted to commit suicide, suffering pain, permanent injury, and emotional distress.

128     The Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR'S rights.

129     TYLER LUMAR's injuries were proximately caused by THE COOK COUNTY SHERIFF, including but not limited to the individually named Defendants who acted pursuant to the Cook County Sheriff's Office and its policies and practices in engaging in misconduct described in this count.

130     COOK COUNTY is therefore directly liable for TYLER LUMAR's injuries and his death.

131     As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT V**
**LUMAR v. Individual Chicago Police Officers**
**42 U.S.C. § 1983 – UNLAWFUL ARREST AND DETENTION**
**VIOLATION OF 4TH AMENDMENT**
*(Dismissed without prejudice per Court Order on July 27, 2018)*

132.     Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 132 of Count V.

133.    At all times relevant, TYLER LUMAR was a pretrial detainee within the custody of the Chicago Police Department.

134.    At no time did TYLER LUMAR bring in or carry in any narcotics or other contraband to Cook County Jail, either on his person or otherwise.

135.    At all times while TYLER LUMAR remained at Cook County Jail, TYLER LUMAR did not obtain and/or possess any contraband and/or narcotics on his person.

136.    Sometime after 9:00 a.m. on August 19, 2016, TYLER LUMAR was placed into Cook County Jail, Bullpen 23 with 25 other detainees.  At 9:11 a.m., while TYLER LUMAR was sitting in Bullpen 23, an unknown African American male, seated one detainee to the right of LUMAR, removed contraband from his shoe and dropped it behind the bench where both he and LUMAR were seated.

137.    Cook County Sheriff Officers T. WLODARSKI, CRAWFORD, GARMON, and LEON were conducting a custodial search searched the pretrial detainees who were inside group lockup, Bullpen 23.

138.    During his custodial search of all 26 arrestees, Cook County Sheriff Officer THOMAS WLODARSKI recovered a package which contained 12 individually packaged small white rocks from the floor behind the bench where LUMAR and several other inmates were seated.

139.    Officer WLODARSKI then detained TYLER LUMAR.

140.    Cook County Sheriff Officer T. WLODARSKI then removed LUMAR from Bullpen 23 and restrained him outside bullpen 20.

141.    Thereafter, both Cook County Sheriff CRAWFORD, GARMON, LEON, and T. WLODARSKI restrained/arrested LUMAR while Chicago Police Officers, including but not limited to Officer VINSON (#17066) handcuffed LUMAR.

142.    Defendants had no probable cause to arrest and/or restrain TYLER LUMAR for possession of narcotics as the narcotics were identified on the floor, behind a bench, in a room with 25 other detainees.    Defendants' seizure/arrest was without probable cause and was unnecessary and unreasonable and was therefore in violation of Plaintiff's Fourth and Fourteenth Amendment Rights.

143.    At no time did Cook County Officer T. WLODARSKI, CRAWFORD, GARMON, or LEON locate the contraband on TYLER LUMAR's person.

144.    TYLER LUMAR continuously advised the Cook County Defendants that the contraband discovered by Cook County Officer T. WLODARSKI was not in his possession, was not found on his person and was dropped by another detainee.

145.    The Cook County Department of Corrections maintains video footage of the bullpen lockup areas for pretrial detainees.    Video footage of TYLER LUMAR shows that another detainee sitting one detainee to the right of TYLER LUMAR dropped the contraband on the floor immediately before Cook County Officer THOMAS WLODARSKI discovered the contraband on the floor of the bullpen.    Officer WLODARSKI never reviewed the video footage of Bullpen 23.

146.    The Cook County Correctional Officers, including WLODARSKI, CRAWFORD, GARMON, and LEON, knew that the Cook County Jail maintained live footage of the bullpen/holding cells.    Defendants never viewed the footage of Bullpen 23 at any time during or after their arrest and restrain of LUMAR.

147.    Officer WLODARSKI or some other Cook County official then contacted the Chicago Police Department to return TYLER LUMAR to 11th District Lockup.

148.    Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) arrested LUMAR at COOK COUNTY.    COOK

COUNTY provided no paperwork to the Chicago Police Officers at the time they turned LUMAR over.

149. The detaining/arresting Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) did not witness WLODARSKI pick up the package believed to be narcotics.

150. The detaining/arresting Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) did not receive any paperwork from the Cook County Sheriff Officers documenting that LUMAR had the alleged narcotics on his person.

151. WLODARSKI told the detaining/arresting Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDEAR (#7662) that he found the narcotics on LUMAR's person while he was conducting a custodial search of the arrestees in Bullpen 23.

152. The Chicago Police Officers, including PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) searched LUMAR before transporting him to Cook County Jail at approximately 8:40 a.m. on August 19, 2016. The searching Chicago Police Officers did not find any narcotics or contraband on LUMAR during this search. Additionally, PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) searched the vehicle they transported the arrestees in before loading the arrestees into the vehicle for transport to Cook County. No narcotics or other contraband was discovered on an arrestee during this search/inspection of the transporting vehicle.

