**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LISA ALCORN, as Independent Administrator of the Estate of TYLER LUMAR, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 17 CV 5859 |
| v. | ) ) | Judge Virginia M. Kendall |
| | ) | Magistrate Sunil R. Harjani |
| THE CITY OF CHICAGO, *et al.,* | ) ) | |
| Defendants. | ) | |

**CITY DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED**
**MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Sergeant Kevin Geyer, by his attorney, Elaine C. Davenport of Sanchez, Daniel and Hoffman LLP, and the City of Chicago, by its attorney, Elizabeth A. Ekl of Reiter Burns LLP (collectively "City Defendants") and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(a)(3), submit the following statement of undisputed material facts in support of their motion for summary judgment. The pleadings, deposition transcripts, and exhibits cited in this statement are attached hereto.[1]

**The Parties, Venue and Jurisdiction**

1.      Plaintiff Lisa Alcorn was appointed plenary guardian of the estate and person of Tyler Lumar on November 7, 2016 in the Circuit Court of Cook County, Probate Division by Judge Carolyn Quinn. TAC[2] ¶ 5.

2.      The City of Chicago is a municipal corporation duly incorporated under the laws of the State of Illinois. TAC ¶ 6.

---

[1] These facts are undisputed only for purposes of City Defendants' Motion for Summary Judgment. City Defendants reserve the right to dispute these facts for all other purposes, including trial.
[2] "TAC" refers to Plaintiff's Third Amended Complaint, Dkt. 279.

3.      Defendant Sergeant Kevin Geyer was an employee of the Chicago Police Department and the acting station supervisor of the 11th District Station during the 3rd watch on August 18, 2016. TAC, ¶ 11.

## Background

**Incident at Madison Family Health Center**

4.      Chicago Police Department ("CPD") Officers Daniel Warren and Carlos Vega were called to Madison Community Health Center on the afternoon of August 18, 2016 regarding a disruptive patient. TAC ¶ 16, Ex. 31, Warren Dep., at 28:14-29:3; Ex. 29, Vega Dep., at 19:17-20; 20:4-17.

5.      Upon arrival, Warren and Vega learned a patient, identified as Tyler Lumar ("Lumar"), came into the clinic for treatment related to his asthma and then became enraged when the doctor refused to provide him with codeine. They learned he attempted to access a secured section of the clinic where the doctor had retreated to avoid Lumar and yelled at office employees, "I'll come back and shoot this place up." Ex. 31, Warren Dep., at 46:8-47:2; Ex. 29, Vega Dep., at 25:2-26-1; 29:11-14; Ex. 1, Original Case Incident Report (Dep. Ex. 150).

6.      At approximately 3:15 p.m., at the request of medical staff, Lumar was given verbal notice that he was banned from the clinic property but was free to leave. TAC ¶¶ 17, 18; Ex. 31, Warren Dep., at 47:5-11, 56:13-24; Ex. 1, Original Case Incident Report (Dep. Ex. 150).

7.      Lumar left the Madison Family Health Center and proceeded to walk peacefully down Madison Street. TAC ¶ 21.

**Lumar's Arrest**

8.      After leaving the health clinic, Warren and Vega discovered through their in-car personal terminal device ("PDT") that Lumar had an outstanding warrant out of Lee County. Ex.

31, Warren Dep., at 59:12-60:20; 69:6-22; 73:6-74:9; 74:21-75:20; Ex. 29, Vega Dep., at 29:19-33:7; 34:15-35:9; Ex. 4, PDT Information/Hot Desk Search (Dep. Ex. 174).

9.      Warren and Vega located Lumar walking peacefully down the street and arrested him on the outstanding warrant at approximately 3:58 p.m. They then transported Lumar to the CPD 11th District Police Station at approximately 4:16 p.m. TAC ¶¶ 22, 25; Ex. 3, Affidavit of Daniel Warren.

**Verification of the Outstanding Lee County Warrant**

10.     At approximately 4:26 p.m., Officer Vega contacted civilian Corrine Esteban at CPD's Law Enforcement Agencies Data System (LEADS) desk located at CPD Headquarters to confirm the validity of the warrant. Ex. 18, Esteban Dep., at 7:11-18; 9:23-10:1; 10:11-11:4; 12:19-20; 41:12-16; Ex. 3, Warren Affidavit, at ¶¶ 5-6; Ex. 2, Arrest Report.

