## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LISA ALCORN, as Independent | ) | |
| Administrator of the Estate of | ) | |
| TYLER LUMAR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 5859 |
| | ) | |
| v. | ) | Honorable Judge |
| | ) | Virginia M. Kendall |
| THE CITY OF CHICAGO, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO CITY OF CHICAGO DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ................................................................................................................. 1

Facts ............................................................................................................................ 1

Argument .................................................................................................................... 4

    I.    The BOP Order was an Express Unconstitutional Policy of the City ......................... 5

    II.   The General Administrative Order was Invalid and Void Ab Initio ...................... 12

    III.  Geyer Personally Participated in a Constitutional Deprivation. .............................. 14

    IV.  Geyer is Not Entitled to Qualified Immunity. ......................................................... 15

    V.   Tyler Lumar Suffered a Single, Indivisible Injury ................................................. 17

    VII.  Sufficient Evidence is in the Record to Allow a Jury to Consider Proximate Cause ......................................................................................................................... 18

        A. Tyler Lumar's Suicide was Legally Foreseeable. ............................................. 19

        B. Illinois Wrongful Death. ...................................................................................... 21

    VIII. The Tort Immunity Act Does Not Bar Plaintiff's State Law Claims ................... 25

Conclusion ................................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Allstate Ins. Co. v. Menards, Inc.,* 285 F.3d 630 (7th Cir. 2002) ...................17

*Arlotta v. Bradley Center*, 349 Ill. App. 3d 517 (7th Cir. 2003) ...................10

*Blair v. Mackoff*, 284 Ill. App. 3d 836 (Ill. App. Ct. 1996) ...................14

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) ...................5

*Carey v. Piphus*, 435 U.S. 247 (1978) ...................18

*Cty. Of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539 (2017) ...................18

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ...................6

*Crumpton v. Walgreen Co.*, 871 N.E.2d 905 (Ill. App. Ct. 2007) ...................22

*Dezort v. Village of Hinsdale*, 342 N.E.2d 468 (Ill. App. 1976) ...................26

*Doe v. Sheriff of DuPage County*, 128 F.3d 586 (7th Cir. 1997) ...................10

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ...................16

*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974) ...................18

*Graham v. Connor*, 490 U.S. 386 (1989) ...................15

*Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986) ...................11, 16

*Hankins v. Alpha Kappa Alpha Sorority, Inc.,* 447 F. Supp. 3d 672 (N.D. Ill. 2020) ....... 21-22, 24

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...................15, 16

*Hayes v. City of Des Plaines*, 182 F.R.D. 546 (N.D. Ill. 1998) ...................26

*Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) ...................15

*Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006) ................ 7-8

*Johnson v. Wal-Mart Stores*, 588 F.3d 439 (7th Cir. 2009) ...................23-24

*Kentucky v. Graham*, 473 U.S. 159 (1985)...................................................................14

*La Bombarbe v. Phillips Swager Associates Inc.,* 130 Ill. App. 3d 896 (Ill. App. Ct. 1985).........................................................................................................................19

*Lampe v. Ascher,* 59 Ill. App.3d 755, 376 N.E.2d 74 (Ill. App. Ct. 1978) ............................ 16-17

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019)...........................................7, 15, 16, 19

*Lewis v. Downey,* 581 F.3d 467 (7th Cir. 2009) ........................................................18

*Lewis v. O'Grady,* 853 F.2d 1366 (7th Cir. 1988) .....................................................12

*Llaguno v. Mingey,* 739 F.2d 1186 (7th Cir. 1984) ...................................................12

*Little v. Chicago Hoist Body Co.,* 32 Ill. 2d 156 (Ill. 1965).........................................23

*Latuszkin v. City of Chicago,* 250 F.3d 502 (7th Cir. 2001) ........................................5

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) ................................................5

*McCormick v. City of Chicago,* 230 F.3d 319 (7th Cir. 2000) .......................................5

*McBride v. Soos,* 679 F.2d 1223 (7th Cir. 1982) ....................................................15

*McLaughlin v. Sullivan,* 123 N.H. 335 (N.H. 1983)..................................................23

*Memphis Community School Dist. v. Stachura,* 477 U.S. 299 (1986)..............................18

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) ................................................5

*Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336 (7th Cir. 1985) ...........................9

*Moore v. Kusper,* 465 F.2d 256 (7th Cir. 1972) .....................................................9

*Owen v. City of Independence,* 445 U.S. 622 (1980)................................................14

*Pearson v. Callahan,* 555 U.S. 223 (2009)..........................................................15

*People v. Schroeder*, 102 Ill. App. 3d 133, 137 (Ill. App. Ct. 1981).................................13

*Portis v. City of Chicago,* 613 F.3d 702 (7th Cir. 2010).................................6, 11-12, 15, 16

*Quinones v. City of Evanston,* 58 F.3d 275 (7th Cir. 1995)..........................................14

iv

*Shick v. Ill. Dep't of Human Servs.,* 307 F.3d 605 (7th Cir. 2002)...............................................16

*Surplus Store Exchange, Inc. v. City of Delphi,* 928 F.2d 788 (7th Cir. 1991) ...............................9

*Thompson v. City of Chicago,* 472 F.3d 444 (7th Cir. 2006)...........................................................15

*Turcios v. DeBruler Co.,* 32 N.E.3d 1117 (Ill. 2015) ................................................................ 21-22

*United States v. Salerno,* 481 U.S. 739 (1987) ................................................................................4

*Virginia v. Moore,* 553 U.S. 164 (2008)..........................................................................................9

*Watts v. Laurent,* 774 F.2d 168 (7th Cir. 1985)...........................................................................17

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012) .............................................................18

Statutes, Rules and Constitutional Provisions

U.S. Constitution Amendment IV .......................................................................................... *passim*

42 U.S.C. § 1983 ....................................................................................................................... *passim*

705 ILCS 35/28...............................................................................................................................12

725 ILCS 5/109-2 ..................................................................................................................7, 9, 16

725 ILCS 5/110-7 .............................................................................................................................8

745 ILCS 10/1-207 .........................................................................................................................25

745 ILCS 10/2-202 .........................................................................................................................25

745 ILCS 10/2-204 .........................................................................................................................25

745 ILCS 10/4-103 .................................................................................................................. 25-26

Illinois Supreme Court Rule 21 .....................................................................................................13

General Administrative Order 2015-06 ..........................................................................................12

## INTRODUCTION

The City maintained an express policy that mandates purposeless detention and is contrary to Illinois law, and Sgt. Geyer enforced that policy against Tyler Lumar. The policy and its enforcement caused a detention of Tyler Lumar that was excessive, purposeless, and thus unreasonable, resulting in a violation of the Fourth Amendment as a matter of law. After his arrest on a minor matter, Tyler Lumar should have been allowed to post a $50 bond and go home. Instead, the challenged policy of the City caused Tyler Lumar to suffer physical and mental distress leading to his attempted suicide and subsequent death.

The City Defendants are decidedly correct-- "The record is devoid of any material fact that would suggest that Lumar was sent to bond court for any reason other than the GAO/BOP order. *See*, City Defendants' Motion for Summary Judgment, R. 349, pp. 7, 13. Plaintiff agrees with the City and will demonstrate that BOP 15-0174 ("BOP Order"), and its enforcement, caused a purposeless detention and a violation of Tyler Lumar's Fourth Amendment rights. Plaintiff will further demonstrate that the General Administrative Order, issued by the Circuit Court of Cook County, is not a defense to Plaintiff's claims because it is an invalid, void order, that violates Illinois law. Moreover, there is no such thing as a "good faith defense" when analyzing municipal liability in the context of § 1983.

## FACTS

Chicago Police Department ("CPD") Officers Daniel Warren and Carlos Vega were called to Madison Community Health Center on the afternoon of August 18, 2016, regarding a disruptive patient. City's 56.1(a) Statement of Material Facts, R. 350 ¶ 4. Lumar left the Madison Family Health Center and proceeded to walk peacefully away from the clinic down Madison Street. *Id*. at ¶ 7. After leaving the health clinic, Warren and Vega discovered through their in-car personal

terminal device that Lumar had an outstanding warrant out of Lee County. *Id*. at ¶ 8. Thereafter, they located Lumar walking peacefully down the street, arrested him on the outstanding warrant at approximately 3:58 p.m., then transported Lumar to the 11th District police station at approximately 4:16 p.m. *Id*. at ¶ 9.

Lumar asked the police about the process of bonding out. 56.1(b) ¶ 1. Officer Warren told Lumar that when a physical copy of the arrest warrant was received, Lumar may be able to receive a bond. 56.1(b) ¶ 2. On August 18, 2016, at 4:48 pm, the arrest warrant was verified by Lee County Correctional Officer Stewart. 56.1(b) ¶ 3. The arrest warrant, which arose from a traffic case, was issued in Lee County, Illinois for case number 2015TR01515, for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay," and bail was set in the amount of $500 (10%). 56.1(b) ¶¶ 4, 5. The amount of the bond on the warrant was $500, 10 percent, which would be $50. 56.1(b) ¶ 6. Lumar acknowledged the warrant but claimed that he already made payments and had gone to court. 56.1(a) ¶ 7. When he was arrested, Tyler Lumar had $130 in his possession. 56.1(a) ¶ 8. If Lumar was allowed to post the $50 bond, Lee County did not need the Chicago Police Department to hold him. 56.1(a) ¶ 9. Upon arrival at the 11th District Police station, Lumar was searched and processed. City's 56.1(a) ¶ 20. At the conclusion of the screening process, Lumar was taken to lockup for further processing including fingerprinting. *Id*. at ¶¶ 24, 25.

