**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| LISA C. ALCORN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 17 C 5859 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lisa Alcorn, as the Independent Administrator of the Estate of Tyler Lumar filed this suit against a set of Defendants, including Sergeant Kevin Geyer and the City of Chicago ("City Defendants"), for claims surrounding the suicide of Tyler Lumar while he was detained by the Chicago Police Department ("CPD"). Before the Court is Plaintiff's motion for summary judgment on Counts I and II of her Third Amended Complaint ("TAC") (Dkt. 345) and the City Defendants' motion for summary judgment on Counts I, II, and IX. (Dkt. 348). For the following reasons, Defendant's motion [348] is granted in full, and Plaintiff's motion [345] is denied in full.

## BACKGROUND

On August 18, 2016, Chicago Police Officers Daniel Warren and Carlos Vega were working patrol and received a call of an assault in progress and a disruptive patient at the Madison Health Clinic on Madison Street. (Dkt. 346 ¶¶ 2–3; Dkt. 368 ¶¶ 2–3; Dkt. 350 ¶ 4; Dkt. 365 ¶ 4). Officers Warren and Vega were dispatched to the clinic at 3800 W. Madison Street where they observed Tyler Lumar inside the building. (Dkt. 346 ¶¶ 4–5; Dkt. 368 ¶¶ 4–5). Officer Warren spoke with Lumar and the medical staff at the clinic. (Dkt. 346 ¶¶ 6–7; Dkt. 368 ¶¶ 6–7). Lumar

1

told Officer Warren he was unhappy with his medical services. (Dkt. 346 ¶ 6; Dkt. 368 ¶ 6). The officers learned Lumar came to the clinic for treatment related to his asthma and became enraged when the doctor refused to provide him with codeine. (Dkt. 350 ¶ 5; Dkt. 365 ¶ 5). The officers learned Lumar allegedly made threats to the clinic staff and knocked over papers. (Dkt. 346 ¶ 8; Dkt. 368 ¶ 8; Dkt. 350 ¶ 5; Dkt. 365 ¶ 5). The doctor at the clinic wanted Lumar to leave the clinic and not return but also did not want to press charges. (Dkt. 346 ¶ 9; Dkt. 368 ¶ 9). Lumar left the clinic after being told by Officer Warren that he was banned from the building. (Dkt. 346 ¶ 10; Dkt. 368 ¶ 10; Dkt. 350 ¶ 6; Dkt. 365 ¶ 6).

After leaving the clinic, Officers Warren and Vega learned through their in-car personal terminal device ("PDT") of an outstanding warrant for Lumar's arrest and attempted to locate him. (Dkt. 346 ¶¶ 11–12; Dkt. 368 ¶¶ 11–12; Dkt. 350 ¶ 8; Dkt. 365 ¶ 8). The officers located Lumar, and Officer Warren placed him under arrest at approximately 3:58 p.m. on August 18, 2016. (Dkt. 346 ¶¶ 13–14; Dkt. 368 ¶¶ 13–14; Dkt. 350 ¶ 9; Dkt. 365 ¶ 9). The arrest warrant was issued on June 7, 2016, by Lee County, IL for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay." (Dkt. 346 ¶¶ 16, 23; Dkt. 368 ¶¶ 16, 23; Dkt. 364 ¶ 5; Dkt. 390 ¶ 5). After the arrest, Lumar arrived at the 11th District police station ("11th District") around 4:26 p.m. (Dkt. 346 ¶¶ 17–18; Dkt. 368 ¶¶ 17–18).

At approximately 4:26 p.m., Officer Vega contacted Corrine Esteban at Chicago Police Department's Law Enforcement Agencies Data System ("LEADS") desk to confirm the validity of the warrant. (Dkt. 350 ¶ 10; Dkt. 365 ¶ 10). Esteban confirmed the warrant against Lumar was serviceable in the geographical limits of Cook County, printed the LEADS response, memorialized the descriptors demonstrating Officer Vega had the correct person in custody, and issued a clerical HOLD number. (Dkt. 350 ¶ 11; Dkt. 365 ¶ 11). Esteban provided her attestation paper to the

2

Extradition Department at the Chicago Police Department headquarters. (Dkt. 350 ¶ 16; Dkt. 365 ¶ 16). At approximately 4:43 p.m., Detective Joseph Tripoli of Extradition contacted Lee County via computer to request a copy of the warrant and its information. (Dkt. 350 ¶ 17; Dkt. 365 ¶ 17). He noted in his message, "Held at: Chicago Police Department," and that, "Subject will be transported to bond court and then to Cook County jail." (*Id*.). Lee County Correctional Officer Kimberley Stewart verified the warrant was valid for failure to appear contempt non-pay on August 18, 2016, at approximately 4:48 p.m. (Dkt. 346 ¶ 21; Dkt. 368 ¶ 21; Dkt. 350 ¶ 18; Dkt. 365 ¶ 18; Dkt. 364 ¶ 3; Dkt. 390 ¶ 3). Lee County also relayed details regarding the bond that was set on the warrant and indicated Lee County would extradite if Lumar was unable to pay the bond on the warrant. (Dkt. 350 ¶ 18; Dkt. 365 ¶ 18). Officer Stewart testified that if Lumar was allowed to bond out, the 11th District did not need to hold him. (Dkt. 346 ¶ 27; Dkt. 368 ¶ 27; Dkt. 364 ¶ 9; Dkt. 390 ¶ 9).

