**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LISA C. ALCORN, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | No. 17 C 5859 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Lisa Alcorn, as the Independent Administrator of the Estate of Tyler Lumar filed

this suit against a set of Defendants, including Sheriff's Officer Thomas Wlodarski, Sheriff

Thomas Dart, and Cook County ("Sheriff's Office Defendants"), for claims surrounding the death

of Tyler Lumar that took place while he was detained by the Chicago Police Department ("CPD").

Before the Court is Plaintiff's motion for summary judgment on Count III of her Third Amended

Complaint ("TAC"). (Dkt. 333). Before the Court is also Sheriff's Office Defendants' motion for

summary judgment on Counts III and X. (Dkt. 329). For the following reasons, Defendant's

motion [329] is granted in full, and Plaintiff's motion [333] is denied in full.

**BACKGROUND**

On the afternoon of August 18, 2016, medical personnel at the Madison Family Health

Center retreated into a locked office and called the police after Tyler Lumar, who had been refused

codeine as treatment for asthma, knocked over papers, balled up his fists, and threatened "to shoot

up the place." (Dkt. 332 ¶¶ 2–3; Dkt. 361 ¶¶ 2–3; Dkt. 332 Ex. 29 at 45–47). By the time Officers

Warren and Vega arrived on the scene, a security guard at the Health Center already calmed Lumar

1

down and escorted him out to the vestibule area. (Dkt. 332 ¶ 4; Dkt. 361 ¶ 4). Medical personnel told Officers Warren and Vega they would not press charges so long as Lumar left the facility and was told to never return. (Dkt. 332 ¶ 5; Dkt. 361 ¶ 5). The officers relayed this to Lumar and he departed the facility. (Dkt. 332 ¶ 6; Dkt. 361 ¶ 6).

Back in the squad car, Officers Warren and Vega entered Lumar's name into their on-board computer and discovered an outstanding warrant from Lee County, IL for his arrest. (Dkt. 332 ¶¶ 7, 12; Dkt. 361 ¶¶ 7, 12). The arrest warrant was issued on June 7, 2016, for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay." (Dkt. 334 ¶¶ 4–5; Dkt. 360 at 2 ¶¶ 4–5). Officers Warren and Vega located Lumar, and Officer Warren placed him under arrest at 3:58 p.m. on the basis of the outstanding warrant. (Dkt. 332 ¶ 9; Dkt. 361 ¶ 9; Dkt. 334 ¶¶ 2–3; Dkt. 360 at 1 ¶¶ 2–3). Officers Warren and Vega brought Lumar to Chicago Police Department District 11 ("District 11"), and Lumar was processed and placed in a holding cell. (Dkt. 332 ¶ 10; Dkt. 361 ¶ 10). During processing in District 11, Lumar was asked a series of questions and searched. (Dkt. 332 ¶¶ 13, 16; Dkt. 361 ¶¶ 13, 16).

Lumar asked Officer Vega about the process of bonding out. (Dkt. 362 ¶ 4; Dkt. 373 ¶ 4; Dkt. 334 ¶ 8; Dkt. 360 ¶ 8). When arrested on August 18, 2016, Lumar had $130 in his possession. (Dkt. 362 ¶ 5; Dkt. 373 ¶ 5; Dkt. 334 ¶ 10; Dkt. 360 at 2 ¶ 10). The amount of bond on Lumar's outstanding warrant was $500, 10%, amounting to $50. (Dkt. 362 ¶ 2; Dkt. 373 ¶ 2; Dkt. 334 ¶¶ 5–6; Dkt. 360 at 2 ¶¶ 5–6). Pursuant to Chicago Police Department policy, derived from an order issued by Chief Judge Timothy Evans of the Circuit Court of Cook County, anyone arrested on an out-of-county warrant was required to appear in bond court and unable to bond themselves out at the police station. (Dkt. 332 ¶ 12; Dkt. 361 ¶ 12).

Shortly after midnight on August 19, 2016, an ambulance transported Lumar from the holding cell at District 11 to Mount Sinai Hospital due to an asthma attack. (Dkt. 332 ¶ 18; Dkt. 361 ¶ 18). Lumar remained at Mount Sinai Hospital until he was returned to District 11 around 7:00 a.m. on August 19, 2016. (Dkt. 332 ¶ 19; Dkt. 361 ¶ 19). CPD personnel did not re-search Lumar before placing him back in lockup upon his return from the hospital. (Dkt. 332 ¶ 22; Dkt. 361 ¶ 22).