153. Arresting Chicago Police Officers PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) knew that Officer WLODARSKI's claim that he found the

36

narcotics/contraband on LUMAR was false as the Chicago Police Officers knew that LUMAR had been in Chicago Police custody since approximately 3:00 a.m. on August 18, 2016 and that he had been searched by various Chicago Police Officers on at least 8 separate occasions and was never found to be in possession of any contraband/narcotics.

154.    The Chicago Police Department Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) knew that Cook County maintained video surveillance of its bullpens as they routinely transported arrestees to and from Cook County Jail.  After WLODARSKI told the Chicago Police Officers, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) that he found narcotics/contraband on LUMAR, neither PETER VINSON (#17066) nor DIETRICE ELLENS-ALEXANDER (#7662), nor any other CPD viewed the surveillance footage, knowing that LUMAR did not have such narcotics/contraband on his person.

155.    As such, the Chicago Police Department, including but not limited to PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662), did not have probable cause to detain and arrest LUMAR for possession of the narcotics/contraband.

156.    Based upon the Chicago Police Department's firsthand knowledge and prior actions (noting that they had searched LUMAR 8 times before he was transferring to Cook County, including minutes before he was brought into Cook County's lockup), the Chicago Police Department officers could not have been mistaken as to whether LUMAR had narcotics/contraband in his possession.   As such, they lacked probable cause to arrest and detain him on August 19, 2016 at Cook County Jail.

157.    At approximately 9:30 a.m., Chicago Police Central Detention 5 Transport, Police Officers PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662)

transported TYLER LUMAR immediately back to the 11th District Lockup. The distance from Cook County Jail to the 11th District is approximately 2.5 miles; it took Chicago Police Officers approximately 10 minutes via car to travel from Cook County Jail to the 11th District. LUMAR arrived at the 11th District sometime between 10:15 and 10:45, along with the contraband found by WLODARSKI at the Cook County Jail. Officer Vinson turned over the narcotics to the Station Supervisor Officer John Gartner (#2523).

158. TYLER LUMAR continuously advised the Chicago Police Officers, including PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) that the contraband discovered by Cook County Officer T. WLODARSKI was not in his possession, was not found on his person and was dropped by another detainee.

159. Officers PETER VINSON (#17066) and DIETRICE ELLENS-ALEXANDER (#7662) acted with the intent to wrongfully arrest and detain TYLER LUMAR.

160. Cook County never filed charges against TYLER LUMAR for possession or any other crime related to the contraband/narcotics.

161. The Chicago Police Department never filed charges against TYLER LUMAR for possession or any other crime related to the contraband/narcotics.

162. As a proximate result of Defendants' unconstitutional conduct, TYLER LUMAR was unlawfully restrained, seized, and arrested and was also unlawfully detained by the Chicago Police Department on August 19, 2016 at Cook County Jail. As a proximate result of his unlawful arrest, seizure, and detainment, TYLER LUMAR was taken back to the 11th District lockup, instead of proceeding to bond court where he would have been allowed to bond himself out for $50.00. As a result of this separate illegal arrest and detainment, LUMAR attempted to commit suicide, which proximately resulted in serious permanent mental and physical injuries.

163.    LUMAR was deprived of the rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution. As a proximate result of his unlawful arrest and detention, he became emotionally and medically unstable, and attempted to commit suicide. He suffered pain, permanent injury, and emotional distress. Therefore, Defendants are liable to Plaintiff TYLER LUMAR pursuant to 42 U.S.C. §1983.

164.    The Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR'S rights.

165.    Defendants' conduct proximately caused the injuries suffered by TYLER LUMAR and his death.

166.    As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT VI**
**LUMAR V. CITY OF CHICAGO**
**42 U.S.C. § 1983 – MUNICIPAL LIABILITY/MONELL CLAIM**
**4TH AMENDMENT CONSTITUTIONAL VIOLATION**
*(Dismissed without prejudice per Court Order on July 27, 2018)*

167.    Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 167 of Count VI.

168.    Plaintiff realleges and incorporates paragraphs 133 through 164 as Paragraph 168 of Count VI.

169.    This count is brought pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

170.    At all times relevant, TYLER LUMAR was a pretrial detainee in the custody of the Chicago Police Department.

171.    While CPD Officers including, but not limited to, Defendants Officer VINSON and Officer ALEXANDER kept watch, Defendant Cook County Correctional Officers including, but not limited to WLODARSKI, CRAWFORD, LEON, and GARMON detained/arrested Plaintiff LUMAR for contraband found on the floor of Bullpen 23, not being found on any specific detainee.

172.    At all times relevant, CPD Officers Defendants Officer VINSON and Officer ALEXANDER knew that LUMAR did not have the narcotics/contraband in his possession.  As such, they knew there was no probable cause for his detainment/arrest at Cook County Jail.

173.    As duly appointed representatives of the Chicago Police Department, Defendants Officer VINSON and Officer ALEXANDER acted in accordance with an express policy to unlawfully arrest detainees received at Cook County without having facts and circumstances to establish the necessary probable cause for arrest.