11.     Esteban contacted Lee County through LEADS, confirmed the warrant against Lumar was serviceable in the geographical limits of Cook County, printed the LEADS response, memorialized the descriptors that demonstrated Vega had the correct person in custody, and issued a clerical HOLD number. Ex. 18, Esteban Dep., at 15:8-13; 16:24-18:21; Ex. 5, LEADS Printout Sheet (Dep. Ex. 172, FCRL 84); Ex. 2, Arrest Report (Dep. Ex. 152).

12.     Esteban confirmed the serviceability, or geographical boundaries, of the warrant by reading the geographical boundaries written in the LEADS response which read, "This warrant shall not be executed at any location outside the court-issued geographic limits specified…[including]…Cook." Ex. 18, Esteban Dep., at 16:24-17:5; Ex. 5, LEADS Printout Sheet (Dep. Ex. 172 at FCRL 84).

13.     No bond information was included in the printout obtained by Esteban through the LEADS system. Ex. 5, LEADS Printout Sheet (Dep. Ex. 182 at FCRL 84).

14.     Esteban confirmed with Officer Vega that that the person they had in custody, Lumar, was the person sought by Lee County matched the description of the person identified in LEADS. Vega also received Lumar's acknowledgement of the outstanding warrant. Ex. 18, Esteban Dep., at 17:2-18:3; 20:6-15; 20:24-21:8.

15.     Esteban generated an internal HOLD number (Z14221) for Lumar, which is utilized for filing/tracking purposes, and wrote the HOLD number on the LEADS printout. Ex. 18, Esteban Dep., at 18:11-16; Ex. 5, LEADS Printout Sheet (Dep. Ex. 172 at FCRL 84).

16.     The HOLD number was provided to Vega and Esteban physically walked her attestation paper to the Extradition Department at police headquarters. Ex. 18, Esteban Dep., at 18:12-13; 25:5-26:8.

17.     At 4:43 p.m., Detective John Tripoli of Extradition contacted Lee County via computer to request a copy of the warrant and its information. In the message, he noted, "Held at: Chicago Police Department," and that, "Subject will be transported to bond court and then to Cook County jail." Ex. 7, LEADS Message from Detective Joseph Tripoli.

18.     At approximately 4:48 p.m., Lee County relayed to the CPD that the warrant was valid for failure to appear contempt non-pay on a driving while license suspended, a Class A misdemeanor, and that bond was set on the warrant in the amount of $500.00, 10% to apply. Lee County further indicated it would extradite if Lumar was unable to pay the bond on the warrant. TAC ¶ 34; Ex. 5, Warrant at FCRL 83; s*ee also* 625 ILCS 5/6-303(a).

19.     The facsimile containing extradition paperwork for Lumar indicates it was received at the 11th District at 5:10 p.m. Ex. 5, LEADS Printout Sheet (Dep. Ex. 172).

**Lumar's Processing at the 11th District**

20.      Lumar was searched and processed at the 11th District station. TAC, ¶ 28; Ex. 29, Vega Dep., at 26:2-17; 36:13-24; 38:1-3; Ex. 28, Peals Dep., at 10:17-12:7; Ex. 2, Arrest Report (Dep. Ex. 152).

21.      Lumar was allowed to make telephone calls using his personal cell phone during processing, before arriving in lockup. Ex. 31, Warren Dep., at 84:24-85:8; Ex. 29, Vega Dep., at 37:3-6; 46:20-47:6.

22.      Lumar did not appear to be under the influence of drugs or alcohol as he was being processed at the 11th District. TAC ¶ 29; Ex. 28, Peals Dep., at 10:13-16; Ex. 26, McGuire Dep., at 12:4-22; Ex. 2, Arrest Report (Dep. Ex. 152, at FCRL 574).

23.      Lumar was not acting despondent or irrational and cooperated with the detention aides throughout the processing procedure.  Ex. 28, Peals Dep., at 10:13-16; Ex. 26, McGuire Dep., at 38:13-17; Ex. 2, Arrest Report (Dep. Ex. 152, at FCRL 574).

24.      During processing, Lumar was screened for medical and mental health problems and denied both; he denied prior attempts at suicide or serious harm; and advised he was presently taking prescription medication for asthma. After screening, Lumar was taken to lockup for further processing. Ex. 28, Peals Dep., at 10:13-16; 27:2-11; Ex. 31, Warren Dep., at 22:4-14; 25:12-26:11; Ex. 26, McGuire Dep., at 18:18-19:4; 29:18-24; 31:9-32:16; Ex. 2, Arrest Report (Dep. Ex. 152, at FCRL 574).