In February 2016, arrests of individuals by the CPD for out-of-county warrants were governed by CPD Bureau of Patrol Order 15-017415 (hereinafter, "BOP Order"). *Id*. at ¶ 34. The BOP Order requires that "every person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court." *Id*. at ¶ 34. The BOP Order was created in response to Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Issued Outside of Cook

County ("GAO"). *Id*. at ¶ 35. The GAO was entered by Cook County Chief Judge Evans on June 17, 2015, and requires that, "Defendants taken into custody by an arresting agency located in Cook County on an arrest warrant issued by an Illinois state court outside of Cook County to appear in bond court in the appropriate district or division of this court." *Id*. at ¶ 36.

Sergeant Geyer was the 11th District desk sergeant on August 18, 2016. *Id*. at ¶ 43. He reviewed the paperwork, approved probable cause for Lumar's arrest, and made the determination, in accordance with the BOP Order, that Lumar was ineligible to post bond at the police station and must be held pending his transport to the Cook County Department of Corrections ("CCDOC") for bond court. *Id*. at ¶¶ 43, 44. Prior to July 29, 2015, detainees arrested on out-of-county warrants were allowed to bond out at the police station. 56.1(b) ¶ 10. Per the BOP Order, after July 29, 2015, detainees arrested on out-of-county warrants were not allowed to bond out at the police station. 56.1(a) ¶ 11.

Lumar was placed into a cell in the lockup sometime after 6:40 p.m. City's 56.1(a) ¶ 45. At approximately 12:08 a.m. on August 19, 2016, officers arrived to transport Lumar to Mt. Sinai Hospital after Lumar complained of shortness of breath attributed to his asthma. *Id*. at ¶ 46. While sitting in the waiting room at Mt. Sinai Hospital, Lumar told the transporting officers that he wanted to go home and see his daughter. *Id*. at ¶ 48. Lumar was upset because he believed he should have been allowed to bond out and wanted to see his child. 56.1(b) ¶ 12. Lumar was returned to the 11th District police station from Mt. Sinai at approximately 7:00 a.m. that same morning. City's 56.1(a) ¶ 52.

At 8:40 a.m., two transport officers arrived to take Lumar to the CCDOC to be held pending his appearance in bond court that morning. *Id*. at ¶ 53. After being placed into a bullpen in the CCDOC with other detainees, Cook County correctional officers reportedly observed Lumar drop

3

a package containing twelve individually packaged small white rocks (believed to be a controlled substance) behind a bullpen bench. *Id*. at ¶ 61. Cook County correctional officers reported their observations to CPD officers and released him back into the custody of CPD to be processed for possession of a controlled substance. *Id*. at ¶ 62.

Lumar said, "that wasn't mine," was angry and claimed that the drugs weren't his. 56.1(b) ¶ 13. Officer Vinson escorted Tyler Lumar out of the bullpen area back onto the truck. 56.1(b) ¶ 14. Lumar was taken back to the 11th District. 56.1(b) ¶ 15. Chicago Police Officer Alexander told Tyler Lumar that he would be returned to the Jail for bond court the next day. 56.1(b) ¶ 16. Lumar was acting upset while he was in the van. 56.1(b) ¶ 17. Upon his arrival back at the 11th District Police station, Lumar was ranting and raving, kept saying "this is bullshit" and was agitated and upset. 56.1(b) ¶ 18. Lumar was returned to the 11th District and placed back into a cell at 11:04 a.m. City's 56.1(a) ¶¶ 63, 66, 73. Lumar was told to "calm down" and was escorted to a cell. 56.1(b) ¶ 19. At approximately, 11:15 a.m., while conducting a routine check, CPD Detention Aide Charles Barry discovered Lumar hanging by his t-shirt in his cell. City's 56.1(a) ¶ 73. Lumar succumbed to his injuries on April 18, 2018. *Id*. at ¶ 76. Tyler Lumar's Cause of Death was Complications of Hanging, and the Manner of Death was Suicide. 56.1(b) ¶ 20.

## ARGUMENT

As a direct result of an express policy of the Chicago Police Department that was enforced by Sgt. Geyer, Tyler Lumar was prevented from posting bail to gain his release, and thus unreasonably detained far longer than necessary in violation of the Fourth Amendment. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

**The BOP Order was an Express Unconstitutional Policy of the City**

A municipality may be found liable under § 1983 when it violates constitutional rights via an official policy or custom. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978). To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused "by (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001) *citing McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). The policy that Plaintiff challenges is an express, written policy, identified as BOP 15-0174.

"The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id*. at 379-380, *citing, City of Okla. v. Tuttle*, 471 U.S. 808, 822 (1985).

In this case, Defendant City of Chicago maintained and enforced the BOP Order, an express, unconstitutional policy. The policy requires Chicago police officers, such as Sgt. Geyer, to refuse to accept bail from individuals arrested on warrants issued by Illinois counties, other than Cook County, where the bond amount had already been set by a judicial officer.[1] The BOP Order was enforced against Tyler Lumar by Sgt. Geyer and caused a legally unreasonable, excessive detention in violation of the Fourth Amendment.

---

1  The record shows that Sgt. Geyer's conduct, which violated Tyler Lumar's constitutional rights, was directed by City policy, and was thus neither malicious, nor reckless. As such, Plaintiff no longer seeks punitive damages from Sgt. Geyer.

"An excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004). Needless delay, or delay for delay's sake — or, worse, delay deliberately created so that the process becomes the punishment — violates the Fourth Amendment. *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010), *citing, County of Riverside v. McLaughlin*, 500 U.S. 44, at 56, 59. Detentions as brief as four hours can be excessive and must be justified. *Portis*, 613 F.3d at 705.

BOP 15-0174 provides as follows:

> "[E]very person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court.
>
> *After local processing*, all persons arrested on a warrant issued by an Illinois state court outside of Cook County will be transported to the appropriate holding facility as determined by Special Order S06-12-02 'Non-Traffic Arrest Warrant Procedures." No law enforcement agency will be permitted to obtain custody of an arrestee for a warrant issued by their jurisdiction prior to that arrestee being taken into custody by the Cook County Sheriff following a bond hearing." BOP 15-0174, eff. 7/29/15 (emphasis added).

Significantly, and as will be discussed in more detail below, the BOP Order mandates gratuitous, continued detention even after the police conclude all administrative processing of the arrestee, and regardless of whether the amount of the bond has already been set by a judicial officer. The policy that the BOP Order expressly creates is contrary to Illinois law, which clearly provides for the procedures to be followed when a person, such as Tyler Lumar, is arrested pursuant to a warrant in a county other than the county in which the warrant for his arrest was

issued. In that regard, Illinois law provides as follows:

"Person arrested in another county.

(a) Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued. He shall be admitted to bail in the amount specified in the warrant or, for offenses other than felonies, in an amount as set by the judge, and such bail shall be conditioned on his appearing in the court issuing the warrant on a certain date. The judge may hold a hearing to determine if the defendant is the same person as named in the warrant.

(b) Notwithstanding the provisions of subsection (a), *any person arrested in a county other than the one in which a warrant for his arrest was issued, may waive the right to be taken before a judge in the county where the arrest was made. If a person so arrested waives such right, the arresting agency shall surrender such person to a law enforcement agency of the county that issued the warrant without unnecessary delay.* The provisions of Section 109-1 shall then apply to the person so arrested."

725 ILCS 5/109-2 (emphasis added).

The policy of the Defendant City of Chicago plainly violates Illinois law. The BOP Order does not provide for the ability to waive the right to be taken before a Cook County judge as called for in subsection (b) of the statute and does not require police to surrender custody to a law enforcement agency of the county that issued the warrant without unnecessary delay. To the contrary, the BOP Order creates unnecessary delay.

Here, there was no need for Tyler Lumar to be taken before a judge to protest that he was not the individual named in the warrant. *See, e.g.*, *Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir.

7

2006) (holding that where a detainee claims that he was detained based upon misidentification, the Due Process Clause is satisfied where the jailer brings the detainee before a judge). As Tyler Lumar did not dispute that he was the individual named in the warrant, the City did not need to bring him before a judge. It is uncontroverted that Lumar never contested that he was the individual named in the warrant. Importantly, Lumar only argued to the arresting officers that he had paid the outstanding fine that was the basis for the issuance of the warrant. As such, Lumar should have been surrendered to the Lee County Sheriff's Department. It is, however, undisputed in the record that Lee County advised Chicago police that if Lumar posted the $50 bond called for in the warrant, the Chicago Police no longer needed to hold Lumar.