The amount of the bond on the warrant was $500, 10 percent, which amounted to $50. (Dkt. 346 ¶ 24; Dkt. 368 ¶ 24; Dkt. 364 ¶ 6; Dkt. 390 ¶ 6). When arrested, Lumar had $130 in his possession. (Dkt. 346 ¶ 26; Dkt. 368 ¶ 26; Dkt. 350 ¶ 27; Dkt. 365 ¶ 27; Dkt. 364 ¶ 8; Dkt. 390 ¶ 8). Lumar acknowledged the warrant but claimed he already made payments and had gone to court. (Dkt. 346 ¶ 25; Dkt. 368 ¶ 25; Dkt. 350 ¶ 14; Dkt. 365 ¶ 14; Dkt. 364 ¶ 7; Dkt. 390 ¶ 7). Lumar asked Officer Vega about the process of bonding out. (Dkt. 346 ¶ 19; Dkt. 368 ¶ 19; Dkt. 365 ¶ 1; Dkt. 390 ¶ 1). Officer Warren told Lumar that when a physical copy of the arrest warrant came across, if he was eligible, he might be able to receive a bond. (Dkt. 346 ¶ 20; Dkt. 368 ¶ 20; Dkt. 364 ¶ 2; Dkt. 390 ¶ 2). The charged offense entered on the arrest report, "725 ILCS 5.0/110-3 ISSUANCE OF WARRANT Class Z - ," was selected from a drop-down menu in the CLEAR computer system which generates the arrest reports; this option was the only applicable selection

from the program's drop-down options. (Dkt. 350 ¶¶ 30, 32; Dkt. 365 ¶¶ 30, 32). The charge of "Issuance of Warrant/Class Z" is the drop-down selection for Illinois warrants regardless of whether the warrant was issued from within Cook County or from an out-of-county warrant. (Dkt. 350 ¶ 31; Dkt. 365 ¶ 31). Details for the section "Bond Info" on the arrest report are entered when an arrestee posts bond and details of the posted bond are available. (Dkt. 350 ¶ 33; Dkt. 365 ¶ 33). The section on the arrest report for Lumar indicates, "Bond Information Not Available." (Dkt. 351 Ex. 2).

While at the 11th District police station, Lumar did not appear agitated, and he cooperated throughout the processing procedure. (Dkt. 350 ¶¶ 23, 26; Dkt. 365 ¶¶ 23, 26). During that processing, Lumar was screened for medical and mental health concerns. (Dkt. 350 ¶ 24; Dkt. 365 ¶ 24). He denied having any mental health issues or medical concerns and also denied previously attempting suicide. (*Id*.). He informed the officers that he was taking prescription medication for asthma only. (Dkt. 350 ¶ 24; Dkt. 365 ¶ 24). Officers Warren and Vega compiled Lumar's paperwork, including the arrest and case report, in the processing room over approximately three hours and forty minutes, during which time Lumar remained in the processing room. (Dkt. 350 ¶¶ 28–29; Dkt. 365 ¶¶ 28–29).

Lumar was "received in lockup" at 6:26 p.m. which means he entered the lockup after the lockup keeper completed asking any screening questions. (Dkt. 346 ¶¶ 42–43; Dkt. 368 ¶¶ 42–43). Once an arrestee is received in lockup, he is searched, photographed, fingerprinted, and allowed to use the phone before being placed in a cell. (Dkt. 346 ¶ 44; Dkt. 368 ¶ 44). In Lumar's case, he was searched and then fingerprinted at approximately 6:35 p.m. and photographed at approximately 6:40 p.m. (Dkt. 346 ¶¶ 45–48; Dkt. 368 ¶¶ 45–48; Dkt. 351 Ex. 2). In lockup, his property was inventoried. (Dkt. 350 ¶ 25; Dkt. 365; ¶ 25). Lumar was also allowed to make

telephone calls during processing with his personal cell phone before arriving in lockup. (Dkt. 350 ¶ 21; Dkt. 365 ¶ 21). Once in lockup, he was also allowed to make additional phone calls. (Dkt. 350 ¶ 25; Dkt. 365 ¶ 25).