Later in the morning of August 19, 2016, Chicago Police Officers Vinson and Alexander brought Lumar from District 11 to Cook County Jail at 26th Street, in a van with over twenty other arrestees from various Chicago Police Districts to begin the process of being brought to bond court. (Dkt. 332 ¶ 25; Dkt. 361 ¶ 25; Dkt. 334 ¶ 12; Dkt. 360 at 3 ¶ 12). Upon arrival at Cook County Jail, personnel, including Cook County Sheriff's Officer Wlodarski, first searched detainees for possession of weapons or other contraband. (Dkt. 332 ¶¶ 26, 30; Dkt. 361 ¶¶ 26, 30). This took place prior to Cook County Jail officially taking detainees into custody. (*Id.*). Detainees did not go through a metal detector or body scanner at Cook County Jail prior to being searched. (Dkt. 332 ¶ 29; Dkt. 361 ¶ 29).

Cook County Jail personnel then placed Lumar with other detainees into "Bullpen 23," a large cell that held multiple pretrial detainees, at Cook County Jail. (Dkt. 334 ¶ 13; Dkt. 360 at 3 ¶ 13). Officer Wlodarski testified he saw Lumar pick something up from the ground with his left hand and drop it behind the bench he was sitting on. (Dkt. 362 ¶¶ 19–20; Dkt. 373 ¶¶ 19–20; Dkt. 334 ¶ 32; Dkt. 360 at 8 ¶ 32; Dkt. 360 at 14 ¶¶ 3–4; Dkt. 374 ¶¶ 3–4). Officer Wlodarski testified he approached Lumar and took hold of his hand, but Lumar had nothing in his hand. (Dkt. 362 ¶ 21; Dkt. 373 ¶ 21; Dkt. 334 ¶ 33; Dkt. 360 at 9 ¶ 33; Dkt. 360 at 16 ¶ 13 Dkt. 374 ¶ 13).

Officer Wlodarski reached down to the ground next to Lumar and recovered a baggie that contained twelve individually wrapped baggies of small white rocks, suspected at the time, and later determined through testing by the Illinois State Police, to be crack cocaine. (Dkt. 332 ¶¶ 33–34; Dkt. 361 ¶¶ 33–34; Dkt. 334 ¶ 34; Dkt. 360 at 9 ¶ 34; Dkt. 360 at 15–17 ¶¶ 5, 15; Dkt. 374 ¶¶ 5, 15). Officer Wlodarski worked at the Sheriff's Office for over ten years at this point and was familiar with how crack cocaine appeared. (Dkt. 332 ¶ 30; Dkt. 361 ¶ 30). Officer Wlodarski testified only "seconds," or "less than half a minute" passed from the time he saw Lumar pick something up to the time he himself picked up the contraband. (Dkt. 362 ¶ 22; Dkt. 373 ¶ 22; Dkt. 334 ¶ 35; Dkt. 360 at 9 ¶ 35). Lumar was separated from the other detainees and handcuffed. He became agitated at this time while Officer Wlodarski completed the necessary paperwork. (Dkt. 332 ¶ 35; Dkt. 361 ¶ 35). Discovery of contraband on a detainee requires the completion of an incident report by the person who discovered or recovered the contraband. (Dkt. 334 ¶ 17; Dkt. 360 at 4 ¶ 17). Officer Wlodarski filled out the report and stated:

> On the above date at 0905hrs, R/D Wlodarski, T #15733 was conducting a search of new prisoners in bullpen 23 when R/D noticed prisoner Lumar, Tyler IR#2025878 reaching behind the bullpen bench. R/D took detainees hand from the back of bench and saw prisoner drop a plastic package. R/D recovered the package which contained 12 individually packaged small white rocks (suspect crack cocaine). Sgt. Latham, C #3170 notified, prisoner and contraband returned to CPD district 11 for charges.

(Dkt. 362 ¶ 8; Dkt. 373 ¶ 8; Dkt. 334 ¶ 18; Dkt. 360 at 4 ¶ 18; Dkt. 332 Ex. 33). Sergeant Latham signed Wlodarski's incident report on August 19, 2016. (Dkt. 334 ¶ 21; Dkt. 360 at 5 ¶ 21; Dkt. 332 Ex. 33). At several points, Lumar was in unsecure locations or left unsupervised during his detainment. (Dkt. 332 ¶ 49; Dkt. 361 ¶ 49).