174.    The CITY OF CHICAGO, through the Chicago Police Department, had an express policy to accept and arrest detainees at Cook County Jail, even when the facts and circumstances of the arrest failed to establish the necessary probable cause for arrest.

175.    Defendants Officer VINSON and Officer ALEXANDER did not hesitate to arrest LUMAR when LUMAR was a restrained/arrested pretrial detainee housed inside Cook County's bullpen for contraband discovered by Cook County which was unknown to belong to any specific pretrial detainee, depriving Plaintiff LUMAR of the right to be free from unlawful arrest.

176.    By following an express policy to refrain from checking into facts and

circumstances, i.e. from requiring adequate probable cause, thereby depriving Plaintiff LUMAR of the right to be free from unlawful arrest, Defendant CPD Officers including, but not limited to, Officer VINSON and Officer ALEXANDER infringed upon Plaintiff LUMAR's Fourth Amendment right to be free from unlawful seizures.

177.    Defendants City of Chicago Police Department's records show a widespread practice arresting detainees without probable cause that are seized while being detained at Cook County Jail, and turned over to CPD by Cook County.

178.    Such failure to properly vet detainees before taking them into custody is a facial violation of arrestees' Fourth Amendment rights to be free from unlawful arrest and detention.

179.    Holding arrestees against their will without probable cause while being detained at Cook County Jail is the moving force behind the suicide attempts of many prisoners in CPD custody.

180.    As Commanding Officer of the Central Detention Unit, CPD Lieutenant KEVIN HANNIGAN (Star #218) acted as a decision maker with final policymaking authority when he ratified the Chicago Police Department's express policy and widespread practice; specifically, here, Defendant Officers ALEXANDER and VINSON's decision to transport LUMAR back to the 11th District lockup, knowing such arrest lacked the necessary probable cause.

181.    When CPD Central Detention Unit's final policymaker HANNIGAN approved LUMAR's transport, as part of this express policy and widespread practice, it served as the moving force behind LUMAR's attempt on his own life while detained in 11th District lockup.

182.    By acting under orders from a final policymaker, CPD Defendant Officers ALEXANDER and VINSON transported arrestee LUMAR in direct conflict with his Fourth Amendment rights to be free from unlawful arrest and detention; such constitutional violation

under the imprimatur of a municipal actor with ultimate decision-making authority was the moving force in Plaintiff LUMAR's subsequent suicide attempt by hanging.

183.    This express policy and widespread practice, which resulted in Defendant CPD Officers including, but not limited to, Officer VINSON and Officer ALEXANDER violating LUMAR's Fourth Amendment right to be free from unlawful seizures, was the moving force behind Plaintiff LUMAR's attempt to take his own life. If Defendant CPD Officers including, but not limited to, Officer VINSON and Officer ALEXANDER had not unlawfully detained and arrested LUMAR, Plaintiff LUMAR would have been able to bond out at bail court on August 19, 2016.

184.    By acting in accordance with a widespread policy to infringe upon the Fourth Amendment rights of similarly situated detainees to Plaintiff LUMAR, Defendants City of Chicago Police Department caused the municipal government to violate citizens' fundamental rights.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT VII**
**LUMAR V. Jonathan Errum, in his Individual Capacity**
**42 U.S.C. § 1983 – OBJECTIVELY UNREASONABLE TO LUMAR'S BASIC NEEDS**
**(DENIAL OF PROPER MEDICAL CARE and CONDITIONS OF CONFINEMENT)**
**VIOLATION OF 4TH AMENDMENT**

185.    Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 185 of Count VII.

186.    As outlined in Count I and Count II of the instant complaint (in that the Defendants

knew that the Lee County traffic warrant was for a bondable Class A misdemeanor offense for driving on a suspended license and not a Class Z), TYLER LUMAR was wrongfully detained by Defendants. The wrongful detainment caused TYLER LUMAR to suffer severe emotional and physical distress as LUMAR was transferred for emergency medical treatment at Mount Sinai for an asthma attack after he was advised by Defendants that he could not bail himself out.

187. LUMAR suffered the asthma attack after he became extremely agitated and anxious that he was being withheld and detained unlawfully by the Chicago Police Department. He advised the Chicago Police Officers of his agitation and anxiety and advised them that he needed medical treatment.

188. On August 18, 2016, at approximately 11:30 p.m., after insisting he needed medical attention, certain Chicago Police Officers, including but not limited to WALTER DELGADO (Star #4033) transported Lumar to Mount Sinai for emergent medical care. LUMAR was treated and discharged from Mount Sinai and transported back to the 11th District sometime around 7:00 a.m.

189. The Chicago Police Officers knew that TYLER LUMAR believed himself to be wrongfully detained as TYLER LUMAR had advised Defendants multiple times while in Defendants' custody that he had timely made his installment payment of court costs and that any traffic warrant issued by Lee County was invalid.