25.      In lockup, Lumar's property was inventoried. He was fingerprinted (6:26 p.m.), photographed (6:40 p.m.), and then allowed to make additional phone calls. Ex. 28, Peals Dep., at 27:2-28:7; 28:8-23; 29:1-7; Ex. 26, McGuire Dep., at 18:18-23; 38:4-6; 39: 7-10; Ex. 29, Vega Dep., at 42:3-8; 42:24-43:2; Ex. 2, Arrest Report (Dep. Ex. 152, at FCRL 574).

26.     During processing, Detention Aide Peals observed Lumar's demeanor to be "cool," finding that he "seemed pretty normal," and did not appear agitated. Ex. 28, Peals Dep., at 32:2-12; 72:20-73:12. Detention Aide Andrew McGuire did not see anything abnormal about Lumar. Ex. 26, McGuire Dep., at 28:18-29:13.

27.     Lumar had $130.00 on his person when he arrived at lockup. TAC ¶ 100; Ex. 31, Warren Dep., at 121:16-122:10; Ex. 2, Arrest Report (Dep. Ex. 152, at FCRL 572).

**Completion of Paperwork Related to Arrest**

28.     Arresting Officers Warren and Vega compiled Plaintiff's paperwork in the processing room, including preparation of his arrest and case report using CPD's CLEAR system, and printed the LEADS printout and PCAT printout. This process took about three hours and 40 minutes. Ex. 29, Vega Dep., at 38:11-14, 19-23; 39:8-13; 40:16-24; Ex. 1, Initial Case Report (Dep. Ex. 150); Ex. 2, Arrest Report (Dep. Ex. 152); Ex. 3, Warren Affidavit.

29.     Lumar was in the processing room the entire time the arrest and case report were being prepared. Ex. 29, Vega Dep., at 38:24-39:2.

30.     The charged offense entered on the arrest report, "725 ILCS 5.0-110-3/ISSUANCE OF WARRANT / Class Z - ," was selected from a drop-down menu in the CLEAR computer system which generates the arrest reports. Ex. 2, Arrest Report (Dep. Ex. 152 at FCRL 571); Ex. 31, Warren Dep., at 100:15-101:23; Ex. 3, Warren Affidavit (including Ex. A, Dropdown Screenshot).

31.     The charge of "Issuance of Warrant/Class Z" is the drop-down selection utilized by CPD for Illinois warrants *regardless* of whether the warrant was issued from within Cook County or from an out-of-county warrant. Ex. 3, Warren Affidavit (including Ex. A, Dropdown Screenshot).

32.     The selection of "725 ILCS 5.0-110-3/ISSUANCE OF WARRANT/Class Z-" is the only applicable selection from the CPD's computerized CLEAR program's drop-down options for Lumar's arrest from which Warren and Vega could have chosen.  Ex. 31, Warren Dep., at

100:15-101:23; Ex. 3, Warren Affidavit (including Ex. A, reflecting Dropdown Screenshot options: (1) Fugitive from Justice – out of state warrant; (2) Issuance of Warrant (chosen by Warren/Vega); and, (3) Child Protection Warrant).

33.     The "Bond Info" section of CPD arrest report indicates "No Bond Information Available." Details are entered into the "Bond Info" section when an arrestee posts bond and details of the posted bond are available. Ex. 2, Arrest Report (Dep. Ex. 152 at FCRL 572); Ex. 20, Geyer Dep., at 84:23-85:12; Ex. 3, Warren Affidavit.

**General Administrative Order ("GAO") / Bureau of Patrol Order 15-0174 ("BOP Order")**

34.     In February 2016, arrests of individuals by the CPD for out-of-county warrants were governed by CPD Bureau of Patrol Order 15-017415 (hereinafter, "BOP Order"), which states in pertinent part:

> In June 2015, Chief Judge Timothy C. Evans issued an order stating that every person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois State court outside of Cook County shall be required to appear in bond court.

Ex. 11, BOP 15-017415.

35.     The BOP Order was created in response to Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Issued Outside of Cook County ("GAO"), which states in pertinent part:

> Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court…A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff.

Ex. 12. GAO; Ex. 27, Mullenix Dep., at 11:6-11; 21:15-23:5; 50:21-24; 69:17-23.

36.     The GAO was entered by Cook County Chief Judge Evans on June 17, 2015 and orders arresting agencies and the Circuit Court Clerk of Cook County to comply with a procedure that requires Defendants taken into custody by an arresting agency located in Cook County on an arrest warrant issued by an Illinois state court outside of Cook County pursuant to an intrastate

warrant. It states that "Defendants taken into custody by an arresting agency located in Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court in the appropriate district or division of this court." Ex. 12, GAO.