It is also the law in Illinois that a police department has no discretion to refuse tendered bail in a misdemeanor case after bond has been set. *Lampe v. Ascher*, 59 Ill. App.3d 755, 760-761, 376 N.E.2d 74 (Ill. App. Ct. 1978). "We find that the statutes and supreme court rules applicable to bail for misdemeanor offenses reveal a scheme mandating prompt, efficient pretrial release from custody. …the purpose sought is '*to avoid undue delay in freeing certain persons accused of an offense.*'" *Id.* at 760, (emphasis in original).

Moreover, "[a] person for whom bail has been set has a right to be released from custody, subject to the conditions of the bail bond, when the appropriate amount of bail has been properly deposited." *People v. Harbach*, 298 Ill. App. 3d 111, 117, 698 N.E.2d 281 (Ill. App. Ct. 1998), *citing*, 725 ILCS 5/110-7(a), (b). It is undisputed that Tyler Lumar asked the Chicago Police officers about the process of posting bond and had more than enough money in his pocket to satisfy the bond that the Lee County court previously set. But for the BOP Order, Sgt. Geyer would have allowed Tyler Lumar to post the $50 bond at the 11th District Police Station and go home.

Although mere enforcement of a state statute is not a sufficient basis for imposing § 1983

municipal liability, *Surplus Store Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791-92 (7th Cir. 1991), the City was not following state statute, but was, in fact, violating it. The record demonstrates that the BOP Order violated Illinois state law instead of enforcing the law. To be clear, Plaintiff does not claim that a mere violation of state law is actionable under the Fourth Amendment. "[I]t is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008). However, violation of a state statute gives rise to a corresponding § 1983 violation, if the right encompassed in the state statute is guaranteed under the United States Constitution. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985), *citing, Moore v. Kusper*, 465 F.2d 256, 258 (7th Cir. 1972). In this case, the statute that was violated undoubtedly protects rights guaranteed by the Fourth Amendment.

The Illinois statute, 725 ILCS 5/109-2, guarantees Fourth Amendment rights because it directs that the arrestee be brought before a judge in the county of arrest without unnecessary delay and guarantees that the arrestee can contest probable cause to detain them, i.e., that they are the same individual whose arrest the warrant commanded. Under the statute, the arrestee can also waive the right to an identity hearing to contest probable cause, but the statute nonetheless directs that the arrestee must be surrendered to a law enforcement agency of the county that issued the warrant *without unnecessary delay*. Thus, the statute guards against the violation of the Fourth Amendment from both detention on a warrant without probable cause and excessive, unreasonable detention because it directs the arresting agency, in this case the Chicago Police Department, to relinquish custody of the arrestee without unnecessary delay. Here, the express policy of the Chicago Police Department plainly violates Illinois law causing a purposeless and thus unreasonable detention that violated the Fourth Amendment.

Assuming, *arguendo,* that the rights encompassed in Illinois statute 725 ILCS 5/109-2 are

not guaranteed under the United States Constitution, the violations of state law nonetheless demonstrate that once administrative processing was completed, there was no legal justification or lawful purpose to continue to hold Tyler Lumar. To be sure, Plaintiff does not challenge Lumar's detention during administrative processing. "[T]he 'booking' of an arrestee, which for one thing confirms the person's identity, does not violate the Fourth Amendment[,] . . . even when the arrest is for a minor matter, and even if the arrestee is ready and able to post bail immediately." *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003)*, quoting, Doe v. Sheriff of DuPage County*, 128 F.3d 586, 588 (7th Cir. 1997). However, once the last steps of administrative processing concluded at 6:40 pm, after fingerprinting and photographing Lumar, his continued detention became purposeless and thus unreasonable.

If the challenged policy obeyed state law rather than violated it, Tyler Lumar would have been asked whether he agreed to waive the right to be taken before a Cook County judge for an identity hearing to contest that he was in fact the individual named in the warrant. Because Lumar never protested that he was not the same Tyler Lumar named in the warrant, Lumar would have then waived an appearance before a Cook County judge. At that point, the Chicago Police would have no legitimate reason or need to hold Lumar and would have surrendered him to the Lee County Sheriff. Here, Lee County had already notified Chicago Police that Lumar had only to post $50 in cash to be admitted to bail and leave the police station. Lumar, who had $130 in his pocket, would have then posted the $50 bond. This is not speculation because it is undisputed that: (a) Lumar never argued that the arrest warrant was issued for a different person, (b) Lumar asked the police officers about the ability to bond out, (c) Lumar had sufficient cash in his possession to satisfy the bond amount and (d) Lee County had advised Chicago Police that Lumar did not need to be held if he posted bond.

10

The BOP Order specifically mandates continued detention after administrative processing is complete. At the conclusion of administrative processing, referred to as "local processing" in the BOP order, Lumar's detention became purposeless and thus per se unreasonable in violation of the Fourth Amendment. Here, Lumar was asked screening questions, was fingerprinted, then photographed, with the entire process completed at 6:40 pm on August 18, 2016.

The Seventh Circuit has addressed numerous cases where an excessive detention in violation of the Fourth Amendment has been alleged, challenging the reasonableness of the length of the detention. The common thread to these cases is the inquiry the Seventh Circuit requires into the *reasons* why release was delayed. Here, release was delayed past 6:40 pm only because of the illegal policy of the BOP Order as conceded by the City Defendants. *See,* City Defendants' Motion for Summary Judgment, R. 349, pp. 7, 13.

In *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), the plaintiff Gramenos was arrested on a misdemeanor charge of shoplifting and sought compensation for the allegedly unreasonable four hours and twenty minutes he was held by the police. The Seventh Circuit remanded the case to allow a jury to consider whether the detention was excessive. The Court wrote: "On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it. *Id*. at 437.

In *Portis v. City of Chicago*, the Seventh Circuit reversed a grant of summary judgment for plaintiffs in a class-action challenging the length of detention for persons arrested by the Chicago Police for fine-only misdemeanors. 613 F.3d at 703. The district court had concluded as a matter of law that taking more than two hours to release the class members after the generation of their Central Booking ("CB") numbers was unreasonable. *Id*. The Seventh Circuit rejected the adoption of a two hour bright-line rule, decertified the class, and remanded the case to the district court. *Id.*

11

at 705-706. In doing so, the Seventh Circuit held that the "court must examine not only the length of a given detention but also the reasons why release was deferred." *Id*. at 705.

In *Llaguno v. Mingey*, 739 F.2d 1186 (7th Cir. 1984), the Seventh Circuit ruled that considerations other than the time of detention should be taken into account in assessing whether a delay was reasonable holding that "[o]ther factors may include the reasons for delay, whether delay was justified by the administrative steps that were necessary to be taken, such as transportation, booking and filing charges, and the number of people to be processed." *Id*. at 1196.

In *Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir. 1988), the plaintiff challenged the reasonableness of a delay in the release of a criminal defendant from custody after the basis for his detention had ended. *Id. at 1367*. Lewis was arrested and detained for 11 hours on an arrest warrant issued for another person. *Id*. "We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish — in this case perhaps a number of hours. Reasonable time must be allowed for such matters as transportation, identity verification, and processing. *Id*. at 1370.

**The General Administrative Order was Invalid and Void Ab Initio**

The City Defendants place blame for the unconstitutional BOP Order on General Administrative Order No. 2015-06, entered by Cook County Chief Judge Evans ("the GAO"). However, the GAO improperly modifies Illinois law, is invalid and offers no defense to Plaintiff's claims. "The [circuit courts] may, from time to time, make all such rules for the orderly disposition of business before them as may be deemed expedient, *consistent with law*." 705 ILCS 35/28. (emphasis added). Circuit courts are further empowered by Illinois Supreme Court Rule 21 to adopt rules which are consistent with the Illinois Supreme Court rules and the statutes of Illinois. Rule 21 provides:

(a) Circuit Court Rules. A majority of the circuit judges in each circuit may adopt rules governing civil and criminal cases, including remote appearances, which are *consistent with these rules and the statutes of the State*, and which, so far as practicable, shall be uniform throughout the State. All rules of court shall be filed with the Administrative Director within 10 days after they are adopted.

(b) Administrative Authority. Subject to the overall authority of the Supreme Court, the chief circuit judge shall have the authority, among other things, to determine the hours of court and of the judges in the circuit, the available leave time to which a judge is entitled, and, when the judge's conduct negatively affects the operations of the court or public confidence in the court, to direct how that judge must conduct himself or herself. In the exercise of this general administrative authority, the chief judge shall take or initiate appropriate measures to address the persistent failure of any judge to perform his or her judicial duties or to comply with a directive from the chief judge. Ill. S. Ct. R. 21(a)(b) (eff. Oct. 1, 1983). (emphasis added).

Like the BOP Order, the GAO is clearly inconsistent with, and illegally modifies, Illinois statutory and case law as discussed above. The GAO was not even a Circuit Court rule adopted by a majority of the circuit judges. Even if it was, it would still be invalid because it modifies state law. The GAO was issued pursuant to the administrative authority of the chief circuit court judge, and that authority is quite limited. The GAO impermissibly goes far beyond determining court hours, judges' hours or judges' leave time.