On August 18, 2016, Sergeant Kevin Geyer, the assigned desk sergeant or station supervisor, dealt with bonding procedures. (Dkt. 346 ¶¶ 33–34; Dkt. 368 ¶¶ 33–34; Dkt. 350 ¶ 43; Dkt. 365 ¶ 43). According to Chicago Police Department Special Order S06-01, active in August 2016, the station supervisor held the responsibility of determining, pursuant to orders, whether an arrestee may bond out, preparing the forms, and collecting the money. (Dkt. 350 ¶ 39; Dkt. 365 ¶ 39). Issuing a bond receipt and taking bond is done pursuant to police department policy. (Dkt. 346 ¶ 37; Dkt. 368 ¶ 37). If police department policy allows someone to bond out, they have the means to do so, and they are eligible to bond out, they will be bonded out. (Dkt. 346 ¶ 38; Dkt. 368 ¶ 38). However, if department policies state an arrestee cannot bond out, the arrestee will be sent to bond court according to that policy. (Dkt. 346 ¶ 39; Dkt. 368 ¶ 39). Relevant here, per department policy, individuals arrested on out-of-county warrants are not eligible for bond regardless of whether a bond has been set. (Dkt. 350 ¶ 41; Dkt. 365 ¶ 41). Sergeant Geyer reviewed the relevant paperwork, approved probable cause for Lumar's arrest, and made the determination that Lumar was to be transported to the Cook County Department of Corrections ("CCDOC") for bond court the following morning pursuant to Chicago Police Department policy. (Dkt. 350 ¶ 43; Dkt. 365 ¶ 43).

Chicago Police Department Bureau of Patrol Directive 15-0174 ("BOP Order"), issued July 29, 2015, mandated that anyone arrested based on a warrant issued in an Illinois county outside of Cook County could not post bond at the police station. (Dkt. 346 ¶ 28; Dkt. 368 ¶ 28; Dkt. 364 ¶ 11; Dkt. 390 ¶ 11). Instead of being bonded out, the nondiscretionary BOP Order

required anyone at the 11th District arrested on a warrant issued outside of Cook County to instead be sent to bond court at the CCDOC at 26th Street and California. (Dkt. 346 ¶¶ 29–30; Dkt. 368 ¶P 29–30; Dkt. 350 ¶¶ 37–38; Dkt. 365 ¶¶ 37–38). All officers were expected to follow the BOP Order or face being disciplined. (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37). As of August 18, 2016, Sergeant Geyer was aware of the BOP Order and its mandate requiring any person arrested on an out-of-county warrant to be sent to bond court at Cook County. (Dkt. 350 ¶ 44; Dkt. 365 ¶ 44).

The BOP Order was created in response to Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Outside of Cook County ("GAO"), entered by Chief Judge of the Circuit Court of Cook County Timothy Evans on June 17, 2015. (Dkt. 350 ¶¶ 35–36; Dkt. 365 ¶¶ 35–36; Dkt. 351 Ex. 12). The GAO states in part: "Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court. . . A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff." (Dkt. 350 ¶ 35; Dkt. 365 ¶ 35; Dkt. 351 Ex. 12).

Approximately five and a half hours after being placed in the lockup, on August 19, 2016, Officers Delgado and Vega arrived the 11th District at approximately 12:08 a.m. to transport Lumar to the hospital because he complained of shortness of breath attributed to his asthma. (Dkt. 350 ¶ 46; Dkt. 365 ¶ 46). Lumar was uncooperative with the transport officers and Emergency Medical Services personnel who arrived to take him to Mount Sinai Hospital. (Dkt. 350 ¶ 47; Dkt. 365 ¶ 47). A Chicago Fire Department ambulance transported Lumar to Mount Sinai Hospital at approximately 12:26 a.m. (Dkt. 346 ¶¶ 49, 51; Dkt. 368 ¶¶ 49, 51). While in the waiting room at the hospital, Lumar told the transporting officers he wanted to go home and see his daughter; but he did not exhibit any signs of suicidal ideation to the officer waiting with him in the waiting room.

6

That officer was a Crisis Intervention Team-trained officer.  (Dkt. 346 ¶ 52; Dkt. 368 ¶ 52; Dkt. 350 ¶¶ 48–49; Dkt. 365 ¶¶ 48–49; Dkt. 364 ¶ 12; Dkt. 390 ¶ 12).  Lumar was seen by doctors at Mount Sinai and the emergency department physician, Dr. Ferguson, did not believe Lumar exhibited any signs of suicidal ideation.  After treatment, he was cleared to be returned to the 11th District station.  (Dkt. 350 ¶¶ 50–51; Dkt. 365 ¶¶ 50–51).  Lumar arrived back at the 11th District on August 19, 2016, at approximately 7:00 a.m.  (Dkt. 346 ¶ 53; Dkt. 368 ¶ 53; Dkt. 350 ¶ 52; Dkt. 365 ¶ 52).