Due to the confiscation of contraband prior to the court hearing, Cook County Jail personnel rejected Lumar for admission and sent him back to District 11 with Officers Vinson and

4

Alexander along with the confiscated contraband. (Dkt. 332 ¶ 36; Dkt. 361 ¶ 36). Officers Vinson and Alexander departed Cook County Jail with Lumar at approximately 10:33 a.m. and arrived at District 11 with Lumar around 11:00 a.m. on August 19, 2016. (Dkt. 332 ¶ 39; Dkt. 361 ¶ 39). Officer Alexander told Lumar he would be returned to the Cook County Jail for bond court the following day. (Dkt. 362 ¶ 29; Dkt. 373 ¶ 29; Dkt. 334 ¶ 44; Dkt. 360 at 11 ¶ 44). While in the van, Lumar acted upset. (Dkt. 362 ¶ 30; Dkt. 373 ¶ 30; Dkt. 334 ¶ 45; Dkt. 360 at 11 ¶ 45). Upon Lumar's arrival at District 11, Detention Aid Errum testified he was "ranting and raving" and repeatedly saying, "this is bullshit." (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 46; Dkt. 360 at 11 ¶ 46). Detention Aid Errum testified he told Lumar to "calm down" and escorted him to a cell. (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 47; Dkt. 360 at 11 ¶ 47). The officers turned over the contraband to Chicago Police Department Sergeant Gartner for further processing and storage. (Dkt. 332 ¶ 40; Dkt. 361 ¶ 40).

Shortly after being placed in lockup at District 11 on August 19, 2016, Lumar hung himself after taking off his shirt and tying it to the bars and around his neck. (Dkt. 332 ¶ 43; Dkt. 361 ¶ 43; Dkt. 362 ¶ 34; Dkt. 373 ¶ 34; Dkt. 334 ¶ 50; Dkt. 360 at 13 ¶ 50). At approximately 11:15 a.m., Detention Aid Barry found Lumar unconscious in his cell. (Dkt. 362 ¶ 32; Dkt. 373 ¶ 32; Dkt. 334 ¶ 48; Dkt. 360 ¶ 48). Detention Aid Errum used a personal pocketknife to release Lumar and initiated CPR. (Dkt. 332 ¶ 44; Dkt. 361 ¶ 44; Dkt. 362 ¶ 33; Dkt. 373 ¶ 33; Dkt. 334 ¶ 49; Dkt. 360 at 12 ¶ 49). Paramedics transported Lumar to Mount Sinai Hospital where he was found to have no discernible brain activity. (Dkt. 332 ¶ 45; Dkt. 361 ¶ 45). Tyler Lumar ultimately passed away from complications of hanging on April 18, 2018, and the manner of death was suicide. (Dkt. 332 ¶ 45; Dkt. 361 ¶ 45; Dkt. 362 ¶ 35; Dkt. 373 ¶ 35; Dkt. 334 ¶¶ 52–53; Dkt. 360 at 13 ¶¶ 52–53; Dkt. 334 Ex. 16 at 185).

None of the officers or lockup keepers that interacted with Lumar on August 18, 2016, including Officers Warren and Vega, thought he was likely to harm himself or commit suicide. (Dkt. 332 ¶¶ 11, 17; Dkt. 361 ¶¶ 11, 17).  The officer that took Lumar to Mount Sinai Hospital on the evening of August 18, 2016, thought Lumar was angry but not suicidal or likely to harm himself.  (Dkt. 332 ¶ 20; Dkt. 361 ¶ 20).  The doctor who treated Lumar at Mount Sinai noted he was yelling at his police officer escorts as inconsistent with respiratory distress but did not state in the record that she was concerned about his mental health.  (Dkt. 332 ¶ 21; Dkt. 361 ¶ 21).  CPD personnel did not re-screen Lumar for suicide upon his return from the hospital.  (Dkt. 332 ¶ 22; Dkt. 361 ¶ 22).  The doctor who treated Lumar at Mount Sinai did not note any mental health disturbances or suicidal ideation.  (Dkt. 332 ¶ 23; Dkt. 361 ¶ 23).  None of the CPD Officers or Detention Aids who saw or interacted with Lumar on August 19, 2016, including Officers Vinson and Alexander, who brought Lumar from Cook County Jail to District 11, thought he was likely to commit suicide or harm himself.  (Dkt. 332 ¶¶ 41, 46; Dkt. 361 ¶¶ 41, 46).  CPD personnel did not re-screen Lumar for suicide upon his return on August 19, 2016, to District 11.  (Dkt. 332 ¶ 42; Dkt. 361 ¶ 42).