190. Defendants also knew, from speaking with Casey Tencate, TYLER LUMAR's fiancé that she and TYLER LUMAR believed that TYLER LUMAR was being wrongfully detained as Casey Tencate also advised Defendants that TYLER LUMAR had timely made his installment payment of court costs and that any Lee County traffic warrant was invalid.

191. Casey Tencate advised Defendants that she had proof of all of TYLER LUMAR's payments as she possessed receipts from each monthly installment payment; she offered to provide

43

the receipts to Defendants; however, Defendants refused to accept the documents.

192.    Additionally, the City of Chicago Police Officer Defendants knew that TYLER LUMAR did not possess the controlled substance which was alleged to have been found on his person while he was in the bullpen at Cook County Department of Corrections, located at 26th & California because they had searched him on 8 separate occasions, prior to transferring him to Cook County.

193.    After his initial arrest on August 18, 2016, TYLER LUMAR was at all times within the custody of the Chicago Police Department, even while he was treated at Mount Sinai Hospital on August 18, 2016.

194.    Defendants were the sole persons responsible for searching TYLER LUMAR and for transporting TYLER LUMAR to the hospital and to the Cook County Department of Corrections.

195.    TYLER LUMAR was first searched by Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) on August 18, 2016, at the time of their initial arrest, at approximately 3:50 p.m. on Madison Street.  Chicago Police Officers DANIEL WARREN (#17444) and CARLOS VEGA (#17477) found no contraband or narcotics on TYLER LUMAR's person.

196.    TYLER LUMAR was searched a second time by Defendants, including Officer ESTEBAN (#17617), when he first arrived to the 11th District station.  Officer ESTEBAN (#17617) found that TYLER LUMAR was not in possession of any contraband or narcotics.

197.    TYLER LUMAR was searched a 3rd time by booking officer KIMONI PEALS after arriving at the 11th District station on August 18, 2016.  At the time TYLER LUMAR was searched, the booking Chicago Police Officers found that he had $130.00 on his person and a

44

necklace. TYLER LUMAR was wearing a long sleeve pocket less shirt and a pair of pocket less gym shorts. Officer KIMONI PEALS and the other Chicago Police booking Officers who searched TYLER LUMAR found that he was not in possession of any contraband or narcotics.

198. TYLER LUMAR was searched a 4th time by Officer JUSTIN CONNER (#18863), at the time he took TYLER LUMAR's mugshot. Officer JUSTIN CONNER found that TYLER LUMAR was not in possession of any contraband or narcotics.

199. TYLER LUMAR was then placed in lockup until he was transferred to Mount Sinai Hospital at about 11:30 p.m. on August 18, 2016 for complaints related to an emergent asthma attack. The Chicago Police Officers transporting TYLER LUMAR to the hospital searched TYLER LUMAR a 5th time prior to the transfer. The transporting officers did not find any contraband and/or narcotics on TYLER LUMAR.

200. Officer WALTER DELGADO and other Chicago Police Officers transported TYLER LUMAR back to the 11th District station from Mount Sinai at approximately 6:30 a.m. on August 19, 2016. Officer WALTER DELGADO searched TYLER LUMAR for the 6th time prior to transporting him back to the 11th District. Officer DELGADO did not find any narcotics or contraband on TYLER LUMAR.

201. LUMAR was received by Officer John P. Granat at the 11th District station at approximately 7:00 a.m. on August 19, 2016. TYLER LUMAR was searched by Officer GRANAT for a 7th time. He was not found to have any contraband or narcotics on his person.

202. At approximately 8:40 a.m. on August 19, 2016, Officer DIETRICE ELLENS-ALEXANDER (#7662), as part of Central Detention Prison Transport, transported TYLER LUMAR to the Cook County Department of Corrections, located at 26th and California. Prior to transporting TYLER LUMAR to Cook County, Officer ALEXANDER (#7662) searched LUMAR

for the 8th time. Officer ALEXANDER did not find any narcotics or contraband on TYLER LUMAR's person.

203.    As such, TYLER LUMAR had been searched by Defendants at least 8 times prior to the time he was transferred to the custody of the Cook County Department of Corrections. Upon each search TYLER LUMAR never had any contraband and/or narcotics on his person.

204.    Cook County Department of Corrections maintains video footage of the bullpen lockup areas for pretrial detainees. Video footage of TYLER LUMAR shows that another detainee sitting next to TYLER LUMAR dropped the contraband on the floor; Cook County Officer T. WLODARSKI then discovered the contraband on the floor of the bullpen.

205.    At no time did Cook County Officer T. WLODARSKI discover the contraband on TYLER LUMAR's person. Cook County Officers falsified reports of the incident, claiming that they saw LUMAR drop the narcotics and further stating on his report that the incident was not captured on video.

206.    Defendants knew that Cook County maintained live footage of the bullpen/holding cells at the time they received TYLER LUMAR back from the Cook County officers. Defendants never reviewed the footage prior to accepting TYLER LUMAR back into their custody.