37.     The BOP Order was not discretionary. All CPD Officers in the Bureau of Patrol were expected to follow the BOP Order or be faced with discipline. Ex. 22, Jones Dep., at 73:1-24; 77:3-10; Ex. 27, Mullenix Dep., at 73:14-22.

38.     Per the BOP Order, anyone arrested for an out-of-county warrant must go to bond court at 26th Street and California. Ex. 11, BOP Order; Ex. 22, Jones Dep., at 64:10-17.

**Lumar's Detention Pursuant to the BOP Order**

39.     CPD Special Order S06-01 "Processing Persons under Department Control" was in effect in August 2016 and sets forth that the station supervisor is responsible for preparation of bail bonds.  This includes determining if someone is eligible for bail bond, and if so, preparing the forms and collecting the money. Ex. 13, CPD S.O. S06-01(II)(c)(6); Ex. 23, Kranz Dep., at 42:15-43:2.

40.     Bond eligibility is not determined until after an arrestee is fingerprinted in lockup and confirmation is received that the detainee has no other arrest warrants. Ex. 24, Lasch Dep., at 51:3-52:4.

41.     Per department policy, persons arrested on out-of-county warrants are not eligible for bond, even if a bond has been set. Ex. 11, BOP Order (also Geyer Dep. Ex. 1); Ex. 20, Geyer Dep., at 67:11-19; 119:1-13.

42.     The BOP Order was distributed to district station supervisors, including the 11th District, and a copy of the BOP Order was kept at the district front desks. Ex. 20, Geyer, Dep., at 30:9-21-31:4; Ex. 23, Kranz Dep., at 19:15-21:4.

43.     Sergeant Geyer was the 11th District desk sergeant on August 18, 2016. He reviewed the paperwork, approved probable cause for Lumar's arrest, and made the determination, pursuant

to CPD policy, that Lumar was to be transported to the Cook County Department of Corrections ("CCDOC") for bond court. Ex. 29, Vega Dep., at 13-16; Ex. 20, Geyer Dep., at 22:6-14; 23: 22-24:8; 110:14-111:15; 112:21-113:11; Ex. 2, Arrest Report (Dep. Ex. 152).

44.     As of 18 August 2016, Sergeant Geyer was aware of the BOP Order and its mandate requiring that any person arrested on an out-of-county warrant be sent to bond court at Cook County. Ex. 20, Geyer Dep., at 106:11-108:2.

45.     Lumar was placed into a cell in the CPD 11th District lockup sometime after 6:40 p.m. Ex. 28, Peals Dep., 30:3-12.

**Mt. Sinai Hospital**

46.     Officers Delgado and Vega arrived at approximately 12:08 p.m. on August 19, 2016 to transport Lumar to Mt. Sinai Hospital based on his complaint of shortness of breath attributed to his asthma. TAC, ¶ 39; Ex. 16, Delgado Dep., at 13:3-14:19; 17:1-19.

47.     Lumar was uncooperative with the transport officers and EMS personnel who arrived to take him to Mt. Sinai Hospital for treatment. Ex. 16, Delgado Dep., at 24:6-21; 26:14-21.

48.     While sitting in the waiting room at Mt. Sinai Hospital, Lumar told the transporting officers that he wanted to go home and see his daughter. Ex. 16, Delgado Dep., at 18:18-24-19:1-13.

49.     Lumar did not exhibit any signs of suicidal ideation to the CIT-trained transport officer in the waiting room. Ex. 16, Delgado Dep., at 62:5-24; 63:5-19.

50.     In the opinion of the emergency department physician, Dr. Ferguson, Lumar did not exhibit any signs of suicidal ideation. Ex. 19, Ferguson Dep., at 15:13-17; 21:5-18; 22:20-23:1.

51.     Lumar was cleared by the hospital staff to be returned to the 11th District. According to Dr. Ferguson, she would not have released Lumar back into police custody if she was concerned about his mental health. TAC, ¶ 41; Ex. 19, Ferguson Dep., at 22:20-23:1; 24:15-20; Ex. 10, Mt. Sinai Records.

52.     Lumar was returned to the 11th District police station from Mt. Sinai at approximately 7:00 a.m. on August 19, 2016. Ex. 21, Granat Dep., at 15:4-23; 16:21-17:13; 19:7-13; Ex. 2, Arrest Report (Dep. Ex. 152).