The Illinois Supreme Court and the Illinois Court of Appeals have consistently found that any rule promulgated by the circuit courts may not abrogate, limit, or modify existing law. *See, People ex Rel. Carey v. Power*, 59 Ill. 2d 569, 574 (Ill. 1975) (Circuit court rule invalid insofar as it attempts to limit matters which an extended grand jury may consider); *People v. Schroeder*, 102 Ill. App. 3d 133, 137 (Ill. App. Ct. 1981) ("The administrative order relied upon by the trial court

insofar as it purports to grant authority to dismiss a criminal case [based on undue delay in filing an information] modifies existing law and is invalid."); *People v. McAfee*, 853 N.E.2d 107, 110 (Ill. App. Ct. 2006) (Administrative order imposing $10 DNA collection fee that improperly modified existing law was void *ab initio*.); *Compare, Blair v. Mackoff*, 284 Ill. App. 3d 836 (Ill. App. Ct. 1996) (Administrative order, that dealt with the transfer of refiled cases within the Domestic Relations Division, did not conflict with the General Assembly's mandates in the Code of Civil Procedure or act as an improper exercise of its legislative powers by the judiciary.).

The GAO modified existing law, was invalid, void, and offers no defense to the City. Even if Defendants were to acknowledge that the GAO was invalid, which they do not, and argued that the City was operating in good faith based on the invalid GAO, their argument would be unavailing. "[A] municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983" *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). Accordingly, no matter where the impetus came from, the BOP Order is an illegal policy under Illinois law and violated Tyler Lumar's Fourth Amendment rights when it was enforced against him. Similarly, the invalid GAO does not offer Defendant Geyer a defense since there is no evidence in the record that Geyer even knew about the GAO. Geyer relied on the unconstitutional BOP Order, not the GAO.

### Geyer Personally Participated in a Constitutional Deprivation

"[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original). "A person aggrieved by the application of a legal rule does not sue the rule *maker* — Congress, the President, the United States, a state, a state's legislature, the judge who announced the principle of common law. He sues the person whose acts

hurt him." *Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995).

When Tyler Lumar was at the 11th District police station, Geyer was responsible for the bonding procedure. Geyer personally denied Lumar the right to post bail by enforcing the unlawful policy and participated in the constitutional deprivation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982) (A defendant cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation.). Geyer's motivations are immaterial. "[B]ecause reasonableness is an objective test, a defendant's subjective state of mind is irrelevant to a court's Fourth Amendment analysis. *See, Graham v. Connor,* 490 U.S. 386, 398 (1989); *Henry v. Hulett*, 969 F.3d 769, 781 (7th Cir. 2020). Moreover, conformity with the police department's internal orders is irrelevant to the determination of whether the officer's actions were "objectively reasonable" under the Fourth Amendment. *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006).

As discussed above, Lumar's detention, directed by the BOP Order and personally enforced by Geyer was without a lawful purpose and thus unreasonable. Plaintiff takes no issue with the time it took for the necessary administrative steps. However, after those administrative steps were completed at 6:40 pm, Lumar had a right to post bond and leave the police station. The BOP Order created the "needless delay" the Seventh Circuit acknowledged would violate the Fourth Amendment, *Portis*, 613 F.3d at 705, and Geyer personally enforced it.

**Geyer is Not Entitled to Qualified Immunity**

In *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009), *quoting, Harlow v. Fitzgerald*, 457 U.S. at 818. This requires the Court to make a two-step inquiry: (1) whether the facts make out a violation of a constitutional right; and (2) whether the right was clearly established at the time of the alleged misconduct. *Id.* at 816.

Plaintiff has demonstrated that the facts here make out a violation of Tyler Lumar's Fourth Amendment rights. Those rights were clearly established at the time of the alleged misconduct. It is clearly established that after an arrest, the Constitution only allows, "a brief period of detention to take the administrative steps incident to arrest" *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). It is clearly established that once the "brief" period for administrative procedures is complete, the detainee must then be brought before a magistrate for a probable cause determination or must be released. *Gramenos v. Jewel Tea Co.*, 797 F.2d at 437.

Here, a judicial probable cause determination had already been made, as evidenced by the arrest warrant, leaving no alternative but to release Lumar on bail that was already fixed and that he was prepared to post. It is clearly established that needless delay violates the Fourth Amendment. *Portis* at 705. The fact that Lumar could not be unreasonably detained and had to be allowed to post the judicially pre-set bail after administrative processing was complete, was so obvious that Geyer must have known. Geyer had to accept the bail that Lumar wanted to provide since it is well settled in Illinois, since at least 1978, that a police officer has no discretion in accepting bail once it has been set by a judge or an Illinois Supreme Court rule. *Lampe*, 59 Ill.

16

App.3d at 760-761.[2] Furthermore, it is clearly the law in Illinois, pursuant to statute, that a person arrested based on a warrant issued in another county can waive the right to be taken before a Cook County judge. 725 ILCS 5/109-2. Geyer should be denied qualified immunity.

## Tyler Lumar Suffered a Single, Indivisible Injury

The City Defendants argue that even if Lumar's detention pursuant to BOP was unlawful, the unlawful detention ceased at the moment CPD Officers had probable cause to arrest Lumar for possession of narcotics. *City Defendants' Memorandum of Law*, R. 349, p. 19. Defendants further argue that "any claim for unlawful detention, including, including any claim for damages following his drug arrest in the Cook County lockup, must fail against the City Defendants." *Id*. This is simply incorrect. "It is axiomatic that where several independent actors *concurrently or consecutively* produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (emphasis added).

The City Defendants started the ball rolling with Lumar's unconstitutional detention. The City Defendants delivered Lumar to the Cook County Jail, which they should not have done, and exposed him to Deputy Wlodarski. Wlodarski fabricated evidence and extended the already unlawful detention that was initiated by the City Defendants. Jails are dangerous places. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009). Wlodarski's illegal conduct does not cut off liability for the City. "[M]ultiple proximate causes are often present" and "an actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause." *Whitlock v.*

---

2 "[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only where there are persuasive indications that the state's highest court [would disagree]". *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). After forty-three years, there is no indication that the Illinois Supreme Court disagrees with *Lampe*.

*Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012), *citing,* Rest.3d Torts § 29 cmt. b. Lumar was still being held pursuant to the City's unconstitutional policy when he was returned to the 11th District and when he attempted suicide. Whether the wrongful acts of the City Defendants and Wlodarski occurred concurrently or consecutively makes no difference. What is significant is that the wrongful acts combined to produce a single, indivisible injury, i.e., the mental anguish and suffering that Tyler Lumar experienced that lead to his suicide attempt and the damages that flowed from that.

**Sufficient Evidence is in the Record to Allow a Jury to Determine Proximate Cause**

Tyler Lumar was suffering mental and emotional distress as a direct result of the conduct of the defendants that caused his illegal detention, *at the very same time* of his suicide attempt. A § 1983 plaintiff may recover damages that are proximately caused by any constitutional violation. *See, Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1548 (2017). "[G]enerally the issue of proximate cause is a jury question." *Shick v. Ill. Dep't of Human Servs*., 307 F.3d 605, 615 (7th Cir. 2002). "Compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986) *citing, Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350 (1974); *Carey* v. *Piphus,* 435 U.S. 247, 264 (1978) (mental and emotional distress constitute compensable injury in § 1983 cases).

Tyler Lumar was illegally detained because of the enforcement of the City's unconstitutional policy and was wrongly accused of a felony narcotics offense and further detained as a result. Those constitutional violations were "'ongoing' rather than 'discrete,'" *Lewis v. City of Chicago*, 914 F.3d at 478, and were occurring at the exact time Lumar hung himself. Indeed, at the very same time Lumar tied his shirt around his neck, tied the other end to the cell bars and

18

hung himself, his constitutional rights were being violated by Wlodarski and the City defendants. But for the unlawful BOP Order, Lumar would have posted bond and left the 11th District instead of getting shipped to the Cook County Jail. But for Wlodarski, Lumar would have posted bond after Bond Court. Instead, Lumar was returned to Chicago Police custody with the knowledge that he would be sent back to the next day to the Cook County Jail, which was the same place where Lumar had been wrongfully accused of committing a felony by Wlodarski.

### Tyler Lumar's Suicide was Legally Foreseeable

"It is reasonably foreseeable that an inmate may attempt suicide." *La Bombarbe v. Phillips Swager Associates Inc.*, 130 Ill. App. 3d 896, 898 (Ill. App. Ct. 1985). "It is true that jail inmates are much more likely to commit suicide than free persons are — in fact, nine times as likely." *Jutzi-Johnson v. U.S.*, 263 F.3d 753, 757 (7th Cir. 2001), *citing,* Lindsay M. Hayes Joseph R. Rowan, *National Study of Jail Suicides: Seven Years Later* 54 (National Center on Institutions and Alternatives, Feb. 1988).

After Lumar's return to the 11th District, he was "upset, ranting and raving" after experiencing the tumultuous series of events as discussed. It was eminently foreseeable that in that detention setting; wrongly detained and prevented from posting the $50 bail he had in his pocket; wrongly accused of a felony, and knowing he would be going back the next day to the same county jail; less than fifteen minutes after being placed alone in the cell, after no suicide screening was conducted; Tyler Lumar would attempt to take his life. Tyler Lumar hung himself leading to his death.