Shortly after arriving back at the 11th District Station, at approximately 8:40 a.m. on August 19, 2016, two transport officers arrived to bring Lumar to the CCDOC to be held before his appearance in bond court scheduled for that same morning.  (Dkt. 350 ¶ 53; Dkt. 365 ¶ 53).  While awaiting bond court, and while detained in a group cell ("bullpen") at CCDOC, Lumar was accused of possessing cocaine, a controlled substance, by Sheriff's Deputy Officer Wlodarski who told Chicago Police Officer Peter Vinson that he recovered the narcotics.  (Dkt. 346 ¶¶ 55–56; Dkt. 368 ¶¶ 55–56; Dkt. 350 ¶ 61; Dkt. 365 ¶ 61).  Due to the new charges, Cook County correctional officers released Lumar back into the custody of the Chicago Police Department in order to be processed for possession of a controlled substance.  (Dkt. 350 ¶ 62; Dkt. 365 ¶ 62).  Lumar insisted that the narcotics were not his and was angry at this turn of events.  (Dkt. 346 ¶ 57; Dkt. 368 ¶ 57; Dkt. 364 ¶ 13; Dkt. 390 ¶ 13).  Officer Vinson escorted Lumar out of the "bullpen" at Cook County Jail and back onto the truck where he was transported back to the 11th District, which took approximately fifteen to twenty minutes.  (Dkt. 346 ¶¶ 58–60; Dkt. 368 ¶¶ 58–60; Dkt. 350 ¶ 63; Dkt. 365 ¶ 63; Dkt. 364 ¶¶ 14–15; Dkt. 390 ¶¶ 14–15).  Lumar was acting upset while he was in the van.  (Dkt. 346 ¶ 62; Dkt. 368 ¶ 62; Dkt. 364 ¶ 17; Dkt. 390 ¶ 17).  Chicago Police Officer Alexander told Lumar he would be returned to Cook County Jail for bond court the following day.

(Dkt. 346 ¶ 61; Dkt. 368 ¶ 61; Dkt. 364 ¶ 16; Dkt. 390 ¶ 16). At this point, Lumar had been in custody approximately seventeen hours.

Upon arriving at the 11th District, Lumar repeatedly said, "this is bullshit" and appeared to be agitated and upset. (Dkt. 346 ¶ 63; Dkt. 368 ¶ 63; Dkt. 350 ¶ 67; Dkt. 365 ¶ 67; Dkt. 364 ¶ 18; Dkt. 390 ¶ 18). Lumar was told to calm down by Detention Aide Jonathan Errum and asked if he wanted a phone call, which he refused. (Dkt. 346 ¶ 64; Dkt. 368 ¶ 64; Dkt. 350 ¶ 69; Dkt. 365 ¶ 69; Dkt. 364 ¶ 19; Dkt. 390 ¶ 19). Detention Aide Errum then secured him in a cell at around 11:00 a.m. (Dkt. 350 ¶ 66; Dkt. 365 ¶ 66). There is no evidence in the record that Lumar ever told Detention Aide Errum that he was suicidal. (Dkt. 350 ¶ 70; Dkt. 365 ¶ 70). During their brief interaction, Detention Aide Errum did not perform a complete visual check or arrestee questionnaire of Lumar but also did not perceive him to be under the influence of drugs or alcohol, exhibiting signs of drug or alcohol withdrawal, despondent, or irrational. (Dkt. 350 ¶ 71; Dkt. 365 ¶ 71). Lumar did not report any serious mental problems, and Detention Aide Errum did not perceive any signs that Lumar had any mental health issues or that he may attempt suicide. (Dkt. 350 ¶ 72; Dkt. 365 ¶ 72).

On August 19, 2016, at approximately 11:15 a.m., while conducting a routine check, Detention Aide Barry found Lumar hanging by his t-shirt in his cell. (Dkt. 346 ¶¶ 65–66; Dkt. 368 ¶¶ 65–66; Dkt. 350 ¶ 73; Dkt. 365 ¶ 73). Lumar had taken off his shirt, tied it to the bars, and tied it around his neck. (Dkt. 346 ¶ 67; Dkt. 368 ¶ 67). Chicago Police Department personnel responded to Detention Aide Barry's calls for assistance, cut down Lumar, and began CPR. (Dkt. 346 ¶ 66; Dkt. 368 ¶ 66; Dkt. 350 ¶¶ 74–75; Dkt. 365 ¶¶ 74–75). Sergeant McCall called 911, and paramedics transported Lumar to Mount Sinai Hospital. (Dkt. 350 ¶ 75; Dkt. 365 ¶ 75). On April 18, 2018, Lumar was pronounced dead; the cause of death was "complications of hanging," and

the manner of death was "suicide." (Dkt. 346 ¶¶ 68–69; Dkt. 368 ¶¶ 68–69; Dkt. 350 ¶ 76; Dkt. 365 ¶ 76; Dkt. 364 ¶ 20; Dkt. 390 ¶ 20).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

### A. Count I: Unlawful Detention in Violation of the Fourth Amendment Against Sgt. Geyer

In Count I of the TAC, Plaintiff alleges Sgt. Geyer unlawfully seized and detained Tyler Lumar in violation of the Fourth Amendment by prohibiting him from posting bond at the police station pursuant to the BOP Order. (Dkt. 279). This Court held Lumar's initial arrest by the CPD and transport to the 11th District was proper under the Fourth Amendment. (Dkt. 116 at 11–12). Despite the lawful initial arrest, "[a]n excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004).