Although Lumar's family knew he had been previously arrested, they were not aware of any current mental health issues in 2016 and did not report any concerns about his mental health to the Chicago Police Department or anyone at the Cook County Sheriff's Office.  (Dkt. 332 ¶ 47; Dkt. 361 ¶ 47).[1]

---

[1] On November 18, 2021, in Reply in support of Plaintiff's motion for summary judgment against Officer Wlodarski, Plaintiff filed both a response to the additional facts in Sheriff's Office Defendants' Response to Plaintiff's motion for summary judgment, as well as a set of fifteen newly offered "facts."  (Dkt. 374; Dkt. 375).  Local Rule 56.1(c) permits a party moving for summary judgment to file two documents in reply: a "reply memorandum of law," and a "response to the LR 56.1(b)(3) statement of additional material facts."  Rule 56.1(c) does not authorize an additional statement of material facts by the moving party in the Reply.  Sheriff's Office Defendants move to strike the additional facts raised in the Reply.  (Dkt. 382).  Defendants' motion [382] is granted, and the content of Plaintiff's additional facts in Dkt. 375 are stricken as waived since such facts were not raised until Plaintiff's Reply brief, leaving the defendants no opportunity to respond.  *Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005).

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

**DISCUSSION**

### A. Count III: Unlawful Arrest and Detention in Violation of the Fourth Amendment Against Officer Wlodarski

Plaintiff brings a claim against Officer Wlodarski under § 1983 for unlawful detention and arrest in violation of the Fourth Amendment. (Dkt. 279). Both parties move for summary judgment on Count III. (Dkt. 333; Dkt. 329). The core issue is whether Officer Wlodarski had probable cause to refuse Tyler Lumar for admittance to Cook County Jail due to alleged possession of narcotics. Relatedly, the Court must determine whether Officer Wlodarski is entitled to qualified immunity, in which case the standard would be "arguable probable cause." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

A plaintiff may prevail on a Fourth Amendment claim for continued wrongful pretrial detention. *Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019) ("[T]he constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure' – both before formal legal process and after – and

is justified only on probable cause."). While Officer Wlodarski did not arrest Lumar a second time and instead only rejected him for admission to Cook County Jail, the question of probable cause remains pertinent as it contributed to his continued detention.

In order to prevail on a false arrest claim pursuant to § 1983, Plaintiff must demonstrate a lack of probable cause. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause."). The existence of probable cause "is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *see also Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). The existence of probable cause "requires something more than a hunch," but "does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity – the officer's belief that the arrestee was committing a crime need only be reasonable." *Id*. Plaintiff bears the burden of demonstrating Officer Wlodarski lacked probable cause. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009); *see also Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("[I]n order to survive summary judgment, [the plaintiff] needed to raise a genuine issue regarding whether the officers had probable cause to arrest him.").

It is illegal under Illinois law to bring contraband into a penal institution or to possess contraband in a penal institution "regardless of the intent with which he or she possesses it." 720 ILCS 5/31A-1.1. In Illinois, possession may be actual or constructive. *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021); *People v. Love*, 937 N.E.2d 752, 756 (Ill. App. Ct. 2010).

8

"Actual possession is proved by testimony which shows [that the] defendant exercised some form of dominion over the unlawful substance, such as trying to conceal it or throwing it away." *People v. Scott*, 505 N.E.2d 42, 44 (Ill. App. Ct. 1987). "'Dominion' includes attempts to conceal or throw away illicit material." *People v. Wilson*, 2019 WL 3779416, *4 (Ill. App. Ct. Aug. 9, 2019).