207.    TYLER LUMAR continuously advised Defendants that the contraband discovered by Cook County Officers was not in his possession, was not found on his person and was dropped by another detainee. LUMAR continuously advised Defendants that he had been framed for a crime of which he had not committed.

208.    TYLER LUMAR never received a bond hearing for the arrest and Class Z charges brought by Defendants.

209.    At approximately 9:30 a.m., TYLER LUMAR was instead directly transported

back to the 11th District on August 19, 2016 by Chicago Police Officers, including but not limited to VINSON. The distance from Cook County Jail to the 11th District is approximately 2.5 miles; it took Chicago Police Officers approximately 10 minutes via car to travel from Cook County Jail to the 11th District. Upon arrival, LUMAR was placed in Cellblock #E2 by Defendant Chicago Police Detention Aide JONATHAN ERRUM sometime between 10:15 a.m. and 10:45 a.m.

210.    At some time prior to TYLER LUMAR's initial detention on August 18, 2016 and prior to his second detention on August 19, 2018, Defendants performed a detailed inquiry into TYLER LUMAR's criminal history which would have included running his name through the Chicago Police Department's database/records, locating all prior CPD reports pertaining to TYLER LUMAR. As part of this search, Defendants located a Chicago Police Department report from December 26, 2014, in which the CPD responded to a prior suicide attempt by TYLER LUMAR. As such, Defendants knew that TYLER LUMAR was a suicide risk.

211.    While ERRUM was transferring LUMAR to cell #E2, LUMAR was visibly upset, anxious and appeared hopeless about his situation (as LUMAR reasonably believed there was no lawful warrant for his arrest and believed that he was now being wrongfully accused of having illegal contraband/narcotics on his person.) LUMAR advised ERRUM that he was being wrongfully detained, that he had been framed for having the drugs, and further advised ERRUM that he was suicidal and hopeless.

212.    ERRUM placed LUMAR in cellblock #E2 alone, knowing that he was hopeless and suicidal and knowing that LUMAR believed that he was innocent and was being wrongful detained after being framed for possession of narcotics.

213.    More than 10 minutes after ERRUM placed LUMAR in cellblock #E2, Inmate ERIC SPANN, who was being held in cell #E1 next to LUMAR heard LUMAR praying to God

and asking for forgiveness.

214.    Several minutes thereafter, SPANN heard loud banging noises on LUMAR's cell, which were audible to the Chicago Police Officers and civilians working inside the 11th District. No CPD officer or civilian came to LUMAR'S cell #E2 to investigate the banging noises.

215.    More than 5 minutes after hearing the banging, SPANN yelled for a guard because he needed some tissue.

216.    CHARLES BARRY then came down the cellblock to deliver the tissue to SPANN. While delivering the tissue to inmate SPANN, BARRY noticed LUMAR hanging from his cell.

217.    BARRY cut LUMAR down from the cell and called for assisted.  Officer MENONI performed CPR on LUMAR.

218.    CPD reports state that TYLER LUMAR was found hanging from his cell by Chicago Police Detention Aide CHARLES BARRY (#49970) at 11:15 a.m.

219.    The Chicago Police Department then moved SPANN from Cellblock E to another area so that he could no longer witness the event.

220.    Someone from the Chicago Police Department contacted the Chicago Fire Department/EMS at approximately 11:17 a.m.   The paramedics arrived on the scene at approximately11:30.

221.    Defendants did not charge TYLER LUMAR with any offense related to the contraband discovered by Cook County Officer T. WLODARSKI.

222.    Officer DANY MASTER HELWINK (#261) was responsible for watch command of the inmates on August 18, 2016 and August 19, 2016.

223.    Officer FREDERICK ULLEWEIT (#582) was responsible for watch command of the inmates on August 18, 2016 and August 19, 2016.

48

224.     Chicago Police Detention Aides CHARLES BARRY (#49970) AND JONATHAN ERRUM (#117727), working under Officer DANY MASTER HELWINK (#261) and/or FREDERICK ULLEWEIT (#582) were responsible for monitoring and supervising the inmates, including TYLER LUMAR.

225.     Defendants, knowingly and wrongfully detaining TYLER LUMAR from the outset of his arrest, knowing he could bond himself out but instead holding him without probable cause to arrest him for a Class Z nonbondable offense; and, knowingly and wrongfully arresting TYLER LUMAR for possession of narcotics on August 19, 2016, without probable cause to do so, as Defendants knew that TYLER LUMAR did not have the contraband/narcotics in his possession which were discovered by Cook County Officer T. WLODARSKI (because Defendants had searched TYLER LUMAR at least 8 times), knew that TYLER LUMAR would become emotionally unstable and a suicide risk as a result of his unlawful incarceration, and knowing that TYLER had exhibited extreme stress because he represented, truthfully, that he had paid the outstanding sums owed to Lee County, yet was told he could not be bonded out even though the CPD officers knew that the this was a bondable arrest and that Tyler had the financial means to bond himself out.   Further, Defendants knew that LUMAR became hopeless and suicidal after he was then wrongfully arrested for possession of narcotics, as he was being framed for a crime of which he had not committed.