**Transport to CCDOC**

53.     At approximately 8:40 a.m., on 19 August 2020, two transport officers arrived to take Lumar to the Cook County Department of Corrections ("CCDOC") to be held pending his appearance in bond court that morning. TAC, ¶ 44; Ex. 14, Alexander Dep., at 8:1-9:12; 12:14-21; 13:21-14:24; Ex. 2, Arrest Report (Dep. Ex. 152, FCRL 000574); Ex. 36, Arrestee and Property Transport Manifest (Dep. Ex. 47).

54.     Documentation taken by the transport officers to CCSO lockup at the time of transport includes: the arrest report, criminal history, transport transmittal sheet, and the four-page extradition facsimile. Ex. 14, Alexander Dep., at 12: 22-14:24; 16:11-19:3; Ex. 36, Arrestee and Property Transport Manifest (Dep. Ex. 47); Ex. 5, Warrant and LEADS Response (Dep. Ex. 172); Ex. 2, Arrest Report (Dep. Ex. 152); Ex. 9, Prisoner Transmittal (Dep Ex. 52).

55.     As the officer in charge at the time of Lumar's transport to CCSO, Officer Dietrice Alexander was responsible for checking the arrestees' paperwork for completeness and found Lumar's packet contained the necessary paperwork required to transport him to and be accepted by CCDOC. Ex. 14, Alexander Dep., at 8:1-9:12; 10:8-10; 16:11-19:3; 27:11-22; *see also* Ex. 33, Lewis Dep., at 44:1-48:8.

**Intrastate Hold Affidavits**

56.     An Intrastate Hold Affidavit ("IHA") was not prepared related to Lumar's arrest. TAC, ¶ 78.

57.     An IHA is something that stands in the place of a warrant when the originating agency cannot be contacted at the time that the warrant is being executed. It applies to all warrants issued in the state of Illinois. Ex. 27, Mullenix Dep., at 45:18-24, 54:22-55:5; 46:6-47:12; 54:2-9.

58.     Sergeant Geyer is not familiar with a document called an "IHA" nor does he have knowledge that such a document is required to be included in the court packet before transport to CCDOC for bond court. Ex. 20, Geyer Dep., at 103:5-7.

59.     An IHA form is not required when the warrant accompanies the court packet. Ex. 27, Mullenix Dep., at 31:11-14; 61:19-62:20; 63:19-64:7.

60.     The LEADS verification prepared by Officer Esteban contained the information otherwise included in an IHA. Ex. 18, Esteban Dep., at 16:20-22:16; Ex. 27, Mullenix Dep., at 77:13-79:15; Ex. 5, LEADS Printout Sheet (Dep. Ex. 172 at FCRL 84).

**Return from CCDOC to the 11th District on Possession Charge**

61.     After being placed into a bullpen in the CCDOC with other detainees, Cook County correctional officers reportedly observed Lumar drop a package containing twelve individually packaged small white rocks (believed to be a controlled substance) behind a bullpen bench. TAC, ¶¶ 45, 46; Ex. 8, CCSO Incident Rpt. (Dep. Ex. 51, CCSAO Alcorn 000096).

62.     Cook County correctional officers reported their observations to CPD officers and released him back into the custody of CPD to be processed for possession of a controlled substance. TAC, ¶ 49; Ex. 32, Wlodarski Dep., at 67:2-13, 23-24; 68:1-4; 89:5-19; Ex. 30, Vinson Dep., at 75:9-24; 98:20-23.

63.     Lumar was transported back to the 11th District from CCDOC. TAC, ¶ 52; Ex. 14, Alexander Dep., at 8:11-16.

64.     Lumar was not acting agitated or angry during his transport back to the 11th District; he just said that he "didn't have it" (referring to the drugs) and appeared nervous to transport Officer Alexander. Ex. 14, Alexander Dep., at 31:31:5-32:21.

65.     Detention Aide Jonathan Errum ("Errum") was assigned to the lockup on 19 August 2016 when Lumar returned from the CCDOC, which was the first time Errum saw Lumar. Ex. 17, Errum Dep., at 8:1-3, 17-19; 38:1-5; 59:2-5; 68:14-19; 129:8-11.