Plaintiff has placed evidence into the record of the expert opinion of Dr. John Fabian, Psy.D., a Board Certified Forensic and Clinical Psychologist and a Fellowship Trained Clinical Neuropsychologist. In Dr. Fabian's expert opinion, within a reasonable degree of psychological

certainty, Tyler Lumar was suffering from "other specified personality disorder" and "other specified personality disorder with antisocial and borderline features…" The record shows that Tyler Lumar suffered severe mental distress.

Dr. Fabian further opines, within a reasonable degree of psychological certainty, that "Tyler Lumar's suicide attempt was based on his psychological functioning, coupled with the immediate and acute psychosocial stressors that he was dealt, i.e., being arrested and then locked up for an unpaid fine that he thought was paid; being told that it was likely he could bond out but then being denied bail and spending the night in the police lockup; then suffering an asthma attack, sitting in a hospital waiting room for up to 5 hours after midnight without sleep; then being taken to Cook County Jail where he is accused of a felony, namely narcotics possession that he did not commit; protesting his innocence to no avail; and is told by one of the officers on the return trip from Cook County that he is going to be returned to the same jail where he was just wrongfully accused of a felony. Already suffering from depression, he now becomes despondent and feeling hopeless having never been detained for any length of time before. As a result, Mr. Lumar attempts suicide."

Tyler Lumar, already suffering under an unconstitutional detention inflicted upon him by the City of Chicago, was subjected to further illegal and unconstitutional detention at the hands of Wlodarski. At 9:05 am, Wlodarski falsely claimed that he recovered cocaine from Tyler Lumar during a search, causing Lumar to be returned to the 11th District Police Station to be locked in a cell. An angry Tyler Lumar, ranting and raving, continuously denied that the cocaine was his. A little over two hours later, at 11:15 am, less than fifteen minutes after arriving back at the 11th District and in the absence of a suicide screening, Lumar was found alone and unconscious, hanging in a cell with his shirt tied around his neck. Tyler Lumar was detained in violation of his

Fourth Amendment rights and there is substantial, if not overwhelming evidence in the record that those rights violations caused Lumar to suffer mental anguish leading to his hanging.

**Illinois Wrongful Death**

Defendants rely heavily on *Turcios v. DeBruler Co.*, 32 N.E.3d 1117 (Ill. 2015), in support of their contention that Plaintiff cannot demonstrate that Wlodarski's actions were a proximate cause of Lumar's suicide attempt. That reliance is misplaced. In *Turcios*, the decedent was embroiled in a dispute over an apartment he had rented and the unilateral cancellation of the lease by the landlord. *Id.* at 1120-1121. The decedent was offered $2,000 from the property manager to move out but felt discriminated [against] and harassed. *Id.* at 1121. The decedent reported to a third party that he and his wife felt "fatigue due to lack of sleep over [the]matter," and they were "depressed, anxious and angry" because the management company was not willing to work with them. *Id.* The decedent allegedly told his wife that he could not tolerate the situation any longer, but did not know what to do, and committed suicide the following day. *Id.*

In dismissing the wrongful death action, the *Turcios* court found that the plaintiff did not identify any injury to decedent that caused his death and did not identify on what legal theory defendant's conduct was "wrongful." *Id.* at 1123. "[A] suicide may result from a complex combination of psychological, psychiatric, chemical, emotional, and environmental factors." *Id.* at 1128. As a result, "it is the rare case in which the decedent's suicide would not break the chain of causation and bar a cause of action for wrongful death, even where the plaintiff alleges the defendant inflicted severe emotional distress." *Id.* "But rare is not the same as impossible." *Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020) (Chang, J.). Based on the record, this is one of those rare cases.

In *Turcios*, "the Illinois Supreme Court did not hold that suicide is *always* unforeseeable

as a matter of law. Rather, *Turcios* only set forth a general presumption—albeit a strong one—that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'" *Hankins at* 681-82 (emphasis in original), *citing*, *Turcios*, 32 N.E.3d at 1128. In distinguishing *Turcios*, the District Court in *Hankins* found that the plaintiff had sufficiently plead foreseeability where the complaint set out specific examples of physical and mental abuse that exacerbated the decedent's mental condition. *Id.* 682.

Notably, *Turcios* was decided at the pleading stage on a motion to dismiss without a developed record. *Turcios* at 1120. Here, unlike *Turcios*, we are well beyond the pleadings stage. There is considerable and sufficient evidence in the record to allow a jury to determine proximate cause including, but not limited to; wrongly denying Lumar the ability to post bond; falsely accusing him of the felony offense of possessing a controlled substance; returning him to the police station and telling him that he will be kept there until the next day, destined to be returned to the same place he was falsely accused; not screening Lumar for suicide risk upon his return, where he was "ranting and raving" before being put in a cell alone; the heightened risk of suicide in a detention setting; and the previously discussed expert opinions of Dr. John Fabian.

The general rule under Illinois law is that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee. *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 910 (Ill. App. Ct. 2007). This rule carries an exception that deems suicide foreseeable when the defendant's conduct caused an injury, most often to the head, that made the decedent so "'bereft of reason'" as to cause him to attempt suicide. *Id.* at 911. Here, the injury was not a physical blow, it was devastating psychic harm caused by the intentional wrongs of the Defendants.

"The universal rule followed by most jurisdictions is that the victim's act of suicide is

a new and independent agency breaking the chain of causation from the negligent act and is not reasonably foreseeable…this is summed up as follows: '* * *the better view [is] that when his insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as *a direct result and no intervening force at all*, or as a normal incident of the risk, for which the defendant will be liable. * * * But if the suicide is during a lucid interval when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supersedes the defendant's liability.'" *Little v. Chicago Hoist Body Co.*, 32 Ill. 2d 156, 158-159 (Ill. 1965), *quoting, Prosser, Law of Torts, 2d ed.*, pp. 273-274 (emphasis added).

In following the traditional rule, the Illinois Supreme Court in *Little* observed a "great lapse in time" (five years) between the accident and the attempted suicide. *Little* at 159. Plaintiff proceeds here under the "direct result" theory as there was no lapse in time--no attenuation, and thus there was no intervening force at all. Lumar was enduring mental injury from the Defendants' intentional acts at the exact time of his suicide attempt. *See also, McLaughlin v. Sullivan*, 123 N.H. 335, 337-38 (N.H. 1983) (Exception to general rule that an action will not lie where damages are sought for the suicide of another "typically involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture.")

Defendants' reliance on *Johnson v. Wal-Mart Stores*, 588 F.3d 439 (7th Cir. 2009) is similarly misplaced. In *Johnson*, it was alleged that the decedent, who "had been a mental patient" was negligently sold bullets in violation of state law. *Id.* at 440-441. When the decedent got home from Wal-Mart, she loaded the bullets into a revolver and shot herself in the chest. *Id.* at 441. The issue presented in *Johnson* was, "whether the alleged violation of a public safety statute alone can

generate a reasonable inference of proximate cause in the presence of a suicide." *Id*. at 443. The *Johnson* court found no reason "to deviate from the traditional rule describing suicides as intervening acts that break the causal chain…" *Id*. Here though, the record requires deviation from the "traditional rule."

It is quite easy to cite a "traditional rule" and assert that Plaintiff's claim is barred, but the facts in this case just do not fit. The "traditional rule" contemplates a tort, where the harmed party, after a "lucid interval," attempts suicide. Tyler Lumar's suicide does not at all fit the "traditional rule" and Plaintiff's claim is not automatically foreclosed as the District Court in *Hankins* 447 F. Supp. 3d at 681-682 observed. The record demonstrates that Tyler Lumar attempted suicide at the very time he was suffering from his wrongful detention and enduring mental torment. There was never a "lucid interval." Instead, ongoing, intentional torts resulted in mental anguish--torture.

Lumar was continuously in custody for over seventeen hours[3] after he was entitled to be released at the completion of administrative processing, after Wlodarski falsely accused him of possessing cocaine, after being told by Officer Alexander that he would be returned the next day to the very same place he was falsely accused of a felony. Lumar was then placed into a cell alone, without a suicide screening. Lumar was angry, upset, ranting and raving, repeatedly saying "this is bullshit," and found hanging by his shirt from the cell bars within 15 minutes after being placed in the cell. Those facts coupled with the expert opinion of Dr. Fabian provide more than sufficient evidence to allow a jury to determine proximate cause and find that the suicide attempt was the direct result of the Defendants' wrongful actions rather than an intervening cause that occurred

---

3 Defendants seemingly attempt to get a "discount" on Lumar's time in custody because he spent 7 hours at Mt. Sinai hospital suffering from respiratory distress before he was delivered to the Cook County Jail. *See*, City Defendants' Motion for Summary Judgment, R. 349, p. 13. It is inarguable that Lumar was in custody pursuant the BOP Order at that time.

during a lucid interval.

### The Tort Immunity Act Does Not Bar Plaintiff's State Law Claims

The City of Chicago argues that Plaintiff's wrongful death claim should be dismissed under the Illinois Tort Immunity Act (ITIA), 745 ILCS 10/1-101 et. seq., *citing*, ITIA §§ 2-202, 2-204, and 4-103.