Lumar was detained from his first arrest to his death for approximately nineteen hours. During this time, Lumar was processed for the first charge (the Lee County warrant), brought to

the hospital for care, and brought to the Cook County Jail for bond court. A "delay of 48 hours or less is presumed reasonable, and the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 704 (7th Cir. 2010). The 48-hour burden-shifting approach does not come into play when police "don't plan to present the suspect to a magistrate for a probable-cause hearing." *Id.*; *see also Chortek*, 356 F.3d at 746–47. Nevertheless, detention less than 48 hours may still be unreasonably long especially in light of the reason for delay. *Portis*, 613 F.3d at 705 ("Needless delay, or delay for delay's sake – or, worse, delay deliberately created so that the process becomes the punishment – violates the fourth amendment.") (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 59 (1991)). Alcorn bears the burdens of proof and persuasion for the claim that detention was excessive, and the court "must examine not only the length of a given detention but also the reasons why release was deferred." *Portis*, 613 F.3d at 705. A detention period may be extended for the time reasonably necessary to complete administrative steps incident to the arrest. *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003).

Lumar's detention extended for a total of seventeen hours from his first arrest to his transfer to bond court. Much of this period was overnight during which he was taken to the hospital and treated for his complaint of difficulty breathing. He spent approximately seven of the seventeen hours at the hospital where he was brought after complaining of shortness of breath. The remaining ten hours comprised processing, sleep, phone calls, and transport to bond court in the morning at approximately 8:40 a.m. (Dkt. 350 ¶ 53; Dkt. 365 ¶ 53).

The administrative step of transferring Lumar to bond court was mandatory for Sgt. Geyer as instituted by the BOP Order pursuant to the GAO. (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37). Although Alcorn claims Sgt. Geyer concealed Lumar's eligibility to post bond directly at the 11th District;

10

the record does not reflect this. Rather, Sgt. Geyer did not permit Lumar's bonding out at the police station due to the nondiscretionary BOP Order. Nothing in the record supports the notion that Lumar's offense was eligible for bond at the station and that Sgt. Geyer concealed that from Lumar to force him to attend bond court the next morning. There was no "delay for delay's sake" for example; or deliberate delay.

Plaintiff also argues Sgt. Geyer falsely reported on Lumar's arrest report that the bond information was not available despite the fact that bond was set at $500, 10%, which is $50. Plaintiff bases this claim on the section of the arrest report for "Bond Info" which stated "No Bond Information Available." Yet, Plaintiff fails to dispute that this section of the form is not completed until the accused posts bond and then the details of that bond are placed on the form. (Dkt. 350 ¶ 33; Dkt. 365 ¶ 33). The section correctly stated "No Bond Information Available" because Lumar had not yet appeared on his out-of-county warrant and had not yet posted. (*Id*.). All aspects of administrative processing indicated Lumar was to be sent to bond court solely due to the nondiscretionary BOP Order, including communication from the Extradition Department to Lee County that "Subject will be transported to bond court and then to Cook County jail." (Dkt. 350 ¶ 17; Dkt. 365 ¶ 17).

Because Sgt. Geyer was acting well within his role as a law enforcement officer when he was following the general order, he is also protected by qualified immunity which "shields federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted). To overcome qualified immunity, a plaintiff must establish a violation of a constitutional right, and the court must determine if the right at issue was

"clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: '(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.' If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal citation omitted).

Plaintiff has failed to demonstrate how having to appear in bond court before posting bond violated a "clearly established" constitutional right. A right is "clearly established" if "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) ("This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" (citation omitted)). To demonstrate a right is "clearly established," a plaintiff must point to closely analogous cases or prove the right is "so clear . . . that no one thought it worthwhile to litigate the issue." *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 650 (7th Cir. 2003) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000)).