Constructive possession is "a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). "Constructive possession" occurs when a defendant "has the intent and capability to maintain control and dominion over the contraband. . . . [and] may be proved by showing that the defendant had knowledge of the presence of the contraband and had immediate and exclusive control over the area where the contraband was found." *Love*, 937 N.E.2d at 756. The state must prove beyond a reasonable doubt that a defendant "had knowledge of the presence of the narcotics and that the narcotics were in his immediate and exclusive control" in order to support a finding of possession of a controlled substance. *People v. Scott*, 854 N.E.2d 795, 798 (Ill. App. Ct. 2006).

"Not only can possession be actual or constructive it can also be exclusive or joint." *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015). Exclusive control does not mean only one individual can have constructive possession. *People v. Givens*, 934 N.E.2d 470, 484–85 (Ill. 2010) ("If two or more persons share the intention and power to exercise control, then each has possession."); *see also Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021). Several factors support a finding of knowledge including visibility of the contraband from defendant's location, the amount of time defendant had to observe the contraband, "any gestures or movements made by the defendant that would suggest that the defendant was attempting to retrieve or conceal the contraband," and the size of the contraband at issue. *Love*, 937 N.E.2d at 756.

Officer Wlodarski had probable cause for his belief that Lumar possessed a controlled substance. It is undisputed Officer Wlodarski observed Lumar pick something up from the ground with his left hand and drop it behind the bench he was sitting on. (Dkt. 362 ¶¶ 19–20; Dkt. 373 ¶¶ 19–20; Dkt. 334 ¶ 32; Dkt. 360 at 8 ¶ 32; Dkt. 360 at 14–16 ¶¶ 3–4, 11; Dkt. 374 ¶¶ 3–4, 11). The Plaintiff takes issue with the claim that Lumar "held" the baggie, but even viewing the facts in the light most favorable to Plaintiff, Officer Wlodarski had probable cause to believe Lumar possessed a controlled substance. (Dkt. 360 at 15 ¶ 7; Dkt. 374 ¶ 7). "'[F]leeting' possession is still possession." *United States v. Coles*, 97 Fed. Appx. 665, 667 (7th Cir. 2004).

Plaintiff makes a series of arguments to undermine probable cause, but the arguments are unavailing. First, Plaintiff argues there is no confirmation the baggie picked up by Officer Wlodarski was the same baggie Lumar picked up and dropped. Plaintiff's claim is not based on any evidence in the record. "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Even if the baggies were different, it would not undermine what Officer Wlodarski allegedly saw, and his observations are the basis of probable cause. Officer Wlodarski observed Lumar dropping a baggie of suspected narcotics. *See United States v. Griffin*, 684 F.3d 691, 696 (7th Cir. 2012) ("[P]roximity coupled with evidence of some other factor – including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough to sustain a guilty verdict.") (quoting *United States v. Morris*, 576 F.3d 661, 668 (7th Cir. 2009)). A finding of probable cause "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999).

Plaintiff argues Officer Wlodarski failed to further investigate and seek out exculpatory evidence by viewing video footage of the bullpen, namely that other detainees could have had access to or possession of the narcotics or that Lumar's first contact with the narcotics took place in the bullpen. Even if Officer Wlodarski had further investigated by watching the bullpen video, and even if that investigation led him to believe the narcotics were brought into the bullpen by other detainees and Lumar's first contact with the narcotics was in the bullpen, it would not undermine probable cause. *See Lawrence*, 788 F.3d at 346 (upholding as an accurate statement of law as a jury instruction: "Possession of an object is the ability to control it. Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction and control over it, either directly or through others. Also, an individual may possess an object if other individuals share the ability to exercise control over the object. Possession may be either sole or joint."). The Supreme Court has recognized, "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. . . . Detecting contraband concealed by new detainees . . . is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail." *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 322, 332 (2012). "This could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of the jail. . . . A hardened criminal or gang member can, in just a few minutes, approach the person and coerce him into hiding the fruits of a crime, a weapon, or some other contraband." *Id.* at 336. Regardless of whether Lumar brought the baggie into the bullpen, a reasonable officer could have believed Lumar found the narcotics and took the opportunity to possess the baggie. Whether other detainees also had access to the contraband does not undermine probable cause for Lumar's possession.

11

Exclusive control does not mean only one individual can have constructive possession. *Givens*, 934 N.E.2d at 484–85 ("If two or more persons share the intention and power to exercise control, then each has possession."); *see also United States v. Ford*, 22 F.4th 687, 693 (7th Cir. 2022) ("Constructive possession can be joint or sole.").