226.     Defendants knew TYLER LUMAR had a propensity to suffer severe emotional distress from continued unlawful detention, based upon his prior emotional and physical reactions, including the emergent asthma attack for which required medical attention on August 18, 2016. Defendants knew LUMAR was a suicide risk based upon the statements made to ERRUM and inmate SPANN.  Defendants heard loud audible banging noises at LUMAR's cell, yet failed to

respond, even though they knew LUMAR was a danger to himself and that the banging was the sound of LUMAR inflicting injury upon himself.

227.    Defendants acted objectively unreasonably by failing to exercise reasonable safety for LUMAR's health, medical needs, and safety (making the conditions of confinement unreasonable) by failing to take the appropriate steps to protect him, including failing to monitor and supervise him, by failing to remove all harmful materials from his person, including but not limited to his shirt and shoes, by failing to respond to the loud banging noises coming from LUMAR's cell, and by failing to adequately provide LUMAR with conditions of confinement that did not pose a serious risk of harm, knowing that LUMAR posed a substantial risk of self-harm/suicide to himself.

228.    Defendants knew that inmates who are wrongfully detained and inmates who are framed for crimes of which they did not commit, such as TYLER LUMAR, pose a substantial risk of suicide and that the risk of suicide increases as the length of wrongful detention progresses. Defendants further knew, based upon the statements made by LUMAR to Chicago of Chicago lockup personnel ERRUM, that LUMAR was hopeless and suicidal, at the time ERRUM placed LUMAR in cell #E2.

229.    Knowing this risk of suicide, Defendants acted objectively unreasonable by consciously disregarding this known suicide risk by failing to closely observe LUMAR after he expressed suicidal/hopeless thoughts to ERRUM, by failing to promptly investigate the banging noises they heard coming from LUMAR's cell, and by failing to perform the required 15-minute inmate checks on LUMAR.

230.    Chicago Police Department Special Orders and policy require that all inmates are visually checked on every 15 minutes as Defendants know that suicide attempts are common and

that inmates pose a substantial risk of self-harm/suicide to themselves.

231.     Chicago Police Detention Aide CHARLES BARRY (#49970), working under Officer DANY MASTER HELWINK (#261) and/or FREDERICK ULLEWEIT (#582) knowingly and falsely completed a watch log for August 19, 2016 which purports to show that BARRY performed the required 15-minute visual checks on all inmates, including TYLER LUMAR. LUMAR left Cook County Jail at 9:30 a.m. and arrived at the 11th District sometime between 10:15 – 10:45 a.m.  Chicago Police Department reports are conflicting as some CPD reports state that LUMAR was rejected by Cook County at 11:04 a.m. (and therefore would still be at Cook County at 11:04) and on other reports, CPD states that LUMAR was placed into cell #E2 at 11:04. Chicago Police Officers purposefully falsified the reports to reflect that LUMAR was placed in the cell at 11:04 because the EMS call to the paramedics was uncontestably made at 11:17. Therefore, if LUMAR was noted to be inside the cell at 11:04 and found at 11:15, then BARRY's report would indicate that he performed the required 15-minute check.  Inmate SPANN, however, saw ERRUM place LUMAR in the lockup more than 20 minutes before BARRY came down cellblock E to deliver SPANN a requested tissue.  At the time BARRY discovered LUMAR he was not performing a required "15-minute inmate check" but rather inadvertently discovered LUMAR while handing SPANN a tissue.

232.     BARRY falsified the watch log for August 19, 2016 which he completed at the end of his watch/shift, after LUMAR had been discovered and transferred to Mount Sinai, by initialing next to each 15-minute interval for the hours of his watch/shift that he had visually checked on each inmate when in fact he did not actually perform such required visual inmate checks.  As such, Defendants not only consciously disregarded the risk of suicide to TYLER LUMAR, but knowingly created false records in an attempt to conceal their actions/disregard.

233.    The conduct of the Defendants violated the 4th Amendment to the U.S. Constitution in that it was objectively unreasonable and deliberately indifferent to TYLER LUMAR'S medical health and safety (making the conditions of confinement unreasonable) needs; specifically, Defendants wrongful detention in violation of the 4th Amendment on both August 18, 2016 and on August 19, 2016 (after returning from Cook County) predicated on knowingly false information created a substantial risk of self-harm/suicide to TYLER LUMAR.

234.    Defendants' misconduct was undertaken with malice, willfulness, and deliberate indifference to TYLER LUMAR's rights.

235.    As a proximate result of Defendants objectively unreasonable actions and/or deliberate indifference, Plaintiff TYLER LUMAR sustained pain, emotional distress, and permanent injuries by hanging himself in his jail cell.