66.     Errum buzzed Lumar back into lock-up when Lumar returned from Cook County at approximately 10:55 a.m. and secured Lumar in a cell at approximately 11:04 a.m. Ex. 17, Errum Dep., at 72:1-73:2; 74:14-20; 76:18-24; 78:18-20; F79:20-24; Ex. 15, Barry Dep., at 119:10-16; 79:20-24; 81:19-21; Ex. 35, CPD Incident Rpt., HZ398499 (Dep. Ex. 154).

67.     During Errum's brief interaction with Lumar, Lumar repeatedly stated "this is bullshit" and appeared agitated and upset about being back at the lock-up. Ex. 17, Errum Dep., at 76:22-77:22; 81:15-18; 91:12-19; 129:12-16.

68.     Errum did not perceive Lumar's agitation as out of the ordinary, as Errum testified that "pretty much everyone coming into the jail is agitated as no one likes to be in jail." Ex. 17, Errum Dep., at 20:15-19.

69.     Errum told Lumar to calm down and asked Lumar if he wanted a phone call, which Lumar refused. Ex. 17, Errum Dep., at 76:22-77:2; 81:22-24; 82:1-7.

70.     There is no evidence in the record that Lumar ever told Errum that he was suicidal or that he had previously attempted suicide. Ex. 17, Errum Dep., at 131:2-4; 132-13:16.

71.     Although Errum did not perform a complete visual check of arrestee or arrestee questionnaire of Lumar, based on his brief observation of Lumar, Errum did not perceive Lumar to be under the influence of drugs or alcohol or to be exhibiting signs of drug or alcohol withdrawal

12

nor did Errum perceive Lumar to be despondent or irrational during Lumar's interactions with Errum. Ex. 17, Errum Dep., at 130:10-19; 134:19-23.

72.    Lumar did not report any serious mental problems and Errum did not feel that Lumar exhibited any signs that Lumar had any mental health issues or that he may attempt suicide. Ex. 17, Errum Dep., at 131:5-10; 132:9-16.

73.    Errum put Lumar into a cell in the lockup without incident at 11:04 a.m. At approximately, 11:15 a.m., while conducting a routine check, Detention Aide Charles Barry discovered Lumar hanging by his t-shirt in his cell. Ex. 15, Barry Dep., at 81:14-82:23; 84:4-19; Ex. 17, Errum Dep., at 46:24-47:5; 50:16-24; 84:4-10; Ex. 6, Daily Prisoner Log Record (Dep. Ex. 29); Ex. 37, Gartner Dep., at 71:12-72:10; Ex. 35, CPD Incident Rpt., HZ398499 (Dep. Ex. 154).

74.    Barry immediately called for the assistance. Other CPD personnel responded, including Detention Aide Jonathan Errum, and Lumar was cut down. Ex. 15, Barry Dep., at 85:5-86:16; Ex. 17, Errum Dep., at 83:16-24; 85:13-87:17; 88:8-11; Ex. 25, McCall Dep., at 17:4-18:16.

75.    CPR was started by CPD personnel, including Errum, and 911 was called by Sergeant McCall. Paramedics continued CPR after arriving at the 11th District and transported Lumar to Mt. Sinai Hospital, where it was determined he was brain dead. Ex. 15, Barry Dep., at 86:23-87:3; 108:14-109:4; Ex. 17, Errum Dep., at 89:9-11; 90:4-10, 16-24; Ex. 21, Granat Dep., at 23:6-12; 24:16-24; Ex. 25, McCall Dep., at 18:20-23; 18:24-19:4; 19:7-20:19.

76.    Tyler Lumar succumbed to his injuries on April 18, 2018. TAC, ¶ 65.

Dated: October 15, 2021                Respectfully Submitted,

CELIA MEZA

Corporation Counsel of the City of Chicago

/s/ Elaine C. Davenport
Special Assistant Corporation Counsel
Elaine C. Davenport
Hugh O'Donnell
Sanchez Daniels & Hoffman LLP
333 West Wacker Drive, Suite 500
Chicago, IL 60606
(312) 641-1555

*Attorneys for Defendant Sergeant Kevin Geyer*

/s/ Elizabeth A. Ekl
Special Assistant Corporation Counsel
Terrence M. Burns
Elizabeth A. Ekl
Paul A. Michalik
Katherine C. Morrison
Reiter Burns LLP
311 South Wacker Drive
Suite 5200
Chicago, IL 60606
312-982-0090
*Attorneys for Defendant City of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, I served the foregoing **City Defendants' Rule 56.1 Statement Of Undisputed Material Facts In Support Of Their Motion For Summary Judgment** on all counsel of record via the Court's (ECF) electronic filing service.


s/ Elizabeth A. Ekl