In regards to §§ 2-202 and 2-204, the ITIA provides as follows:

> "*A public employee* is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (emphasis added).

> "Except as otherwise provided by statute, *a public employee*, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS 10/2-204 (emphasis added).

"'Public Employee' means an employee of a local public entity." 745 ILCS 10/1-207. The City of Chicago is plainly a "local public entity," rather than a "public employee," and cannot avail itself of either § 2-202 or § 2-204 of the ITIA.

Turning now to § 4-103, it provides:

> "Neither a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners." 745 ILCS 10/4-103.

§4-103 does not provide blanket immunity for all jail suicides. Law enforcement officials, including jail officers and officials, owe a duty under Illinois law to protect detainees from "self-injury or self-destruction" by using "ordinary and reasonable care for the preservation of their

prisoner's health and life under the circumstances of the particular case." *Hayes v. City of Des Plaines*, 182 F.R.D. 546, 549 (N.D. Ill. 1998), *quoting, Dezort v. Village of Hinsdale*, 35 Ill. App.3d 703, 710, 342 N.E.2d 468, 472-73 (Ill. App. 1976).

More importantly, Plaintiff makes no claim challenging the sufficiency of the 11th District detention area's equipment, personnel, supervision, or facilities. Plaintiff had sought to challenge the City of Chicago's failure to provide cut-down tools to detention personnel which caused a delay in the attempted rescue of Tyler Lumar. This Court however, previously struck that claim. *See,* Order, R. 306, February 8, 2021, at 2. The thrust of Plaintiff's claim is directed at the unconstitutional BOP Order and Wlodarski's fabrications that caused Lumar to be illegally detained against his will and resulted in severe mental anguish leading to suicide. Plaintiff does take issue with the lack of any suicide screening upon Lumar's return to the 11th District. That evidence, however, is not in support of a stand-alone claim of failing to prevent the suicide, it is offered to demonstrate foreseeability. It is foreseeable that a person who was suffering severe mental anguish during an illegal detention, and not screened for suicidal ideation, would attempt suicide in a cell where he was placed alone. As such, Defendants' claim of immunity pursuant to ITIA § 4-103 must fail.

## CONCLUSION

Typically, a plaintiff struggles to find contested issues of fact in a desperate effort to stave off a defendant's summary judgment motion. Once again however, this is a rare case. When all is laid bare, it becomes obvious that not only should the City Defendants' motion for summary judgment be denied, but it is likewise obvious that they have no defense to Plaintiff's claims. The City Defendants rely exclusively on the validity of the GAO to justify the illegal BOP Order. For the Defendants to succeed, this Honorable Court would need to find that the GAO is a valid

administrative order that is consistent with, and does not modify or abrogate Illinois law, or, that the City was entitled to rely on the void GAO, even if mistaken as to its validity. As discussed, neither scenario is possible as the law does not allow it. The GAO was void *ab initio,* yet blindly executed by the City. The GAO is not a salvation, it is a millstone the City cannot escape.

The BOP Order was unlawful, it was enforced, and it violated Tyler Lumar's constitutional rights. The BOP Order caused a purposeless, and constitutionally unreasonable detention. Instead of being allowed to post bail using the money he had in his pocket, Tyler Lumar was shipped to the Cook County Jail where he was framed for a felony. The record contains sufficient evidence for a jury to decide proximate cause. Tyler Lumar underwent severe mental anguish and as a direct result, at the very time his constitutional rights were being violated, Lumar hung himself by the neck. Tyler Lumar suffered a single, indivisible injury, and the City Defendants are responsible for all of it.

WHEREFORE the Plaintiff LISA ALCORN, for all the foregoing reasons, respectfully requests that this Honorable Court deny the City Defendants' Motion for Summary Judgment in its entirety, set this cause for a jury trial, and grant such other relief as this court deems just and appropriate.

Respectfully submitted,

/S/*Donald J. Pechous*
Donald J. Pechous

Attorneys for Plaintiff:

Donald J. Pechous
The Khowaja Law Firm, LLC
8 S. Michigan Ave., Suite 2600
Chicago, IL 60603
312-388-1198
Email: dpechous@khowajalaw.com

Bryan J. O'Connor, Sr.
O'Connor Law Group, LLC
19 S. LaSalle St., Suite 1200
Chicago, IL 60603
312-236-1814
Email: boc@oconnorlawgroup.com

97 C 8412
United States District Court, N.D. Illinois, Eastern Division.

# Hayes v. City of Des Plaines

182 F.R.D. 546 (N.D. Ill. 1998)
Decided Aug 26, 1998

547 *547     Estate brought action against city and several of its police officers after decedent committed suicide while being held in an interview room at the police station. On estate's motion to strike certain of defendants' affirmative defenses, the District Court, Keys, United States Magistrate Judge, held that: (1) as a matter of first impression, suicide was not a bar to recovery under § 1983 or Illinois statutory law; (2) trier of fact was required to decide whether police officers were enforcing the law at the time arrestee committed suicide, for purposes of immunity defense; (3) fact question precluded striking immunity defense to claim of that officers violated statutory duty to provide medical care to detainee; (4) defendants could not make out an immunity defense, under Illinois statute creating immunity for performing discretionary acts; and (5) court would not strike defense that police officers were immune, under Illinois statute governing supervision of inmates.

    Motion to strike affirmative defenses granted in part and denied in part.

    Stuart David Gordon, Zukowski, Rogers, Flood & McArdle, Chicago, IL, for Plaintiff.

    William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Arlington Heights, IL, for Defendants.

546 *546  [1]  **Watch Commander Walter Lang,** [2] **Officer Dick Lalowski, and Officer Gregory** 548 **Halverson, Defendants.** *548

*MEMORANDUM OPINION AND ORDER*

KEYS, United States Magistrate Judge.

    The dispute before the Court arises from Plaintiff's Motion to Strike Certain [3] of Defendants' Affirmative Defenses. For the reasons set forth below, this Court grants in part, and denies in part, Plaintiff's motion.

[3] Ms. Hayes moves to strike Defendants' second, third, fourth, fifth, sixth and tenth affirmative defenses.

### BACKGROUND

    Plaintiff, Catherine Hayes, filed suit against Defendants, the City of Des Plaines (" the City" ) and several of its police officers, after her former husband, Michael P. Hayes, committed suicide while being held in an interview room at the police station. (Complaint ¶ ¶ 1, 4, 20, 22.) Mr. Hayes allegedly broke into the apartment of an ex-girlfriend on December 15, 1996. (Complaint ¶ 11.) Later that day, Officer Dick Lalowski called Mr. Hayes and asked him to come into the police station. (Complaint ¶ 13.) At some point after Mr. Hayes arrived at the station, Officer Lalowski arrested him. (Answer ¶ 16.) Sometime thereafter, Mr. Hayes eventually told Officer Lalowski that he had experienced " suicidal thoughts in the past," and that a doctor was treating him for his " condition." (Answer ¶ 15.) Defendants admit that Mr. Hayes had a scar on his wrist, but the parties disagree as to the visibility and obviousness of the scar, and whether it was a scar from a prior suicide attempt. (Complaint ¶ 15; Answer ¶ 15.)

Hayes v. City of Des Plaines    182 F.R.D. 546 (N.D. Ill. 1998)

Officer Lalowski apparently noted in Mr. Hayes' arrest report the terms " Med Sui" under the heading " Cautions." (Complaint ¶ 17, Ex. B.) While Officer Lalowski completed the arrest report, he allegedly left Mr. Hayes alone in an interview room. (Complaint ¶ 16, Answer ¶ 16.) The interview room had no electronic surveillance, but it did contain a pay telephone. (Complaint ¶ 16.) A few hours after Mr. Hayes' arrest, Officer Gregory Halverson photographed and fingerprinted him. (Answer ¶ 18.) After processing him, Officer Halverson returned Mr. Hayes to the interview room alone. (Answer ¶ 19.) Approximately one hour later, a non-defendant officer found Mr. Hayes on the floor with the pay telephone cord wrapped around his neck. (Complaint ¶ 20.) The officer, and several unidentified officers, attempted to resuscitate Mr. Hayes and then called for an ambulance. (Complaint ¶ 21.) Unfortunately, Mr. Hayes' life could not be saved, and it was determined that suicide caused his death. (Answer ¶ 22.)

Ms. Hayes is suing the City, and each individual Officer, on five different counts. Count I charges each Defendant with violating Mr. Hayes' civil rights under 42 U.S.C. § 1983 (" § 1983" ). (Complaint at 6, 9.) Counts II through V are all pendant state claims. Count II alleges that Defendants were negligent. (Complaint at 9, 10.) Count III charges Defendants with willful and wanton conduct. (Complaint at 10, 11.) Finally, Counts IV and V raise claims against Defendants under 740 ILL. COMP. STAT.. 180/1 (West 1983) for: 1) wrongful death and negligence; and 2) wrongful death and willful and wanton conduct, respectively. (Complaint at 11-13.)