There does not need to be a case exactly on point for a right to be "clearly established," but "existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (quoting *al-Kidd*, 563 U.S. at 741). The circumstances of the violation must be "clearly established" in a particularized manner, and the inquiry should be "undertaken in light of the specific context of the case, not as a broad general

proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the legal doctrine . . . will apply to the factual situation the officer confronts.'") (citation omitted); *see also White v. Pauly*, 580 U.S. 73, (2017) ("[T]he clearly established law must be 'particularized' to the facts of the case . . . Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.") (quoting *Anderson*, 483 U.S. at 639–40). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

There was no reason for Sgt. Geyer to believe administering procedures pursuant to a BOP Order in place for over a year violated Lumar's "clearly established" constitutional rights. The GAO was a valid, nondiscretionary promulgation of instructions for court procedures of arrests on out-of-county warrants. *Davidson v. Davidson*, 612 N.E.2d 71, 72 (Ill. App. Ct. 1993) ("[T]he judicial branch of government possesses the constitutional authority to promulgate procedural rules to facilitate the discharge of its constitutional duties."). It was not clearly established that Lumar's right to bond out directly from the police station without delay would outweigh the court's right to establish procedures. Sgt. Geyer's role in not permitting Lumar to post bond at the police station was merely clerical in nature and did not violate a clearly established constitutional right.

Expecting Sgt. Geyer to assess and determine whether a legally valid court order violated an arrestee's constitutional rights would "disrupt the balance . . . . between the interest in vindication of citizens' constitutional rights and in public officials' effective performance of their

13

duties." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017) (citation omitted). Officers could be subject to internal discipline if they failed to follow the BOP Order and discarded the requirement that arrestees on out-of-county warrants go before bond court prior to posting bond. (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37). It is unreasonable to find that following the BOP Order violated a clearly established constitutional right. Therefore, this Court finds qualified immunity attaches and protects Sgt. Geyer from any liability for his role in prohibiting Lumar from posting bond at the 11th District station pursuant to the BOP Order. Defendants' motion for summary judgment on Count I is granted, and Plaintiff's motion for summary judgment on Count I is denied.

**B. Count II: *Monell* Claim for Express Policy Constitutional Violation Against the City of Chicago**

Plaintiff brings a claim in Count II of the TAC against the City of Chicago pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Dkt. 279). Specifically, Plaintiff alleges the CPD issued an unauthorized hold for Lumar to restrain him against his will, without due process, in accordance with the express policy of the BOP Order. Plaintiff originally also alleged that the CPD engaged in a widespread practice of arbitrarily and capriciously allowing some individuals arrested on out-of-county warrants to post bond at the police station. In Plaintiff's response and motion for summary judgement, the widespread practice theory of liability is abandoned, leaving only the question of the express policy. (Dkt. 345; Dkt. 366).

To prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct "properly attributable to the municipality itself." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). To do so, Plaintiff must prove he or she suffered a violation of a constitutional right. *Id*. The alleged constitutional violation must have been caused by one of three types of actions: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-

settled that it constituted a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citation omitted). Plaintiff must also show the policy or custom demonstrates municipal fault, which is easily established when a municipality takes action or directs an employee to take action that facially violates a federal right. *First Midwest Bank Guardian of Estate of LaPorta*, 988 F.3d at 986 (citing *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404–05 (1997)). Finally, a *Monell* plaintiff must prove the municipality's action was the "moving force" behind the violation. *First Midwest Bank Guardian of Estate of LaPorta*, 988 F.3d at 987.

There are two varieties of "express policy" claims under *Monell*. The first applies, "as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (citing *Monell*, 436 U.S. at 658). To prevail on this first variation, Plaintiff must identify specific language in the policy that explicitly violates a person's constitutional rights. *Id.* at 381. "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id.* at 379–80 (citing *City of Okl. v. Tuttle*, 471 U.S. 808, 822 (1985)). The second variation of an "express policy" claim applies where the plaintiff "object[s] to omissions in the policy," *i.e.*, that the policy fails to address certain issues. *Id.* at 380. Such claims require "more evidence than a single incident to establish liability." *Id.* The BOP Order is the express policy for which Plaintiff brings a *Monell* claim. Plaintiff's claim falls under the first category as evidence of only one occurrence, Lumar's detention, is presented. Under this claim, Plaintiff is required to point to specific language that explicitly violates an individual's constitutional rights. Plaintiff

points only to the requirement in the BOP Order that an individual on an out-of-county warrant be taken to bond court prior to being eligible to post bond.

The first question is whether Lumar suffered a constitutional injury. *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'"). Absent a showing that the overnight detention of Lumar in anticipation of appearing in bond court was unconstitutional, Plaintiff's *Monell* claim fails. *See Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 134 (2014)). A reasonable detention period may include time necessary to complete the administrative steps incident to an arrest, "delay of 48 hours or less is presumed reasonable, and the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis*, 613 F.3d at 704; *see also McLaughlin*, 500 U.S. at 56 ("[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement."). Examples of unreasonable delay include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility." *McLaughlin*, 500 U.S. at 56.

CPD detained Lumar for approximately seventeen hours prior to his transportation to CCDOC for his appearance in bond court. His continuing detention arose for the purpose of filing new charges on the alleged possession of narcotics and is not directly at issue in the *Monell* claim. The presumption therefore is that the seventeen-hour detention pending a probable cause

determination was reasonable. Still, it is possible that such a length of time could amount to an unreasonable delay depending on the purposes of the delay.