Further, once an officer establishes probable cause, he or she is not required to conduct additional investigation. *Holland v. City of Chicago*, 643 F.3d 248, 254–55 (7th Cir. 2011); *see also Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) ("Once a police officer discovers sufficient facts to establish probable cause, she has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence."). An officer may not "close his or her eyes to clearly exculpatory facts," but "the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010). Officer Wlodarski had no reason to further investigate by watching the bullpen video since he observed Lumar's actions himself.

Plaintiff relies heavily upon the argument that Officer Wlodarski fabricated evidence, prohibiting a finding of probable cause. *Lewis*, 914 F.3d at 477. The record belies this assertion. In fact, Officer Wlodarski is not alleged to have fabricated evidence but rather purportedly falsified a report. The discrepancy in the report is Officer Wlodarski's statement that he "took detainees hand from the back of bench and saw prisoner drop a plastic package." (Dkt. 362 ¶ 8; Dkt. 373 ¶ 8; Dkt. 334 ¶ 18; Dkt. 360 at 4 ¶ 18). In fact, Officer Wlodarski testified as follows:

> Q. Is your statement of facts narrative true and accurate?
> A. After reviewing the tape, I believe no.
> Q. What is inaccurate about it?
> A. The order of – well, I should say the sequence of the events, that I noticed the bag or him pick up an object, he – when I grabbed his hand, the bag was still down on the ground, and then I reached down and picked it up.

Q. Okay. So if I'm understanding your testimony, what's incorrect about [the incident report] is – well, what is – actually, in terms of the substance of it, if anything, what's incorrect?

A. Of me I believe seeing the bag, him dropping the bag. It wasn't dropped when he – when I went and reached for his hand. It was already dropped.

Q. So when you went and pulled his left wrist, the contraband was already on ground, correct?

A. Correct.

Q. Okay. Is the portion where you say, "Tyler Lumar, IR number 2025878 reaching behind the bullpen bench," is that accurate?

A. Yes, ma'am.

Q. Is the portion that says, "RD took detainee's hand from the back of the bench," is that accurate?

A. I believe he already had it on his lap.

Q. Already had what on his lap?

A. His hand on his lap.

(Dkt. 332 Ex. 30 pp. 63–64). Plaintiffs claim to have caught Officer Wlodarski in a blatant lie, arguing, "Wlodarski fabricated a set of facts creating an illusion of probable cause." (Dkt. 333 at 11). Plaintiff similarly points to testimony about conversations Officer Wlodarski had with other officials where he "failed to tell anyone that he saw the baggie on the floor before Lumar picked it up and he further failed to tell anyone that Lumar dropped the bag within seconds." (Dkt. 333 at 9).

Officer Wlodarski did not admit to fabrications or a false report but rather that the order of events in the report was inaccurate. Of course, the Court recognizes that fabricated evidence and false statements cannot serve as the basis for probable cause. *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013). Yet, Officer Wlodarski's statements in the report and to other officers did not create probable cause. *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("[T]he police reports do not alter the facts on the ground; Young was sitting next to the gun."); *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("[P]robable cause depends on information known to the police at the time, not on how things turn out.").

Defendants assert that Officer Wlodarski is protected by qualified immunity. Qualified immunity "shields federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted). To overcome qualified immunity, a plaintiff must establish a violation of a constitutional right, and the court must decide if the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is "clearly established" if "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) ("This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can '"reasonably . . . anticipate when their conduct may give rise to liability for damages."'" (citation omitted)).

It is unclear how Officer Wlodarski could have violated a clearly established right by the actions he took in response to observing Lumar's possession of a controlled substance. Plaintiff fails to put forward any analogous cases that support such a conclusion. Plaintiff's only substantive argument is that Officer Wlodarski fabricated evidence which violated clearly established constitutional rights. Yet, as the Court has set forth above, no such fabrication occurred. Qualified immunity does not extend where an officer knowingly or recklessly made false statements and "no accurate information sufficient to constitute probable cause attended the false statements." *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir.

14

1985)). The opposite is true here where the substantive basis for probable cause remains true and the officer testified consistent with that probable cause.