236.    As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT VIII**
**LUMAR V. CITY OF CHICAGO**
**42 U.S.C. § 1983 – MUNICIPAL LIABILITY/MONELL CLAIM**
**4TH AMENDMENT CONSTITUTIONAL VIOLATION**
***(Dismissed without prejudice per Court Order on July 27, 2018)***

237.    Plaintiff realleges and incorporates fact paragraphs 18 through 64 as Paragraph 237 of Count VIII.

52

238.   Plaintiff realleges and incorporates the paragraphs 106 through 234 of Count VII as Paragraph 238 of Count VIII.

239.   This count is brought pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

240.   Chicago Police Department Special Orders require that lockup personnel complete a visual check of each arrestee every 15 minutes and that the personnel create an Inspection Log which records the time of each inspection, a concise statement of conditions found, notable occurrences, actions taken, and the initials and employee identification number.

241.   Around and before the suicide attempt of TYLER LUMAR, the Chicago Police Officers employed at all 25 Districts, including but not limited to the 11th District, who were responsible for performing 15-minute visual checks on inmates, would fail to actually conduct such checks but falsely report that such checks were being performed.  Specifically, the Detention Aides assigned to conduct the inmate checks would falsify watch logs by initialing that he/she performed such visual check even though he/she physically failed to do so.

242.   In August of 2016, and for a period of time prior, Defendant CITY OF CHICAGO had an express policy at all 25 Chicago Police District stations, including but not limited to the 11th District, under which the Chicago Police Detention Aides would falsify watch logs and other records by falsely claiming to perform 15-minute visual checks on inmates, which were necessary to protect inmates' health, medical needs, and safety; a constitutional right guaranteed to pretrial detainees under the 4th Amendment.  LUMAR was subjected to this express policy on August 19, 2016, when Defendant CHARLES BARRY falsified the Watch Log for August 19, 2016, by initialing and documenting that he performed the required visual checks on the inmates housed in Cellblock E, including LUMAR, even though he had not actually done so.

243.   In August of 2016, and for a period of time prior, Defendants had notice of a widespread practice by employees at Chicago Police district stations, specifically the 11th District station under which Chicago Police Detention Aides would falsify watch logs and other records by falsely claiming to perform the required 15-minute visual checks on inmates, necessary to protect inmates' health, medical needs, and safety; a constitutional right guaranteed to pretrial detainees under the 4th Amendment.

244.   Specifically, there existed, around and before the time of TYLER LUMAR'S attempted suicide, a widespread practice within the Chicago Police Department under which employees, including Chicago Police Detention Aides and Watch Commanders, commonly created an Inspection Log which falsely stated that the employee was performing the required visual inmate checks every 15 minutes.  Instead, the employees engaged in a widespread practice of completing the Inspection Logs only for purposes of satisfying the requirements of the Special Order; however, the employees failed to actually perform the visual checks.  The employees then engaged in the practice of providing these Inspection Logs to their supervisors, who also knew them to be false.

245.   This widespread practice was and is allowed to flourish because the City of Chicago, through its agents, including the Chicago Police Department, directly encouraged or approved and was thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control police officers and personnel and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those that caused TYLER LUMAR's injuries.

246.   The above widespread practice, so well-settled as to constitute the de facto policy of the City of Chicago and the Chicago Police Department, were able to exist and thrive because

54

governmental policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. The Watch Commanders of all 25 Districts, including but not limited to FREDERICK ULEWEIT (#582) were decision makers with final policy making authority. They signed off and ratified all Watch Logs completed by the Detention Aides and other CPD employees, knowing that such employees were falsifying the records in that the employee was not actually conducting the visual inspection. The District Commanders of all 25 Districts, including by not limited to the District Commander for the 11th District, Defendant JAMES JONES and KEVIN JOHNSON were decision makers with final policy making authority. They ratified the Chicago Police detention aides and Watch Commanders practice of falsifying the Watch Log reports.

247.    Defendants violated TYLER LUMAR's rights by establishing and maintaining both the express policy and the wide spread practices, which were the moving force for the foregoing constitutional violations he suffered. Specifically, Chicago Police Detention Aide CHARLES BARRY (#49970) falsely created an Inspection Report purporting to claim that he conducted 15-minute visual checks of TYLER LUMAR. CHARLES BARRY (#49970) failed to monitor and supervise TYLER LUMAR every 15 minutes, even though he and the other Defendants knew he posed a substantial risk of suicide to himself. CHARLES BARRY's participation in the City of Chicago's widespread practice caused CHARLES BARRY to leave TYLER LUMAR unattended so that he was able to inflict self-harm/suicide upon himself. This resulted in a violation of LUMAR's 4th Amendment right to not be denied proper medical care and reasonable conditions of confinement. The 11th District Commander Defendant JAMES JONES and KEVIN JOHNSON and the Watch Commander FREDERICK ULEWEIT (#582) directly participated in this constitutional deprivation as the Watch Commander signed off on CHARLES

55

BARRY's Watch Log, knowing it be false, and the District Commander's JAMES JONES' actions in ratifying it.

248.     As a result of Defendant's unconstitutional conduct, in establishing and maintaining an express policy and a widespread practice, ratified by specific persons with policymaking authority, LUMAR was deprived of the rights, privileges, and immunities secured to him by the Fourth Amendment, in that he was subjected to objectively unreasonable conditions of confinement and deprived of proper medical care and safety.