Defendants have set forth ten affirmative defenses, and Ms. Hayes has moved to strike the following: the second affirmative defense, going to Count I; the third, sixth and tenth affirmative defenses, going to Counts II through V; and the fourth and fifth affirmative defenses, going to Counts II and IV. (Motion to Strike at 1; Affirmative Defenses at 1-3.)

## DISCUSSION

### A. *The Standard for a Motion to Strike Affirmative Defenses*

Under Federal Rule of Civil Procedure
549  12(f), a motion to strike is appropriate if *549 it eliminates an insufficient defense. FED. R. CIV. P. 12(f). The court will deny a motion to strike a defense if the defense presents " ' substantial questions of law or fact' " or " ' if the insufficiency of the defense is not clearly apparent on the face of the pleadings, nor can reasonably be inferred from any state of facts in the pleadings.' " *United States v. 416.81 Acres of Land,* 514 F.2d 627, 631 (7th Cir.1975)(quoting *United States v. 187.40 Acres of Land, Huntingdon County, Pa.,* 381 F.Supp. 54, 56 (M.D.Pa.1974)).

The court disfavors motions to strike, because it prefers that defenses be heard if the possibility exists that the " ' defenses may succeed after a full hearing on the merits.' " *416.81 Acres,* 514 F.2d at 631 (quoting *187.40 Acres,* 381 F.Supp. at 56). Therefore, the court will only strike an affirmative defense " ' [i]f it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the Complaint....' " *Van Schouwen v. Connaught Corp.,* 782 F.Supp. 1240, 1245 (N.D.Ill.1991) (quoting *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 737 (N.D.Ill.1982)).

### B. *Application of the Motion to Strike Standard to Defendants' Affirmative Defenses*

#### 1. The Second and Third Affirmative Defenses

Defendants cannot support their second and third affirmative defenses, which state that Mr. Hayes' suicide is a bar to recovery on all of Ms. Hayes' counts under § 1983 and Illinois law, respectively. Suicide is neither a federal crime nor a statutory crime in Illinois.[4] However, the Seventh Circuit has held that prison officials may be liable under § 1983 for a pre-trial detainee's suicide, if a prison official is deliberately

Hayes v. City of Des Plaines    182 F.R.D. 546 (N.D. Ill. 1998)

indifferent to a substantial suicide risk. *Mathis v. Fairman,* 120 F.3d 88, 91 (7th Cir.), *cert. denied,* 522 U.S. 1016, 118 S.Ct. 603, 139 L.Ed.2d 891 (1997). Pretrial detainees have, at least, the same constitutionally protected rights as convicted prisoners. *Hall v. Ryan,* 957 F.2d 402, 405 (7th Cir.1992).

> 4 Defendants cited cases from various jurisdictions, including Illinois, which consider suicide immoral and a common law crime. However, under Illinois law, a particular act is not characterized as a criminal offense unless it is promulgated in an Illinois statute. See 720 ILL. COMP. STAT. . 5/1-3 (West 1983). Additionally, the Supreme Court explained that only legislatures can create federal crimes. Liparota v. United States, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). Therefore, without any legislation making suicide either a federal or a state crime in Illinois, Defendants' argument that suicide is a common law crime and, therefore, a bar to recovery, remains unpersuasive to this Court.

In Illinois, law enforcement officials owe a " general duty of care to those who have been arrested and incarcerated" as well as to those already convicted of a crime. *Dezort v. Village of Hinsdale,* 35 Ill.App.3d 703, 342 N.E.2d 468, 472-73 (Ill.App.1976). The duty includes protecting prisoners from " self-injury or self-destruction" by requiring police officers to use " ordinary and reasonable care for the preservation of their prisoner's health and life under the circumstances of the particular case." *Id.* at 473.

Whether Mr. Hayes was a pre-trial detainee at the time of his suicide is unclear, but both sides do agree that he was arrested and detained. Both sides would also probably agree that Mr. Hayes was going to be placed into a cell shortly to await arraignment. Clearly, Defendants had a duty to at least exercise ordinary and reasonable care toward Mr. Hayes after his arrest. As set forth by both the federal and Illinois state courts, suicide has not

been a bar to recovery under § 1983 or Illinois statutory law.[5] Therefore, this Court strikes the Defendants' second and third affirmative defenses.

> 5 This Court could find no cases where a decedent's suicide was alleged to be a crime and used as an affirmative defense by an individual or municipality. Therefore, this issue appears to be one of first impression.

### 2. The Fourth Affirmative Defense

The remaining affirmative defenses concern the rest of the state claims against the Defendants. The Defendants' fourth affirmative defense is that the Officers were engaged in the enforcement of a law and, *550 thereby, immune from liability for negligence under Counts II and IV. Such an affirmative defense raises a substantial question of fact, which this Court will not strike.

In Illinois, a " public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILL. COMP. STAT.. 10/2-202 (West 1983). The Illinois Supreme Court has held that the term " execution or enforcement" of a law should be given its plain and ordinary meaning. *Arnolt v. City of Highland Park,* 52 Ill.2d 27, 282 N.E.2d 144, 147 (Ill.1972). The court in *Arnolt* held that, not every act performed by a police officer while on duty is an execution or enforcement of a law. *Id.* However, " [e]nforcing the law is rarely a single, discrete act, but is instead a course of conduct." *Thompson v. City of Chicago,* 108 Ill.2d 429, 92 Ill.Dec. 231, 484 N.E.2d 1086, 1088 (Ill.1985).

The Illinois courts have found that certain kinds of acts constitute " enforcing or executing" a law, while other acts do not. *See Thompson v. City of Chicago,* 108 Ill.2d 429, 92 Ill.Dec. 231, 484 N.E.2d 1086, 1088 (Ill.1985)(attempting to disperse an unruly crowd is an act of enforcing the law); *Bruecks v. County of Lake,* 276 Ill.App.3d 567, 213 Ill.Dec. 68, 658 N.E.2d 538, 539

Hayes v. City of Des Plaines    182 F.R.D. 546 (N.D. Ill. 1998)

(Ill.App.1995)(holding that a police officer en route to a " shots fired" call is enforcing the law); *Leaks v. City of Chicago*, 238 Ill.App.3d 12, 179 Ill.Dec. 324, 606 N.E.2d 156, 159 (Ill.App.1992)(officer engaging in routine patrol is not enforcing the law); *Simpson v. City of Chicago*, 233 Ill.App.3d 791, 175 Ill.Dec. 29, 599 N.E.2d 1043, 1045 (Ill.App.1992)(investigating a missing person report is not an act of enforcing the law); *Trepachko v. Village of Westhaven*, 184 Ill.App.3d 241, 132 Ill.Dec. 602, 540 N.E.2d 342, 347 (Ill.App.1989)(officer stopping a car for a traffic violation is enforcing a law); *Fitzpatrick v. City of Chicago*, 112 Ill.2d 211, 97 Ill.Dec. 419, 492 N.E.2d 1292, 1297 (Ill.1986)(investigating a traffic accident is an act of enforcing the law); *Glover v. City of Chicago*, 106 Ill.App.3d 1066, 62 Ill.Dec. 597, 436 N.E.2d 623, 629 (Ill.App.1982) (officer making an arrest is enforcing the law). As the above cases set forth, the trier of fact must determine whether the officer in question performed the particular injurious act while enforcing the law. *Arnolt*, 282 N.E.2d at 148-49.

In the case at hand, Mr. Hayes committed suicide after police officers had already arrested, processed, and completed necessary paperwork on him. Further, the facts are unclear as to why Mr. Hayes was returned to the interview room after being fingerprinted and photographed, as opposed to being placed in a cell. However, as the Illinois Supreme Court has held, the trier of fact must decide whether the Defendant Officers were engaged in a course of conduct of enforcing the law at the time when Mr. Hayes committed suicide. Therefore, this Court will not strike Defendants' fourth affirmative defense.

### 3. The Fifth Affirmative Defense

This Court will not strike Defendants' fifth affirmative defense, which also goes to Counts II and IV. Defendants claim that they are entitled to immunity under 745 ILL. COMP. STAT.. 10/4-105 (West 1983)(" 4-105" ), because the Officers did not have actual knowledge that Mr. Hayes was a

suicide risk nor did they willfully and wantonly ignore that risk; and therefore, they were under no obligation to provide Mr. Hayes with medical care.

A prison official may have actual knowledge of a substantial risk, and could be found deliberately indifferent, if the official ignores an " obvious" risk. *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Seventh Circuit in *Hall* acknowledged that officers may have actual knowledge of a suicide risk if a detainee acts in a bizarre manner. 957 F.2d at 405. Further, " suicidal tendencies or intent" to commit suicide may also show that officers had actual knowledge of a risk to the detainee. *Mathis*, 120 F.3d at 92.

Willful and wanton conduct is defined as " an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others...." *551 745 ILL. COMP. STAT. 10/1-210 (West 1983). The Illinois Supreme Court has added that willful and wanton conduct shows a " reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness, or carelessness...." *Lynch v. Board of Educ. of Collinsville*, 82 Ill.2d 415, 45 Ill.Dec. 96, 412 N.E.2d 447, 457 (Ill.1980)(internal quotations and citations omitted).