Plaintiff focuses heavily on the discrepancy between state law and the GAO and BOP Order. In relevant part, Illinois state statute provides:

> When bail has been set by a judicial officer for a particular offense or offender any sheriff or other peace officer may take bail in accordance with the provisions of Section 110-7 or 110-8 of this Code and release the offender to appear in accordance with the conditions of the bail bond, the Notice to Appear or the Summons. The officer shall give a receipt to the offender for the bail so taken and within a reasonable time deposit such bail with the clerk of the court having jurisdiction of the offense. A sheriff or other peace officer taking bail in accordance with the provisions of Section 110-7 or 110-8 of this Code shall accept payments made in the form of currency, and may accept other forms of payment as the sheriff shall by rule authorize.

725 ILCS 5/110-9. Illinois law further provides:

> Person arrested in another county.
>
> (a) Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued. He shall be admitted to bail in the amount specified in the warrant or, for offenses other than felonies, in an amount as set by the judge, and such bail shall be conditioned on his appearing in the court issuing the warrant on a certain date. The judge may hold a hearing to determine if the defendant is the same person as named in the warrant.
>
> (b) Notwithstanding the provisions of subsection (a), any person arrested in a county other than the one in which a warrant for his arrest was issued, may waive the right to be taken before a judge in the county where the arrest was made. If a person so arrested waives such right, the arresting agency shall surrender such person to a law enforcement agency of the county that issued the warrant without unnecessary delay. The provisions of Section 109-1 shall then apply to the person so arrested.

725 ILCS 5/109-2. Unlike Illinois state law, the BOP Order and GAO do not permit an arrestee to waive the right to be taken before a judge in the county where the arrest was made. Illinois appellate courts reinforced state law, holding "The public's interest in the smooth operation of the misdemeanor bail system far outweighs the police department's interest in an accused's continued

17

detention once booking procedures are completed, bail has been set by a judge or supreme court rule, and bail money is tendered." *Lampe v. Ascher*, 376 N.E.2d 74, 77 (Ill. App. Ct. 1978).

In contrast, the GAO issued by Chief Judge Evans of the Circuit Court of Cook County on June 17, 2015, stated, "Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court . . . A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff." (Dkt. 350 ¶¶ 35–36; Dkt. 365 ¶¶ 35–36). "Subject to the rules of the Supreme Court, the circuit and Appellate Courts may make rules regulating their dockets, calendars, and business." 735 ILCS 5/1-104(b). In response, the CPD issued the BOP Order on July 29, 2015, stating in relevant part, "In June 2015, Chief Judge Timothy C. Evans issued an order stating that every person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court." (Dkt. 346 ¶ 28; Dkt. 368 ¶ 28). Despite the fact that Plaintiff raises genuine concerns with the legality of the BOP Order and GAO under Illinois state law, the Court's analysis is unchanged. "[I]t is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008).

Typically, determining the reasonableness of the length of a detention is "a question best left open for juries to answer based on the facts presented in each case." *Chortek*, 356 F.3d at 747 (quoting *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988). Yet here, Plaintiff provides no evidence to present a genuine issue of material fact to overcome the presumption that Lumar's detention of less than 48 hours was unreasonable. *Id*. at 748 ("[I]n the absence of any evidence of improper purpose for the delay, we believe the government has provided a sufficient explanation."). Courts are required to "allow a substantial degree of flexibility" in determining

whether a delay is unreasonable. *McLaughlin*, 500 U.S. at 56. Here, Plaintiff cannot point to any evidence in the record that the delay was "motivated by ill will" or "for delay's sake." *Id*. Rather, Plaintiff recognizes the delay was for the purpose of appearing in bond court on an out-of-county warrant, pursuant to a BOP Order issued at the direction of the GAO. ((Dkt. 346 ¶ 28; Dkt. 368 ¶ 28). "While '[e]veryone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail,' . . . or in police custody, neither the individual defendants nor the City is required to adopt procedures to process arrestees in the fastest conceivable way." *Palermo v. City of Chicago*, 980 F.2d 733 (Table), *2 (7th Cir. 1992) (quoting *McLaughlin*, 500 U.S. at 58). The Court does not find a genuine issue of material fact exists such that the question of whether the delay was unreasonable remains for the jury. Therefore, the Court grants City Defendant's motion for summary judgment on Count II (Dkt. 348) and denies Plaintiff's motion for summary judgment on Count II (Dkt. 345).