### B. Count X: State Law Wrongful Death Claim against Cook County Sheriff

The final claim at issue against Cook County is brought under the Illinois Wrongful Death Act. (Dkt. 279). Plaintiff must provide evidence of causation to survive summary judgment under the Illinois wrongful death statute, 740 ILCS 180/1, *et seq*. The Illinois wrongful death statute permits a decedent's estate to sue a party whose alleged "wrongful act, neglect or default" caused the individual's death. 740 ILCS 180/1. Plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)). The proximate cause element includes both cause in fact and legal cause. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). Legal cause is only established when an injury is reasonably foreseeable. *Id*. Proximate cause is a question of fact for the jury unless there is no material issue regarding the matter or only one conclusion is clearly evident. *Williams v. Univ. of Chicago Hospitals*, 688 N.E.2d 130, 134 (Ill. 1997).

"In wrongful death cases involving suicide, the general rule is that the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law and breaks the causal link between any alleged negligent conduct and the injury. . . . Nevertheless, our courts have held that, where a plaintiff can show the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1177 (Ill. 2018) (citing *Turcios*, 32 N.E.3d); *see also Johnson v. Wal-Mart Stores,*

15

*Inc.*, 588 F.3d 439, 442 (7th Cir. 2009). The question of reasonable foreseeability is an objective one, and "the question is what a reasonable person would see the likely result to be." *Id.*

Plaintiff points to an exception to this general rule when "as the proximate result of an injury upon his head caused by the negligence of another; the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life. His act in this case is not a voluntary one, and therefore does not break the causal connection between the suicide and the act which caused the injury." *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911 (Ill. App. Ct. 2007) (quoting *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. Ct. 1964)). Plaintiff argues this Court should find Lumar's suicide took place as a direct result of his prolonged detention with no intervening force.

Plaintiff relies on a district court case for the premise that although it is rare that suicide would not break the chain of causation, it is not impossible. *Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020). The court in *Hankins* found, "[T]he Illinois Supreme Court did not hold that suicide is always unforeseeable as a matter of law. Rather, *Turcios* only set forth a general presumption – albeit a strong one – that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'" *Id*. at 681–82. The court's finding at the motion to dismiss stage in *Hankins* bears no impact on the decision here. In *Hankins*, the court found Plaintiff sufficiently plead foreseeability since, "there does not appear to be any Illinois precedent foreclosing liability based on allegations that a victim explicitly told defendants that (1) their misconduct was triggering symptoms of the victim's mental-health issues; and (2) the victim had a plan to commit suicide. It is of course possible that discovery will eventually reveal facts that undermine the causal link." *Id*. at 683. Even if the holding in *Hankins* were precedential, which it is not, it would not persuade the Court of foreseeability in this case.

Lumar did not explicitly tell any Defendants that conduct was triggering, or that he intended to commit suicide.

In Lumar's case, there was no basis for Defendants to be aware of a risk of suicide. None of the individuals that interacted with Lumar believed he was at risk (Dkt. 361 ¶¶ 11, 17, 41, 46). Even if any individuals perceived some risk in his behavior, it would not be sufficient to find reasonable foreseeability and therefore liability. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("[S]trange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel.").

Plaintiff argues Lumar's suicide was legally foreseeable by virtue of his position as a detainee. *La Bombarbe v. Phillips Swager Associates Inc.*, 474 N.E.2d 942, 944 (Ill. App. Ct. 1985) ("[I]t is reasonably foreseeable that an inmate may attempt suicide."); *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("It is true that jail inmates are much more likely to commit suicide than free persons are – in fact, nine times as likely."). The fact that the risk exists does not make it such that prison officials will be held liable for wrongful death if a suicide occurs when no additional risk factors are present. Plaintiff cites to Doctor Fabian's report on the risk of suicide based on Lumar's circumstances. The report submitted by Plaintiff does not alter the factual circumstances where Defendants had no reason to be aware of a heightened risk of suicide for Lumar while he was in custody. Plaintiff fails to cite to any legal or evidentiary support for a finding of foreseeability, much less one that would overcome the general rule that suicide "is an independent intervening event that the tortfeasor cannot be expected to foresee." *Johnson*, 588 F.3d at 442. Therefore, Sheriff's Office Defendants' motion for summary judgment on Count X is granted. (Dkt. 329).

## **CONCLUSION**

For the foregoing reasons, Sheriff's Office Defendants' motion for summary judgment [329] is granted in full. Plaintiff's motion for summary judgment [333] is denied in full.


Virginia M. Kendall
United States District Judge

Date: September 28, 2022