249.     As a proximate result of Defendant's objectively unreasonable and deliberate indifference, Plaintiff TYLER LUMAR sustained pain, emotional distress, and permanent injuries by hanging himself in his jail cell.

250.     TYLER LUMAR's injuries were caused by employees/agents of the Chicago Police Department and the CITY OF CHICAGO, including but not limited to the individually named Defendants who acted pursuant to the Chicago Police Department and/or the CITY OF CHICAGO and their policies and practices in engaging in misconduct described in this count.

251.     The Chicago Police Department and the City of Chicago are therefore directly liable for TYLER LUMAR's injuries.

252.     As a result of Defendants' conduct, LISA ALCORN, Independent Administrator of the ESTATE OF TYLER LUMAR, has incurred medical bills, long term residential care bills and other expenses.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

## COUNT IX
## LUMAR V. CITY OF CHICAGO
## STATE LAW CLAIM FOR WRONGFUL DEATH

253.     Plaintiff realleges and incorporates fact paragraphs 18 through 118 and 186 - 236 as Paragraph 253 of Count IX.

254.     The CITY OF CHICAGO and the Chicago Police Department Defendants intentionally and unjustifiably interfered with TYLER LUMAR's 4th Amendment right to be free from unlawful detention.

255.     Additionally, the CITY OF CHICAGO, through its employee Defendant Jonathan ERRUM, knew from his own observations that TYLER LUMAR was in need of immediate medical care as he knew TYLER LUMAR was suicidal.  Nevertheless, he acted willfully and wantonly by failing to take reasonable action to summon medical care, by failing to put TYLER LUMAR on suicide watch and instead placing him in a cell alone unattended with certain items ERRUM knew TYLER LUMAR would use to attempt to hang himself.

256.     Tyler Lumar was and is survived by his daughter SAVANNAH LUMAR, who constitutes his heirs under Illinois law.

257.     Decedent Tyler Lumar was officially pronounced dead on April 18, 2018.

258.     The wrongful death of Tyler Lumar was proximately caused by the neglect, default, and/or willful and wanton conduct of the Chicago Police Department and the individual Chicago Police Officer Defendants, as described above, in violation of 740 ILCS §180/1.

259.     Under Illinois law, the CITY OF CHICAGO is liable for all actions of the Chicago Police Officer Defendants while they were acting within the scope of their employment (color of law), under *respondeat superior.*

260.     The Defendant CITY OF CHICAGO is therefore liable for the wrongful death of

TYLER LUMAR under the doctrine of vicarious liability.

261.     As next of kin, the heir of TYLER LUMAR has lost and will continue to lose, pecuniary support, consortium, society, companionship, love and affection.  Additionally, she suffered, and will continue to suffer grief, sorry, and mental suffering as a proximate result of her father's death.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

**COUNT X**
**LUMAR V. COOK COUNTY SHERIFF**
**STATE LAW CLAIM FOR WRONGFUL DEATH**

262.     Plaintiff realleges and incorporates fact paragraphs 18 through 64 and paragraph 120 through 146 as Paragraph 262 of Count IX.

263.     The Cook County Sheriff Officers intentionally and unjustifiably interfered with TYLER LUMAR's 4th Amendment right to be free from unlawful arrest and detention.

264.     Tyler Lumar was and is survived by his daughter SAVANNAH LUMAR, who constitutes his heirs under Illinois law.

265.     Decedent Tyler Lumar was officially pronounced dead on April 18, 2018.

266.     The wrongful death of Tyler Lumar was proximately caused by the neglect, default, and/or willful and wanton conduct of the County Cook Sherriff's Office and the individual Cook County Sheriff Officer Defendants, as described above, in violation of 740 ILCS §180/1.

267.     Under Illinois law, the COOK COUNTY SHERIFF is liable for all actions of the Cook County Sheriff's office, including the Cook County Sheriff Officer Defendants while they

were acting within the scope of their employment (color of law), under *respondeat superior*.

268. The Defendant COOK COUNTY SHERIFF is therefore liable for the wrongful death of TYLER LUMAR under the doctrine of vicarious liability.

269. As next of kin, the heir of TYLER LUMAR has lost and will continue to lose, pecuniary support, consortium, society, companionship, love and affection. Additionally, she suffered and will continue to suffer grief, sorry, and mental suffering as a proximate result of her father's death.

WHEREFORE, Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, prays for judgment in his favor and against Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, and the costs of this action.

## JURY DEMAND

Plaintiff LISA ALCORN, as Independent Administrator of the ESTATE OF TYLER LUMAR, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all triable issues.

s/Eileen M. O'Connor
Eileen M. O'Connor

Eileen M. O'Connor, #6290372
O'CONNOR LAW GROUP LLC
Attorney for Plaintiff
140 S. Dearborn, Suite 320
Chicago, IL 60603
Phone: (312) 236-1814
Facsimile: (312) 580-5479
Email  eoc@oconnorlawgrp.com