The parties disagree as to Defendants' actual knowledge of Mr. Hayes' being a threat to himself. Both Defendants and Ms. Hayes agree that Mr. Hayes admitted to having had suicidal thoughts in the past and to being under a physician's care for those thoughts. Both sides also agree that the Officers noticed a scar on his wrist. However, Defendants assert that the Officers did not know, nor was it obvious to them, that the scar was from a previous suicide attempt. Defendants contest Ms. Hayes' claim that they should have known Mr. Hayes was in imminent danger of attempting

Hayes v. City of Des Plaines    182 F.R.D. 546 (N.D. Ill. 1998)

suicide. Neither party asserted that Mr. Hayes threatened to commit suicide at the police station, or acted in an otherwise threatening or bizarre manner, which would have put the officers on notice that there was an impending danger. Without actual knowledge of Mr. Hayes being an imminent suicide risk, the Officers were not reckless in leaving him unattended in a room with a pay phone,[6] the cord from which he ultimately used to kill himself. After a full hearing on the merits, the Officers may prove that they had no actual knowledge of Mr. Hayes' serious mental condition or that the risk to his life was obvious. Therefore, this Court will not strike Defendants' fifth affirmative defense.

> [6] Ms. Hayes claims that Defendants do not have immunity under 4-105, because they showed a reckless disregard toward Mr. Hayes by placing him in an interview room alone, even though they knew he had experienced suicidal thoughts in the past. (Reply at 13, n. 6.) Ms. Hayes contends that the Officers violated their own regulation pursuant to the Des Plaines Police Lock-Up Facilities General Order (OPS-240), which prohibits leaving a mentally disturbed subject alone in an interview room, and requires that the subject " be under constant supervision." (Reply at 13, n. 6; Ex. A.) However, failing to follow a self-imposed departmental regulation is not even negligence per se, because the party may prove that it " acted reasonably under the circumstances, despite the violation." Delasky v. Village of Hinsdale, 109 Ill.App.3d 976, 65 Ill.Dec. 454, 441 N.E.2d 367, 372 (Ill.App.1982). Therefore, this Court does not find that the Defendants were reckless in failing to adhere to their own regulation.

### 4. The Sixth Affirmative Defense

This Court strikes Defendants' sixth affirmative defense, going to Counts II through V, which asserts that they are entitled to immunity while performing discretionary acts. Under 720

ILL. COMP. STAT.. 10/2-201 (West 1983)(" 2-201" ), " a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

The Illinois Supreme Court has held that a public official receives immunity if the official's position requires the determination of policy *or* the exercise of discretion, and the act or omission that caused the injury was " both a determination of policy *and* an exercise of discretion." *Harinek v. 161 N. Clark St., Ltd. Partnership,* 181 Ill.2d 335, 230 Ill.Dec. 11, 692 N.E.2d 1177, 1181 (Ill.1998) (emphasis added).[7] Policy decisions are those that require a balancing among competing interests. *West v. Kirkham,* 147 Ill.2d 1, 167 Ill.Dec. 974, 588 N.E.2d 1104, 1109 (Ill.1992). Discretionary acts are usually unique acts particular to the public office in question. *552 Snyder v. Curran Township,* 167 Ill.2d 466, 212 Ill.Dec. 643, 657 N.E.2d 988, 993 (Ill.1995).

> [7] The Harinek decision is relatively new and addresses for the first time the issue of whether 2-201 requires a public entity's or public employee's act to be both a policy decision and an exercise of discretion. 230 Ill.Dec. 11, 692 N.E.2d at 1181. While the majority found that the plain language of the statute requires such a reading, at least two justices disagreed with the court's finding and instead interpreted 2-201 as not requiring the public entity's or public employee's act to " satisfy the independent requirement of being a policy determination...." Id. at 1184-85. Before Harinek, Illinois courts assumed that exercising discretion " encompass[ed]," and was not distinct from, making policy determinations. Id. at 1184.

Unlike the policy in *Jackson v. City of Chicago,* 645 F.Supp. 926, 928 (N.D.Ill.1986), where the police department did not provide for

Hayes v. City of Des Plaines    182 F.R.D. 546 (N.D. Ill. 1998)

the prevention of detainee suicides in lock-up cells, the City did have a policy toward detainees with mental health problems. Pursuant to the Des Plaines Police Lock-Up Facilities General Order (OPS-240), detainees with mental disorders should not be placed in interview rooms unattended and should receive constant supervision. (Reply, Ex. A.) In following the Order, officers are not exercising discretion, rather, they are following a set of prescribed rules as to the detainment of those with mental illnesses. However, the officers do exercise discretion when they determine whether a subject is mentally ill or not.

The trier of fact could find that Officers Lalowski and Halverson exercised discretion in deciding to leave Mr. Hayes in the interview room with a pay phone instead of placing him in a lock-up. However, the question then arises as to whether these acts of discretion were also policy decisions, and whether each Officer was in a position to either exercise discretion or make policy. Defendants basically admitted that the individual Officers do not make policy determinations when they denied that Police Chief Sturlini creates " policies and practices" for the department. (Answer ¶ 6.) Surely, if the Police Chief does not make policy for the department, it stands to reason that the officers below him are not policy makers, either.

The individual Officers do not appear to have a basis for immunity under 2-201, because, as now required by *Harinek,* they were not both determining policy *and* exercising discretion in their individual actions toward Mr. Hayes. Therefore, this Court strikes the Defendants' sixth affirmative defense.

**5. The Tenth Affirmative Defense**

Finally, this Court will not strike Defendants' tenth affirmative defense, which also goes to Counts II through V of the Complaint. Defendants assert that, pursuant to 745 ILL. COMP. STAT.. 10/4-103 (West 1983)(" 4-103" ),

they are immune from liability for injuries related to the supervision of inmates. Under the statute, " [n]either a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility...." and if one is provided, for failing to provide adequate supervision or facilities. *Id.* The provision further states that there is no requirement for officials to periodically inspect prisoners. *Id.*

Courts must never " ' depart from [the] plain language' " of a statute by interpreting it in a way " ' which conflict[s] with the clearly expressed legislative intent.' " *Jefferson v. Sheahan,* 279 Ill.App.3d 74, 215 Ill.Dec. 815, 664 N.E.2d 212, 214 (Ill.App.1996)(quoting *Certain Taxpayers v. Sheahen,* 45 Ill.2d 75, 256 N.E.2d 758, 764 (Ill.1970)). In *Jefferson,* the court held that 4-103 did not provide an exception for willful and wanton conduct. 215 Ill.Dec. 815, 664 N.E.2d at 214. The court reasoned that the legislature would have included an exception for willful and wanton conduct if it had intended such behavior to exclude public entities and officials from immunity. 215 Ill.Dec. 815, 664 N.E.2d at 214-15. The court also reasoned that the legislature intended to shield the Sheriff's office from the enormous number of complaints it would undoubtedly receive, were it not for the absolute immunity protection granted by 4-103. *Id.* at 215-16.

Ms. Hayes contends that an interview room is not a " jail, detention, or correctional" facility, and that therefore, Defendants are not protected by 4-103. Even if the Court, *arguendo,* accepted her argument, Defendants could still claim immunity under 4-103, because, reading the plain language of the statute, the first part of the provision clearly immunizes a public entity or official for not providing a detention facility at all.

The General Order for the Des Plaines Police Lock-Up Facilities provides information on the supervision of lock-up facilities and instructions for controlling both the facilities and

its prisoners. (Reply, Ex. A.) The section in the Order entitled " Control of Lock-Up Facilities and Prisoners" for " Mental Subject in Custody," 553 instructs personnel *553 about the protocol for leaving mentally ill detainees in interview or security rooms. (Reply, Ex. A.) Although the words " jail," " detention," or " correctional facility" are not present in the particular section, it appears that the City intended to include interview rooms as a type of lock-up facility, given its placement in the instructions for controlling lock-up facilities.

Additionally, the trier of fact may find that Defendants did not have actual knowledge of the imminent risk of Mr. Hayes committing suicide, or that they should have known about the risk, because the risk was obvious. Then, Defendants may use the general provision under 4-103, which does not require inspection of prisoners. They may also use their own regulation, which, presumably, only requires inspection of prisoners with a *known* " mental disorder." Lastly, Defendants may use 4-103 regardless of whether or not an interview room is considered a jail, detention or correctional facility, because 4-103 does not require an entity to provide such facilities, anyway. As the *Jefferson* court found, 4-103 has no exception for willful and wanton conduct; therefore, the statute provides complete immunity to public entities and officials who fail to provide a detention facility or fail to periodically inspect its prisoners. Thus, for the aforementioned reasons, this Court will not strike Defendants' tenth affirmative defense.

### *CONCLUSION*

### IT IS THEREFORE ORDERED

that:

Plaintiff's Motion to Strike Defendants' second, third, and sixth affirmative defenses be, and the same hereby is, **GRANTED.**

### IT IS FURTHER ORDERED

that:

Plaintiff's Motion to Strike Defendants' fourth, fifth, and tenth affirmative defenses be, and the same is hereby, **DENIED.**

 casetext