### C. Count IX: State Law Claim for Wrongful Death Against City of Chicago

Finally, Plaintiff brings a claim against the City of Chicago under the Illinois Wrongful Death Act. (Dkt. 279). Plaintiff must provide evidence of causation to survive summary judgment under the Illinois wrongful death statute, 740 ILCS 180/1, *et seq*. The Illinois wrongful death statute permits a decedent's estate to sue a party whose alleged "wrongful act, neglect or default" caused the individual's death. 740 ILCS 180/1. Plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)). The proximate cause element includes both cause in fact and legal cause. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015).

Legal cause is only established when an injury is "reasonably foreseeable." *Id*. Proximate cause is a question of fact for the jury unless there is no material issue regarding the matter or only one conclusion is clearly evident. *Williams v. Univ. of Chicago Hospitals*, 688 N.E.2d 130, 134 (Ill. 1997).

"In wrongful death cases involving suicide, the general rule is that the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law and breaks the causal link between any alleged negligent conduct and the injury. . . . Nevertheless, our courts have held that, where a plaintiff can show the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1177 (Ill. 2018) (citing *Turcios*, 32 N.E.3d); *see also Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 442 (7th Cir. 2009). The question of reasonable foreseeability is an objective one, and "the question is what a reasonable person would see the likely result to be." *Id*.

Plaintiff points to an exception to this general rule when "as the proximate result of an injury upon his head caused by the negligence of another; the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life. His act in this case is not a voluntary one, and therefore does not break the causal connection between the suicide and the act which caused the injury." *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911 (Ill. App. Ct. 2007) (quoting *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. Ct. 1964)). Plaintiff argues this Court should find Lumar's suicide took place as a direct result of his prolonged detention with no intervening force.

Plaintiff relies on a district court case for the premise that although it is rare that suicide would not break the chain of causation, it is not impossible. *Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020). The court in *Hankins* found, "[T]he

Illinois Supreme Court did not hold that suicide is always unforeseeable as a matter of law. Rather, *Turcios* only set forth a general presumption – albeit a strong one – that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'" *Id*. at 681–82. The court's finding at the motion to dismiss stage in *Hankins* bears no impact on the decision here. In *Hankins*, the court found Plaintiff sufficiently plead foreseeability since, "there does not appear to be any Illinois precedent foreclosing liability based on allegations that a victim explicitly told defendants that (1) their misconduct was triggering symptoms of the victim's mental-health issues; and (2) the victim had a plan to commit suicide. It is of course possible that discovery will eventually reveal facts that undermine the causal link." *Id*. at 683. Even if the holding in *Hankins* were precedential, which it is not, it would not persuade the Court of foreseeability in this case. Combing the record, there are no facts that inherently show conduct that would trigger any potential mental health issues – and remember, Lumar denied any mental health history and even went to the hospital hours prior to his death where a medical professional also did not see anything amiss in his mental status. He sat at the hospital with a trained officer who also did not see conduct that would initiate his training in this area. Lumar never mentioned the thought of taking his own life to anyone; but more importantly, he never exhibited symptoms of someone who might be in the throes of a mental health crisis.

In Lumar's case, there was no basis for Defendants to be aware of a risk of suicide. Plaintiff fails to point to any evidence in the record of an individual who interacted with Lumar suspecting he was at risk of committing suicide; or even to an individual who observed behavior that a reasonable person would deem to be so abnormal that one would be concerned that he might take his own life. Even if any individuals perceived some risk in his behavior, it would not be sufficient to find reasonable foreseeability and therefore liability. *Estate of Novack ex rel. Turbin v. County*

*of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("[S]trange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel.").

Plaintiff argues Lumar's suicide was legally foreseeable by virtue of his position as a detainee. *La Bombarbe v. Phillips Swager Associates Inc.*, 474 N.E.2d 942, 944 (Ill. App. Ct. 1985) ("[I]t is reasonably foreseeable that an inmate may attempt suicide."); *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("It is true that jail inmates are much more likely to commit suicide than free persons are – in fact, nine times as likely."). The fact that the risk exists does not make it such that prison officials will be held liable for wrongful death if a suicide occurs when no additional risk factors are present. Plaintiff cites to Doctor Fabian's report to establish an existing risk that Lumar would have attempted suicide based on his circumstances. However, Plaintiff placed no factual assertions related to the findings by the doctor in the Rule 56.1 Statement. *Raymond v. Ameritech, Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1."). Regardless, Plaintiff's report does not alter the factual circumstances where Defendants had no reason to be aware of a heightened risk of suicide for Lumar while he was in custody. Plaintiff fails to cite to any legal or evidentiary support for a finding of foreseeability, much less one that would overcome the general rule that suicide "is an independent intervening event that the tortfeasor cannot be expected to foresee." *Johnson*, 588 F.3d at 442. Therefore, City Defendants' motion for summary judgment on Count IX is granted. (Dkt. 348).

## CONCLUSION

For the foregoing reasons, City Defendants' motion for summary judgment [348] is granted in full. Plaintiff's motion for summary judgment [345] is denied in full.

Virginia M. Kendall
United States District Judge

Date: September 27, 2022